## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-24539-CIV-MORENO

HAPPY TAX FRANCHISING, LLC,
a Florida limited liability company and
MARIO COSTANZ, individually,

      Plaintiffs,

vs.

JAMEY HILL, an individual,
THE J L HILL GROUP, LLC,
a Nevada limited liability company,
TRICIA DRAGO, individually,
BANYAN ACCOUNTING, LLC,
a Hawaii limited liability company,
JOHNNIE JEMEL MAINER-SMITH,
individually, BOTTOM LINE TAX
SERVICE LLC, a Georgia, limited liability
company, SEAN MCDONALD,
individually, CHAD GREENE,
individually, MELISSA SALYER,
individually and RANDALL PEVIN,
individually,

      Defendants.         /

### FIRST AMENDED COMPLAINT

    Plaintiffs, HAPPY TAX FRANCHISING, LLC ("**Happy Tax**") and MARIO COSTANZ (collectively, "**Plaintiffs**"), hereby sue Defendants, JAMEY HILL, THE J L HILL GROUP, LLC, TRICIA DRAGO, BANYAN ACCOUNTING, LLC, JOHNNIE JEMEL MAINER-SMITH, BOTTOM LINE TAX SERVICE LLC, SEAN MCDONALD, CHAD GREENE (collectively, "**Franchisee Defendants**"), MELISSA SALYER and RANDALL PEVIN (collectively, "**Former Directors**").

## NATURE OF THE ACTION

1.      Franchisee Defendants are a group of former and current franchisees and area representatives of Happy Tax, and Former Directors were each former officers of Happy Tax (collectively, "**Defendants**").  Acting individually and in concert to achieve a common goal Defendants employed an unlawful scheme to take over and assume control of Happy Tax. When that did not work Defendants sought to sabotage and destroy Happy Tax and injure Mario Costanz by disseminating false and defamatory statements about Plaintiffs, breaching the parties' franchise documents in multiple respects, misappropriating Happy Tax's confidential and proprietary business information and trade secrets, and using such ill-gotten information to unlawfully compete with Happy Tax.

2.      As alleged in more detail below, Defendants' unlawful actions caused numerous Happy Tax franchisees, employees and board members to not market or sell franchises, resign or terminate their relationships with the company for fear of Defendants' disparaging and illegal conduct, caused Happy Tax to sustain damages in excess of $5,000,000 consisting of at least approximately $1-2 million in lost franchise sales fees in 2019 alone, millions in lost future royalties and note payments associated with new franchisees, and significant harm to Plaintiffs' reputations and ability to generate revenue for the company.

## PARTIES, JURISDICTION AND VENUE

3.      Plaintiff, Happy Tax, is a Florida limited liability company with its principal place of business in Miami Beach, Florida.

4.      Plaintiff, Mario Costanz ("**Costanz**"), is the founder and former Chief Executive Officer of Happy Tax and is *sui juris*.

5.      Defendant, The J L Hill Group, LLC ("**Hill Group**"), is a Nevada limited liability company and a former Happy Tax franchisee.

6.      Defendant, Jamey Hill ("**Hill**"), is the owner/operator of Hill Group and is *sui juris*.

7.        Defendant, Banyan Accounting, LLC ("**Banyan**"), is a Nevada limited liability company and a former Happy Tax franchisee.

8.        Defendant, Tricia Drago ("**Drago**"), is the owner/operator of Banyan and is *sui juris*.

9.        Defendant, Bottom Line Tax Service LLC ("**Bottom Line**"), is a Georgia limited liability company and a former Happy Tax franchisee.

10.       Defendant, Johnnie Jemel Mainer-Smith ("**Mainer-Smith**"), is the owner/operator of Bottom Line and is *sui juris*.

11.       Defendant, Sean McDonald ("**McDonald**"), is a current Happy Tax franchisee and is *sui juris*.

12.       Defendant, Chad Greene ("**Greene**"), is a current Happy Tax franchisee and is *sui juris*.

13.       Defendant, Melissa Salyer ("**Salyer**"), was the former Executive Vice President of Business Development for Happy Tax and is *sui juris.*

14.       Defendant, Randall Pevin ("**Pevin**"), was the former Vice President of Operations for Happy Tax and is *sui juris.*

15.       This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332(a)(a) as the matter in controversy exceeds the value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

16.       This Court has personal jurisdiction over each Defendant because: (i) each Defendant's tortious and improper acts occurring outside the State of Florida were specifically designed to harm and in fact did harm Plaintiffs within the State of Florida where Defendants know Happy Tax is principally located; and (ii) each of the operative Franchise Agreements referenced herein contains a provision whereby the Franchisee Defendants each agreed to submit to the jurisdiction of this Court.

3

17. Venue for this action is proper in this Court because: (i) each of the operative Franchise Agreements contains a venue selection clause requiring this action be brought in this Court; (ii) each Franchise Agreement includes a choice of law provision designating Florida law as the governing law; (iii) each Franchise Agreement involves consideration of more than $250,000.00 or relates to an obligation arising out of a transaction involving in excess of $250,000.00; (iv) this action involves at least one party who is incorporated in the State of Florida; and (iv) Defendants are each subject to the Court's personal jurisdiction such that venue is proper pursuant to 28 U.S.C. § 1391(b)(3).

## GENERAL ALLEGATIONS

### A. **Happy Tax Background.**

18. Since 2015, Happy Tax has operated a nationwide network that provides tax preparation services to consumers through franchisees and certified public accountants.

19. Happy Tax created and owns a unique and highly sought after proprietary business model that differentiates Happy Tax from other tax preparation services with its first to market virtual tax system, use of CPAs and audit assistance that has become a huge draw for potential clientele throughout the income tax preparation industry, and made Happy Tax the fastest growing tax franchise by Entrepreneur Magazine three years in a row ("**Happy Tax Model**").

20. Because the Happy Tax Model is unique, Happy Tax has spent a great deal of time, effort and money developing, protecting and securing the Happy Tax Model, instituting numerous measures to protect and safeguard Happy Tax's confidential and proprietary business information from public disclosure (such as obtaining federal trademark and copyright protection for Happy Tax's intellectual property, requiring Non-Disclosure Agreements and Confidentiality Agreements for Happy Tax employees, and including restrictions in the Franchise Agreements that limit access to and the use of Happy Tax's proprietary business information and protected data, among others).

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

21.     Happy Tax franchisees contract with Happy Tax for the right to use the Happy Tax Model, brand, trademarks and trade dress in selling tax preparation services, and Happy Tax franchisees provide assisted tax preparation services both online and in-person, through professional CPAs.

   **B.     The Franchise Agreements.**

22.     Since commencing operations in 2015, Happy Tax has provided various Defendants with the right to operate a Happy Tax income tax preparation franchise pursuant to individual Franchise Agreements:

   a.     Franchise Agreement between Happy Tax and Hill Group dated September 28, 2015;

   b.     Franchise Agreement between Happy Tax and McDonald dated June 14, 2017;

   c.     Franchise Agreement between Happy Tax and Greene dated August 3, 2017;

   d.     Franchise Agreement between Happy Tax and Banyan dated October 20, 2017;

   e.     Renewed Franchise Agreement between Happy Tax and Hill Group dated August 13, 2018;

   f.     Franchise Agreement between Happy Tax and Bottom Line dated November 21, 2018.

23.     Each Franchise Agreement contains an identical non-disparagement clause that provides: "Non-Disparagement. Franchisee agrees that at no time will it disparage Franchisor or its officers, members, agents, employees, and franchisees."

24.     Each Franchise Agreement provides that the non-disparagement clause survives termination of the agreement and thereby is equally enforceable against any Happy Tax franchisees who has been terminated.

25.     In each Franchise Agreement the franchisee covenants to not directly or indirectly "take any action injurious or prejudicial to the goodwill associated with the [Happy Tax Model]."

5

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET No. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

## C.    <u>Hill and Hill Group</u>.

26.    On September 15, 2015, Happy Tax and Hill Group entered into a Franchise Agreement (**"First Hill Franchise Agreement"**).

27.    The First Hill Franchise Agreement provided "[t]his Agreement, including the exhibits, and all ancillary agreements executed contemporaneously with this Agreement is the entire agreement between the parties…."  First Hill Franchise Agreement at § 17.1 (Integration of Agreement).

28.    To secure Hill Group's performance of its obligations under the First Hill Franchise Agreement and the ancillary agreements incorporated therein, in the First Hill Franchise Agreement Hill personally guaranteed Hill Group's performance of "each and every obligation in this Agreement."  First Hill Franchise Agreement at § 21 (Guarantee).

29.    As part of the First Hill Franchise Agreement, on July 7, 2017 Happy Tax and Hill Group executed an Area Representative Agreement whereby Happy Tax provided Hill Group with a specific geographic territory from which Hill Group could recruit new franchise candidates for the "Happy Tax®" program in exchange for, among other things, a percentage of the franchise royalties and fees received by Happy Tax from the new franchisee procured by Hill Group (**"Hill Area Agreement"**).

30.    In exchange for the right to recruit new franchisees and receive a portion of their royalties and fees paid to Happy Tax, section 4.1 of the Area Agreement required Hill Group to pay Happy Tax an initial fee in the amount of $39,000.00 (**"Initial Hill Area Fee"**).

31.    In conjunction with the Hill Area Agreement, on July 13, 2017 Hill Group executed a Promissory Note in favor of Happy Tax, which Hill personally guaranteed pursuant to Sections 17.1 and 21 of the First Hill Franchise Agreement, and pursuant to Section 29 of the Hill Area Agreement (**"Hill Promissory Note"**) (Area Agreement at Exhibit "F").

32.     The Hill Promissory Note set forth the payment terms for Hill Group's required payment of the Initial Hill Area Fee to Happy Tax, and stated as follows:

> 4.    "Maker represents and warrants to [Happy Tax] that this Note is being made in consideration for granting a Happy Tax franchisee to Maker….
>
>       *            *            *            *
>
> 6.    It shall be deemed a default of this Note if…(iii) Maker shall fail to make any payment due under this Note.  If Maker defaults under this Note, then the Payee may declare the principal amount owing and interest due under this Note at that time to be immediately due and payable.
>
> 7.    All costs, expenses and expenditures including, and without limitation, the costs and attorney fees incurred by the Payee in enforcing this Note as a result of any default by the Maker, will be added to the principal then outstanding and will immediately be paid by the Maker. In the case of the Maker's default and the acceleration of the amount due by the Payee all amounts outstanding under this Note will bear interest at the rate of ten percent (10%) per annum from the date of demand until paid.
>
>       *            *            *            *
>
> 12.   The obligations to make the payments provided for in this Note are absolute and unconditional and not subject to any defense, set-off, counterclaim, rescission, recoupment or adjustment whatsoever.

Hill Promissory Note at §§ 4, 6, 7, 12.

33.     On June 13, 2018, Happy Tax and Hill Group executed a renewed Franchise Agreement wherein Happy Tax agreed to provide Hill Group with the continued right to operate a Happy Tax franchise ("**Second Hill Franchise Agreement**").

34.     The Second Hill Franchise Agreement again provided "[t]his Agreement, including the exhibits, and all ancillary agreements executed contemporaneously with this Agreement is the entire agreement between the parties…."  Second Hill Franchise Agreement at § 17.1.

35.     To secure Hill Group's performance of its obligations under the Second Hill Franchise Agreement and the ancillary agreements incorporated therein (such as the Area Agreement), in the Second Hill Franchise Agreement Hill again personally guaranteed Hill Group's performance of "each and every obligation in this Agreement" ("**Hill Guarantee**").

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

36.     As part of the Second Hill Franchise Agreement, on August 8, 2018 Happy Tax (as "Franchisor"), Hill Group (as "Area Representative") and Hill (as "Guarantor") executed an amendment agreement which Hill executed both Individually and as President for Hill Group ("**Hill Amendment Agreement**").

37.     In the Hill Amendment Agreement, Hill Group and Hill agreed and acknowledged:

- Hill Group entered into the Hill Area Representative Agreement with Happy Tax dated July 7, 2017.

- Hill Group executed the Hill Promissory Note payable to Happy Tax in the amount of $39,000.00.

- Hill personally guaranteed Hill Group's obligations under the Hill Area Agreement and the Hill Promissory Note.

- The Initial Hill Area Fee due to Happy Tax, as secured by the Hill Promissory Note, would be increased from $39,000.00 to $224,000.00 with a new payment schedule in exchange for Hill Group receiving a larger geographic territory from which Hill Group could recruit new franchisees.

- Except as modified in the Hill Amendment Agreement, the terms, provisions and obligations contained in the Hill Area Agreement and the Hill Promissory Note "remain in full force and effect."

**D.     Drago and Banyan.**

38.     In 2017, Hill solicited Drago through LinkedIn and advised her about the Happy Tax Model.  After speaking with Hill and expressing interest, in 2017 Drago was introduced to Salyer, Happy Tax's then Executive Vice President of Business Development.  Drago and Salyer spoke numerous times wherein Drago continuously expressed interest in purchasing a Happy Tax franchise and in ultimately having a bigger role with Happy Tax in the future.

39.     Working with Salyer on behalf of Happy Tax, over the coming months Drago and Banyan performed due diligence and continuously expressed interest to Salyer in becoming a Happy Tax franchisee, and one day possibly becoming part of the Happy Tax management team.

40.     At that time Happy Tax was planning its inaugural convention to be held with the next month or so, and Slayer asked Costanz whether Drago could attend.  Although the convention was only for existing Happy Tax franchisees, which Banyan and Drago were not at that time, Costanz agreed to allow Drago to attend the conference based on the large investment Banyan and Drago were considering making into Happy Tax with a purchase of a franchise and a large exclusive territory in which to operate.

41.     In and around mid-2017, Drago attended the Happy Tax convention along with approximately 100 other Happy Tax franchisees, area representatives, employees and vendors. During the conference, Drago asked a number of questions throughout the varied presentations, including questions to the then Chief Financial Officer, Ted Muftic, about the Happy Tax Model.

42.     At a team building event at Top Golf, Drago and Costanz spoke for a short time wherein Drago expressed how impressed she was with the Happy Tax Model, but also displayed emotional swings being overjoyed and overly excited one minute, and overcome with emotions and bouts of uncontrollable crying the next minute when discussing her deceased parents. Drago's emotional outbursts raised concerns for Costanz regarding Drago's emotional state and made Costanz question her candidacy to become a Happy Tax franchisee.

43.     On the last day of the convention, a few Happy Tax team members invited Drago to lunch prior to heading to the airport.  As they were leaving lunch, Costanz commented to Drago that based on her interest and exuberance in the business he could one day see her becoming the Chief Executive Officer of Happy Tax.  Drago immediately lit up with excitement, and from that point forward Drago set her sights on taking over and seizing control of the company.

44.     Following the conference, Drago and Banyan continued to work with Salyer towards structuring franchise relationship whereby Drago and Banyan would have the exclusive right to operate a Happy Tax franchise in Hawaii and a large territory in San Francisco.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

45.     At that time, Costanz learned that Drago was considering using parts of her inheritance or settlement from the death of her parents to invest in a Happy Tax franchise. After learning this, and based on his own conversation with Drago during the conference wherein Drago was overly emotional, Costanz discussed with Salyer and others whether the company should take such a large investment from such an emotionally charged prospect.

46.     Consequently, in mid to late 2017 Costanz had a one-on-one call with Drago wherein he advised her that he was concerned with her making such a large investment in Happy Tax after being so emotional during the recent conference. Costanz told Drago to think about whether or not she could conduct herself professionally so she could figure out for herself whether she wanted to proceed with purchasing a Happy Tax franchise.

47.     Following those discussion, Drago contacted Costanz and Salyer, stated she felt strongly about the business and her ability to be part of the team and make it successful, and tried to convince Costanz and Salyer to allow her and Banyan to make a large investment in the company by purchasing a Happy Tax franchise and a large franchise territory.

48.     Believing Drago would be able to conduct herself in a professional, positive and productive manner, negotiations re-commenced and on October 20, 2017 Happy Tax entered into a Franchise Agreement with Banyan ("**Banyan Franchise Agreement**").

49.     From the very beginning of her franchise relationship with Happy Tax, Drago, acting individually and on behalf of Banyan, terrorized, harassed, intimidated and pressured the Happy Tax team with a barrage of requests, demands and special treatment requirements that the Happy Tax team did not have the bandwidth or resources to accommodate.

50.     As a result of Drago's incessant and unruly behavior towards Happy Tax team members and others, some Happy Tax team members advised Costanz they intended to quit if Drago continued her disruptive and destructive conduct.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

51.     Thus, in early 2018 Costanz and Ted Muftic met Drago in Las Vegas to discuss Drago's destructive conduct that was negatively impacting Happy Tax team members and the Happy Tax operations as a whole.

52.     Following that meeting, Drago became less combative and curtailed her disruptive and unruly behavior that was detrimental to the success of the company.  Plaintiffs later learned Drago ceased her disruptive conduct because during that time Drago and Banyan had been secretly working on a separate accounting business in direct breach of the Banyan Franchise Agreement.

**E.      Happy Tax Revenues Decrease and Drago Makes a Play to Seize Control.**

53.     In early 2019 numerous unforeseen events occurred which adversely impacted Happy Tax's revenues and stunted its growth.  There was a downturn in the crypto currency market that significantly impacted Happy Tax's revenues.

54.     Moreover, at the beginning of the 2019 tax season, the largest retail tax preparation firm, H&R Block, began unlawfully advertising itself as the only company to offer upfront, transparent tax preparation pricing, which Happy Tax had been offering since opening in 2015.

55.     When H&R Block refused to cease infringing on the Happy Tax Model, Happy Tax sued H&R Block in state and then federal court.  Although the case was ultimately resolved, it cost Happy Tax significant legal fees and opportunity cost, thereby reducing Happy Tax's revenues and putting a significant strain on Costanz, who was then the acting Chief Executive Officer of Happy Tax.

56.     To make matters worse, at the start of H&R Block litigation Costanz suffered an agonizing bicep injury which led to a donor tendon replacement surgery right in the middle of tax season.  The stress from the H&R Block litigation, combined with Costanz's physical injuries, took a significant physical and emotional toll on Costanz that required him to work less than his normal 14-16 hour days he typically worked during tax season.

57.     This forced Costanz to rely in large part on his team of executives to operate and manage Happy Tax while Costanz recovered, specifically Salyer and Pevin.

58.     Smelling blood in the water and sensing an opportunity to seize control of the company, in early 2019 Drago began forming a group of investors to purchase Costanz's ownership interest in Happy Tax so that Drago could take control of the Happy Tax operations.

59.     Consequently, in early 2019 due diligence ensued and Costanz provided Drago with extensive amounts of information and documents concerning Happy Tax's finances and business operations.  Ultimately, Drago and Costanz were unable to reach an agreement.

**F.**     **Defendants Deliberately Destroy Happy Tax and Injure Costanz.**

60.     Angered she was unable to purchase Costanz's ownership interest in and take control of Happy Tax, from that point forward Drago began recruiting other Happy Tax franchisees to take part in an unlawful scheme to destroy the company and assist Drago with her personal vendetta to injury Costanz.

61.     Beginning in mid-2019, Drago and other Franchisee Defendants whom Drago recruited to take part in her scheme began a destructive campaign of defamation and commercial disparagement against Plaintiffs.

62.     On numerous occasions, Salyer and Pevin, among other Happy Tax team members, informed Costanz that Drago and various other Happy Tax franchisees that Drago had recruited were making and publishing false, defamatory and injurious statements regarding Happy Tax and Costanz, falsely telling Happy Tax team members and potential investors that there was criminal activity at the company, that Costanz was a fraud and was dishonest, that Happy Tax's financials and franchise disclosures were fraudulent, and that a big class action type lawsuit was coming against the company and its team members.   No such case was ever filed.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

63.     In fact, Drago even publicly and boldly proclaimed her intent to take over Happy Tax by distributing a picture of herself to other Happy Tax franchisees containing the words "new candidate for Happy Tax CEO" ("**Drago Picture**"), attached as **Exhibit "1."**

64.     This destructive campaign to destroy the company and ruin Costanz's hard earned business reputation as the founder of the Happy Tax Model went on for months, and included, among others, Drago (individually and on behalf of Banyan), Hill (individually and on behalf of Hill Group), Mainer-Smith (individually and on behalf of Bottom Line), McDonald and Greene.

65.     Each of these Defendants actively participated in the unlawful scheme by making and/or publishing and disseminating false and defamatory statements regarding Plaintiffs with knowledge that those statements were false and would subject Plaintiffs to distrust, contempt, disgrace and injury in the tax preparation industry.

66.     These unlawful actions resulted in damages to Plaintiffs in excess of $5,000,000: (i) Happy Tax suffered  losses of at least approximately $1-2 million in franchise sales fees in 2019 alone because Happy Tax could not onboard any new franchisees under these conditions; (ii) Happy Tax lost significant future royalties and note payments associated with new franchisees; (iii) numerous key Happy Tax team members refused to sell any new franchises, and resigned their positions with the company for fear of these Defendants' defamatory and destructive actions; and (iv) numerous existing franchisees terminated their business relationships with Happy Tax due to Defendants' continued interference with the company's business operations.

67.     As a direct result of the unlawful scheme perpetrated by Drago (individually and on behalf of Banyan), Hill (individually and on behalf of Hill Group), Mainer-Smith (individually and on behalf of Bottom Line), McDonald and Greene, Happy Tax went from a fast growing and innovative company to one where Happy Tax team members were constantly intimidated and bombarded by these Defendants, keeping everyone in constant fear of a lawsuit thereby irrevocably poisoning the company.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

68.     Because of the financial damages sustained by Happy Tax caused by the above-named Defendants acting individually and in concert to intentionally destroy Happy Tax and injure Costanz, in 2019 the company ceased growing, became unable to continue paying many of its employees, and Happy Tax was forced to lay off many Happy Tax team members.

69.     Consequently, to further cut operational costs Happy Tax had no choice but to discontinue supporting multiple franchisees that were in breach of their agreements. Happy Tax conducted a review of its business plan and decided that in order to rebuild its business, it would need to ensure all franchisees complied with their respective franchise agreement. Happy Tax proceeded to terminate some franchisees that had failed to comply with their agreements, two of which were Hill Group (operated by Hill) and Bottom Line (operated by Mainer-Smith).

        **G.**    **Salyer and Pevin Misappropriate Happy Tax Confidential Information.**

70.     In late-2019, the continuous defamatory and unlawful attacks on Plaintiffs had taken its toll and irrevocably damaged the working relationship between Costanz and Salyer, and Costanz and Pevin.

71.     As a direct result of the damage caused by these Defendants' unlawful actions, on September 9, 2019 Salyer sent Costanz an email wherein she resigned her position as Executive Vice President of Business Development with Happy Tax.

72.     Following her resignation, Salyer and Happy Tax agreed that Salyer would continue in her position with Happy Tax until September 20, 2019.

73.     However, just prior to her departure from Happy Tax, on September 18, 2019 Salyer, acting alone and in concert with Pevin, misappropriated and diverted confidential business materials belonging to Happy Tax to Salyer's personal email, consisting of protected and non-public customer data and information regarding the Happy Tax Model.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

74.     With Pevin's assistance, Salyer unlawfully misappropriated these confidential materials owned by Happy Tax by sending copies to herself while she was still an employee of Happy Tax.  Salyer then attempting to cover her tracks by deleting many of her Happy Tax emails, which Happy Tax later recovered after Salyer's email access was terminated.

75.     Upon information and belief, Salyer and Pevin misappropriated these materials and are improperly and deliberately using them in connection with a competing business they jointly established while they were both still employed as officers of Happy Tax.

76.     Accordingly, on September 20, 2019 Pevin was terminated as Happy Tax's Vice Present of Operations.

77.     On November 7, 2019 and November 20, 2019, Happy Tax sent separate letters to Salyer and Pevin addressing their misappropriation of Happy Tax's confidential information, and reminded them of their continuing obligation to not access or use any of Happy Tax's protected business information for any reason ("**Demand Letters**"), attached as **Composite Exhibit "2."**

**H.**     **The Defamatory Publications.**

78.     On September 9, 2019—the very same day Salyer submitted her resignation— Happy Tax discovered that, without authorization and in violation of Happy Tax's rights, a person or entity or group of persons acting in concert commenced using the address "Team Happy Tax happytax@protonmail.com" to send emails to Happy Tax franchisees, employees, board members and others.  Happy Tax was alerted to the abusive actions and defamatory emails by multiple parties including Happy Tax board members, employees and current franchisees who received the emails.

79.     On September 27, 2019, Hill and certain other current and former franchisees and area representatives sent a letter to various organizations and agencies raising issues with the financial statements prepared by Happy Tax's outside auditor ("**September 27th Letter**"), attached as  **Exhibit "3."**  The September 27th Letter was signed by:

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

Jamey Hill, MSA And on behalf of Tricia Drago, MSA, Sean McDonald, CPA, Chad Greene, CPA, Johnnie Jemel Mainer Smith and those similarly situated Concerned citizen for protecting the public interest Happy Tax Investors.

80.     On September 28, 2019, an email was published and sent anonymously from the "Team Happy Tax happytax@protonmail.com" email address.   The email subject line was "Mario Costanz and Happy Tax" and contained the following defamatory statements injurious to Happy Tax, Mr. Costanz and Ms. Poirier and abusive, fear-inducing statements to existing Happy Tax employees injurious to Happy Tax's business:

      a.   "his [Mario Costanz] dishonesty";

      b.   "Mario Costanz is unstable and dishonest.  He is a thief and a bully.";

      c.   'There is not doubt that Mario Costanz will soon be under scrutiny and going to prison.":

      d.   "You have entrusted a dishonest person [Mario Costanz] with your money...";

      e.   "Mr. Costanz is a pathological liar."

      f.   "If you are employed by Happy Tax LLC, you should leave before your good-faith efforts are rewarded with turmoil, uncertainty and legal liability.";

      g.   "You [Monica Poirier, Happy Tax's CEO], are also dishonest and it is clear that you are in way over your head.  You are just a tool for Mario."

81.     Upon information and belief, this email was created and published in concert by Defendants, and each Defendant knowingly disseminated it to third parties.  The email commences "We are writing this communication anonymously" and repeats "we" at the close of the email.

82.     On or about October 11, 2019, Happy Tax's Chief Tax Officer, Knox Wimberly sent a letter from Happy Tax's counsel to the owner of the "Team Happy Tax happytax@protonmail.com" email account demanding that the owner of the email account cease and desist from sending such emails.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

83.     On October 14, 2019, another anonymous email believed to have originated from and/or been disseminated by Defendants coming from "Team Happy Tax happytax@protonmail.com," containing no subject line, was sent to Knox Wimberly, Happy Tax's Chief Tax Officer, stating:  "As you know, we have been defrauded by Happy Tax and you are no small part of that.  You may know that we have specific knowledge about you and the company."   The email asserted or implied that Mr. Wimberly was part of a fraud by Happy Tax, which statement was false and defamatory.

84.     Another email later the same day from "Team Happy Tax happytax@protonmail.com" to Mr. Wimberly stated:  "We did not threaten you and you have had many chances to help us. Trying to trick us with that png file and yesware was lazy. And sending it from your Happy Tax email account betrayed your intentions.  The only way you can prove your honesty is to denounce Happy Tax rather than perpetuating the fraud."   The reference to "fraud" in such email was false and defamatory.  The email to Mr. Wimberly also was abusive because the sender or sender group sought to persuade Mr. Wimberly to denounce his employer and injure Happy Tax's business and reputation.

85.     Happy Tax, by their counsel, contacted Proton Technologies Gmbh in Switzerland and reported the transmission of abusive and defamatory emails from "Team Happy Tax happytax@protonmail.com."   Happy Tax also noted that owner of "Team Happy Tax happytax@protonmail.com" was violating Happy Tax's trademark rights by using its trademark in the section of the email address.

86.     Proton Technologies responded and advised that they had suspended the "Team Happy Tax happytax@protonmail.com" email account.

**JEFFREY M. BERMAN, P.A.**
1722 Sheridan Street No. 225 | Hollywood, Florida 33020 | Office: 305.834.4150 | Fax: 305.832.0145

87.     After the "Team Happy Tax happytax@protonmail.com" email account was suspended, upon information and belief, the same person or persons acting in concert continued their campaign of sending further abusive, defamatory emails to an employee and a recent investor in Happy Tax.

88.     On October 23, 2019, additional anonymous defamatory email commenced being sent from a new email address of alltrue@tuta.io.  An anonymous email was sent to Nathan Pratt, Happy Tax's Director of Marketing.  The email, captioned "HT - be careful," published false information and was defamatory.   It stated in part: "You are now in danger of Mario Costanz's fraud affecting you.  We hear that you are a good Christian man. We don't want you to be hurt." The reference to "fraud" in such email was false and defamatory.

89.     The next day, on October 24, 2019, Happy Tax, via its counsel, sent a letter to Tutao GmbH, the operator of the tuta.io email, in Germany, requesting that the email account alltrue@tuta.io be suspended and requesting the turn over information regarding the owner of the account.

90.     On October 29, 2019 another anonymous defamatory email was sent to a new major investor in Happy Tax ("**October 29th Email**").  The October 29th Email used the identical subject line "Mario Costanz and Happy Tax" as the September 29, 2019 sent from the "Team Happy Tax happytax@protonmail.com" email account.  The email indicated it was being sent by a group of franchisees and area representatives for Happy Tax:  "We are contacting you to enlighten you about your recent investment.  We are franchisees and area reps for Happy Tax.  We understand that you are a recent investor and we also know you have the reputation of an honorable man."

91.    The October 29th Email published false statements about Plaintiffs as follows:

a.  "Mario has committed fraud on many levels in his dealings with us. We know that he completely misrepresented the business to you when negotiating your investment. We also know that he is continuing to misrepresent the business to you by lying about revenue and existing partner relationships.  There are very few active partners if any.  Happy Tax has simply destroyed these relationships through incompetence, mistreatment and fraud."

b.  "Mario and Happy Tax are currently under investigation in several states and by several regulatory agencies. We know this to be factual because we are directly involved in providing information to these agencies.  There is a wave of civil, regulatory and criminal investigations underway."

c.  "He [Mario Costanz] appointed a franchisee, Monica Poirier, to CEO and CFO position who is so grossly unqualified that it sent any remaining partners into a fight or flight situation."

d.  "We are at the point where we think mental illness [Mario Costanz] might be involved.

e.  "All of the trustworthy Happy Tax employees have been terminated." This false and defamatory statement asserts and/or implies that existing Happy Tax employees are not trustworthy.

f.  "He [Mario Costanz] is a conman and a fraudster.  We will soon have access to explosive documents that we will send you when we can.  These documents will prove the statements in this email.  Should you want one of us to contact you directly and without anonymity, please let us know.  We are not hiding. We are just well aware that Mario will try to destroy anyone who speaks the truth.  He is already doing it to some of us who invested and worked our

19

backsides off for Happy Tax.  Mario is shameless and we will see to it that he gets what he deserves and we are made whole."

92.     Such email was sent from "Former and current Happy Tax Partners."

93.     The next day, a second anonymous defamatory email was sent from alltrue@tuta.io to the major investor ("**October 30th Email**").  The October 30th Email used the <u>identical</u> caption "Mario Costanz and Happy Tax" as the September 29, 2019 sent from the "Team Happy Tax happytax@protonmail.com" email account.  The October 30th Email asserted false and defamatory statements as follows:

g.   "HT has pretty much abandoned the business you invested in"; and

h.   "the [Happy Tax] franchise model is dead due to Mario's incompetence and fraud."

94.     On October 30, 2019, Happy Tax, via its counsel, again reached out to Tutao GmbH, the operator of the tuta.io email, in Germany, requesting the suspension of the alltrue@tuta.io account and requesting turn-over of information about the owner of the account.

95.     Then, on November 7, 2019 Plaintiffs' counsel sent an email to the email account from which certain of the false and defamatory emails originated.    On November 9, 2019, the owner of such email account sent an anonymous, responding email to Plaintiffs' counsel ("**November 9th Email**").   In pertinent part, the anonymous owner of the account stated:

"You haven't filed anything against us. You have filed lawsuits against the wrong people. But who cares right?"

96.     The publisher of the anonymous false and defamatory emails and owner of the email accounts from which such statement originated is aware of this suit, and the sender of the above email continues to claim that the anonymous emails are from a group of people – "us."

97.     On November 13, 2019, Plaintiffs' counsel sent a letter to the alltrue@tuta.io email account requesting that the owner(s) of the account identify himself or themselves by a date certain. No response was received from the owner of the account.  A tracking device placed in the letter indicated that it was opened in Canada and France.  Pevin, the former Vice President of Operations of Happy Tax who was terminated by Happy Tax on September 20, 2019, resides in France.

98.     The purpose of the sender or group of senders acting in concert in transmitting the above emails is to make false, disparaging, abusive and inflammatory allegations about Happy Tax and Costanz in order to deliberately harm Happy Tax's business and the individual directors and officers of Happy Tax.  In addition, the sender or group of senders acting in concert has sought to instill fear in Happy Tax's existing employees to persuade them to quit their employment and thereby further harm Happy Tax's ability to conduct its business.

99.     Plaintiffs have retained the undersigned law firms and have agreed to pay them a reasonable fee for its legal services.

100.    All conditions precedent to the maintenance of this action have occurred, have been performed by Plaintiffs, or have otherwise been waived or excused by Defendants.

## COUNT I—DEFAMATION *PER SE*
### *(Plaintiffs Against Hill, Drago, Mainer-Smith, McDonald, Greene, Salyer and Pevin)*

Plaintiffs adopt and re-allege the allegations contained in paragraphs 1 through 100 above, as if fully set forth herein.

101.    Hill, Drago, Mainer-Smith, McDonald, Greene, Salyer and Pevin, individually and acting in concert, each knowingly published and disseminated false and defamatory statements regarding Happy Tax and Costanz.

102.    These Defendants' statements were false, defamatory, abusive and  inflammatory because they asserted or implied, among other things, that Happy Tax was and is engaged in fraudulent conduct and that Costanz is a thief and a fraudster.

103.    The statements were extremely injurious and prejudicial in nature and subjected Plaintiffs to humiliation, ridicule and contempt.

104.    The statements were made with malicious intent to harm Happy Tax by, among other things, injuring the reputation of Happy Tax's executives with its new major investor, encouraging Happy Tax employees to quit their employment and encouraging existing Happy Tax franchisees to terminate their business relationships with Happy Tax.

105.    These Defendants either each knew that the statements were false or each of them reckless disregarded that the statements were false despite the awareness of the probable falsity of the statements.

106.    As a direct and proximate result of the widespread dissemination of the false statements, Happy Tax has suffered monetary damages, lost profits, reputational harm including injury to its business operation, goodwill, and in Costanz's case, humiliation, mental anguish and suffering, damaged business reputation and loss of his significant investment in Happy Tax.

**WHEREFORE,** Plaintiffs demand judgment against Hill, Drago, Mainer-Smith, McDonald, Greene, Salyer and Pevin, jointly and severally, for compensatory damages, punitive pre-judgment and post-judgment interest, costs, and for such other and further relief as this Court deems just and proper.

## <u>COUNT II—DEFAMATION</u>
### *(Plaintiffs Against Hill, Drago, Mainer-Smith, McDonald, Greene, Salyer and Pevin)*

Plaintiffs adopt and re-allege the allegations contained in paragraphs 1 through 106 above, as if fully set forth herein.

107.    Hill, Drago, Mainer-Smith, McDonald, Greene, Salyer and Pevin, individually and acting in concert, each knowingly published and disseminated false and defamatory statements regarding Happy Tax and Costanz.

108.     These Defendants' statements were false, defamatory, abusive and inflammatory because they asserted or implied, among other things, that Happy Tax was and is engaged in fraudulent conduct and that Costanz is a thief and a fraudster.

109.     The statements were extremely injurious and prejudicial in nature and subjected Plaintiffs to humiliation, ridicule and contempt

110.     The statements were made with malicious intent to harm Happy Tax by, among other things, injuring the reputation of Happy Tax's executives with its new major investor, encouraging Happy Tax employees to quit their employment and encouraging existing Happy Tax franchisees to terminate their business relationships with Happy Tax.

111.     These Defendants either each knew that the statements were false or each of them reckless disregarded that the statements were false despite the awareness of the falsity of the statements.

112.     As a direct and proximate result of the widespread dissemination of the false statements, Happy Tax has suffered monetary damages, lost profits, reputational harm including injury to its business operation, goodwill, and in Costanz's case, humiliation, mental anguish and suffering, damaged business reputation and loss of his significant investment in Happy Tax.

**WHEREFORE,** Plaintiffs demand judgment against Hill, Drago, Mainer-Smith, McDonald, Greene, Salyer and Pevin, jointly and severally, for compensatory damages, punitive pre-judgment and post-judgment interest, costs, and for such other and further relief as this Court deems just and proper.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

## COUNT III—BREACH OF FRANCHISE AGREEMENTS
### (*Happy Tax Against Banyan, Hill Group, Bottom Line, McDonald and Greene*)

Happy Tax adopts and re-alleges the allegations contained in paragraphs 1 through 112 above, as if fully set forth herein.

113.    Based on the content of the false and defamatory emails, and upon information and belief, the sender or group of senders of the emails acting in concert are current and/or former franchisees of Happy Tax.

114.    Banyan, Hill Group, Bottom Line, McDonald and Greene are each a party to a Franchise Agreement with Happy Tax.

115.    Each Franchise Agreement contains a non-disparagement clause that provides: "Non-Disparagement. Franchisee agrees that at no time will it disparage Franchisor or its officers, members, agents, employees, and franchisees."

116.    Each Franchise Agreement also provides that the non-disparagement clause survives termination of the agreement and thereby is equally enforceable against any Happy Tax franchisees who have been terminated.

117.    In each Franchise Agreement the franchisee covenants to not directly or indirectly "take any action injurious or prejudicial to the goodwill associated with the [Happy Tax Model]."

118.    Banyan, Hill Group, Bottom Line, McDonald and Greene each made and/or published and disseminated false and defamatory statements regarding Happy Tax and Costanz.

119.    These statements violate the non-disparagements clauses and the provision barring injurious or prejudicial actions contained in each of the Franchisee Agreements with these Defendants.

120.    Happy Tax has suffered monetary damages, lost profits, reputational harm including injury to their business operation, goodwill, and in Costanz's case, humiliation, mental anguish suffering, loss of income and loss of the value of his shares of Happy Tax.

**JEFFREY M. BERMAN, P.A.**
1722 Sheridan Street No. 225 | Hollywood, Florida 33020 | Office: 305.834.4150 | Fax: 305.832.0145

**WHEREFORE,** Happy Tax demands judgment against Banyan, Hill Group, Bottom Line, McDonald and Greene, for compensatory damages pre-judgment and post-judgment interest, costs, and for such other and further relief as this Court deems just and proper.

## COUNT IV - TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS CONTRACTS AND RELATIONSHIPS
### *(Happy Tax Against Franchisee Defendants)*

Happy Tax adopts and re-alleges the allegations contained in paragraphs 1 through 120 above, as if fully set forth herein.

121.   Happy Tax enjoys advantageous business relationships with each of its employees, team members, board members and franchisees.

122.   Franchisee Defendants are each aware of those prospective and existing business contracts and relationships and have been aware of those contracts and relationships at all times material hereto.

123.   Franchisee Defendants had no privilege or justification for publishing false and defamatory statements to third parties concerning Happy Tax and Costanz, and made such statements with malice, knowledge of their falsity and/or no reasonable grounds for so believing the truth of them, and with a specific intent to harm Plaintiffs.

124.   Without justification, Franchisee Defendants have intentionally and wrongfully interfered with Happy Tax's relationships with its employees, team members, board members and franchisees by continuously publishing false and defamatory statements regarding Happy Tax, which instilled fear and caused many Happy Tax team members to resign and numerous franchisees to terminate their business relationships with Happy Tax.

125.   As a direct and proximate result of Franchisee Defendants' tortious interference with Happy Tax's advantageous business contracts and relationships, Happy Tax has, and continues to suffer, damages in the State of Florida.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

**WHEREFORE,** Happy Tax demands judgment against Franchisee Defendants, jointly and severally, for compensatory damages, pre-judgment and post-judgment interest, costs, and for such other and further relief as this Court deems just and proper.

**COUNT V—MISAPPROPRIATOIN OF TRADE SECRETS**
**PURSUANT TO FLORIDA'S UNIFORM TRADE SECRET ACT**
*(Happy Tax Against Salyer and Pevin)*

Happy Tax adopts and re-alleges the allegations contained in paragraphs 1 through 125 above, as if fully set forth herein.

126.    Happy Tax possesses secret, confidential and proprietary trade secrets and business information to which Happy Tax derives economic value from not being readily ascertainable by others.

127.    Happy Tax took reasonable efforts to protect the secrecy of such information, instituting numerous measures to protect and safeguard Happy Tax's confidential and proprietary business information from public disclosure (such as obtaining federal trademark and copyright protection for Happy Tax's intellectual property, requiring Non-Disclosure Agreements and Confidentiality Agreements for Happy Tax employees, and including restrictions in the Franchise Agreements that limit access to and the use of Happy Tax's proprietary business information and protected data, among others).

128.    On September 9, 2019, Salyer resigned her position as Executive Vice President of Business Development with Happy Tax.

129.    On September 20, 2019, Pevin was terminated as Happy Tax's Vice Present of Operations.

130.    Upon leaving the company, Salyer and Pevin each misappropriated confidential and proprietary information and trade secrets belonging to Happy Tax consisting of, among other things, confidential client information and a list of over 10,000 of Happy Tax's prospective future franchisees not readily available to the general public.

26
**JEFFREY M. BERMAN, P.A.**
1722 Sheridan Street No. 225 | Hollywood, Florida 33020 | Office: 305.834.4150 | Fax: 305.832.0145

131.    Thus, on November 7, 2019 and November 20, 2019, Happy Tax sent letters to Salyer and Pevin addressing their unlawful misappropriation of Happy Tax's confidential information.

132.    Accordingly, Salyer and Pevin have violated Florida's Uniform Trade Secret Act, Fla. Stat. § 668.001.

133.    As a direct and proximate result of Salyer and Pevin's misappropriation of trade secrets belonging to Happy Tax, Happy Tax has, and continues to suffer, damages in the State of Florida.

**WHEREFORE,** Happy Tax demands judgment against Salyer and Pevin, jointly and severally, for compensatory damages, attorney's fees, pre-judgment and post-judgment interest, costs, and for such other and further relief as this Court deems just and proper.

## COUNT VI—BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
### *(Happy Tax Against Salyer and Pevin)*

Happy Tax adopts and re-alleges the allegations contained in paragraphs 1 through 133 above, as if fully set forth herein.

134.    While acting as officers of Happy Tax, Salyer and Pevin each owed Happy Tax a fiduciary duty not to misappropriate Happy Tax's secret, confidential and proprietary trade secrets and business information to which Happy Tax derives economic value from not being readily ascertainable by others.

135.    While acting as officers of Happy Tax, Salyer and Pevin each owed Happy Tax a duty of loyalty not to unfairly compete with Happy Tax by carrying on a competing business while still employed by Happy Tax.

136.    Salyer and Pevin each breached their fiduciary duty each owed to Happy Tax when they misappropriated Happy Tax's confidential and proprietary business information without authorization.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

137.     Salyer and Pevin each breached their duty of loyalty each owed to Happy Tax when they unfairly competed with Happy Tax by carrying on a competing business while still employed by Happy Tax and using the ill-gotten Happy Tax confidential and proprietary business information they misappropriated before leaving the company.

138.     As a direct and proximate result of Salyer and Pevin's breach of fiduciary duty and breach of loyalty, Happy Tax has, and continues to suffer, damages in the State of Florida.

**WHEREFORE,** Happy Tax demands judgment against Salyer and Pevin, jointly and severally, for compensatory damages, attorney's fees, pre-judgment and post-judgment interest, costs, and for such other and further relief as this Court deems just and proper.

## COUNT VII—AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY
### *(Happy Tax Against Pevin)*

Happy Tax adopts and re-alleges the allegations contained in paragraphs 1 through 138 above, as if fully set forth herein.

139.     While acting as an officer of Happy Tax, Salyer owed Happy Tax a fiduciary duty not to misappropriate Happy Tax's secret, confidential and proprietary trade secrets and business information to which Happy Tax derives economic value from not being readily ascertainable by others.

140.     Salyer breached her fiduciary duty owed to Happy Tax when she misappropriated Happy Tax's confidential and proprietary business information without authorization.

141.     Pevin was aware Salyer was breaching her fiduciary duty by misappropriated these confidential and protected business materials, and provided Salyer with substantial assistance and encouragement of Salyer's wrongdoing.

142.     As a direct and proximate result of Salyer and Pevin's breach of fiduciary duty and breach of loyalty, Happy Tax has, and continues to suffer, damages in the State of Florida.

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

**WHEREFORE,** Happy Tax demands judgment against Salyer and Pevin, jointly and severally, for compensatory damages, attorney's fees, pre-judgment and post-judgment interest, costs, and for such other and further relief as this Court deems just and proper.

<u>COUNT VIII—BREACH OF PROMISSORY NOTE</u>
*(Happy Tax Against Hill Group)*

Happy Tax adopts and re-alleges the allegations contained in paragraphs 1 through 142 above, as if fully set forth herein.

143.    This is an action against Hill Group for breach of the Promissory Note.

144.    As part of the First Franchise Agreement, on July 7, 2017 Happy Tax and Hill Group executed the Area Agreement whereby Plaintiff provided Hill Group with a specific geographic territory from which Hill Group could recruit new franchise candidates for the "Happy Tax®" program in exchange for, among other things, a percentage of the franchise royalties and fees received by Happy Tax from the new franchisee procured by Hill Group.

145.    In exchange for the right to recruit new franchisees and receive a portion of their royalties and fee Happy Tax, section 4.1 of the Area Agreement required Hill Group to pay Plaintiff the Initial Area Representative Fee in the original amount of $39,000.00.

146.    To secure payment of the Initial Area Representative Fee, on July 13, 2017 Hill Group executed the Promissory Note in favor Happy Tax wherein Hill Group expressly acknowledged that the Promissory Note "is being made in consideration for granting a Happy Tax franchisee to [Hill Group]."

147.    On August 8, 2018, Plaintiff and Hill Group executed the Amendment Agreement wherein Hill Group agreed and acknowledged that (i) the Initial Area Representative Fee due to Plaintiff, as secured by the Promissory Note, would be increased from $39,000.00 to $224,000.00 with a new payment schedule in exchange for Hill Group receiving a larger geographic territory from which Hill Group could recruit new franchisees, and (ii) except as modified in the

29

Amendment Agreement, the terms, provisions and obligations contained in the Area Agreement and the Promissory Note "remain in full force and effect."

148.    Happy Tax fully performed its obligations under the applicable agreements.

149.    Despite having already received and operated the franchise pursuant to the First and Second Franchise Agreement, having already received the expanded geographic territory under the Area Agreement, as amended by the Amendment Agreement, and despite being obligated to pay the full amount due under the Promissory Note pursuant to Section 15 of the Area Agreement (Post Termination Obligations), Hill Group has failed to pay Happy Tax the liquidated amount of $224,000.00 due under the Promissory Note, and has advised Happy Tax it does not intend to make any of the future payments due to Happy Tax thereunder.

150.    As a direct and proximate result of Hill Group's breach of the Hill Promissory Note Happy Tax has suffered, and continues to suffer, liquidated damages in the amount of $224,000.00.

**WHEREFORE,** Happy Tax demands judgment against Hill Group for liquidated damages in the amount of $224,000.00, attorney's fees and costs pursuant to Section 25.11 of the Area Agreement and Section 7 of the Promissory Note, pre-judgment and post-judgment interest, and for such other and further relief as this Court deems just and proper.

## COUNT IX---BREACH OF GUARANTY
### *(Happy Tax Against Hill)*

Happy Tax adopts and re-alleges the allegations contained in paragraphs 1 through 150 above, as if fully set forth herein.

151.    In July 2017, Happy Tax and Hill Group entered into the First Franchise Agreement.

152.    The First Franchise Agreement provided "[t]his Agreement, including the exhibits, and all ancillary agreements executed contemporaneously with this Agreement is the entire agreement between the parties…." First Franchise Agreement at § 17.1.

153.    To secure Hill Group's performance of its obligations under the First Franchise Agreement and the ancillary agreements incorporated therein, in the First Franchise Agreement Hill personally guaranteed Hill Group's performance of "each and every obligation in this Agreement." First Franchise Agreement at § 21 (Guarantee).

154.    As part of the First Franchise Agreement, on July 7, 2017  Happy Tax and Hill Group executed the Area Agreement whereby Happy Tax provided Hill Group with a specific geographic territory from which Hill Group could recruit new franchise candidates for the " Happy Tax®" program in exchange for, among other things, a percentage of the franchise royalties and fees received by Happy Tax from the new franchisee procured by Hill Group.

155.    In exchange for the right to recruit new franchisees and receive a portion of their royalties and fees paid to Happy Tax, section 4.1 of the Area Agreement required Hill Group to pay Happy Tax the Initial Area Representative Fee in the original amount of $39,000.00.

156.    To secure payment of the Initial Area Representative Fee, on July 13, 2017 Hill Group executed the Promissory Note in favor of Happy Tax, which Hill personally guaranteed pursuant to Sections 17.1 and 21 of the First Franchise Agreement, and pursuant to Section 29 of the Area Agreement.

157.    On August 8, 2018, Happy Tax and Hill Group executed the Amendment Agreement wherein Hill Group agreed and acknowledged that (i) the Initial Area Representative Fee due to Happy tax, as secured by the Promissory Note, would be increased from $39,000.00 to $224,000.00 with a new payment schedule in exchange for Hill Group receiving a larger geographic territory from which Hill Group could recruit new franchisees, and (ii) except as modified in the Amendment Agreement, the terms, provisions and obligations contained in the Area Agreement and the Promissory Note "remain in full force and effect."

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

158.    Happy Tax has fully performed its obligations under the applicable agreements.

159.    Despite having already received and operated the franchise pursuant to the First and Second Franchise Agreement, having already received the expanded geographic territory under the Area Agreement, as amended by the Amendment Agreement, and despite being obligated to pay the full amount due under the Promissory Note pursuant to Section 15 of the Area Agreement (Post Termination Obligations), Hill Group has failed to pay Happy Tax the liquidated amount of $224,000.00 due under the Promissory Note, Hill personally has failed to pay this liquidated amount to Happy Tax pursuant to the Guaranty, and has advised Happy Tax he does not intend to make any of the future payments to Happy Tax under the Promissory Note or Guaranty.

160.    As a direct and proximate result of Hill Group's breach of the Promissory Note and Hill's breach of the Guaranty, Happy Tax has suffered, and continues to suffer, liquidated damages in the amount of $224,000.00.

**WHEREFORE,** Happy Tax demands judgment against Hill for joint and several liquidated damages in the amount of $224,000.00, attorney's fees and costs pursuant to Section 25.11 of the Area Agreement and Section 7 of the Promissory Note, pre-judgment and post-judgment interest, and for such other and further relief as this Court deems just and proper.

**DATED** this 14th day of February 2020.

Respectfully submitted,

JEFFREY M. BERMAN, P.A.
1722 Sheridan Street No. 225
Hollywood, Florida 33020
Tel   305.834.4150
Fax  305.832.0145

By:_____
JEFFREY M. BERMAN
Fla. Bar No. 14979
jeff@jmbermanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

**I CERTIFY** that on February 14, 2020 the foregoing was served: (i) through CM/ECF to all those authorized to receive such electronic notices; and (ii) by email to Chad Greene, *pro se.*

By: _____
Jeffrey M. Berman

**JEFFREY M. BERMAN, P.A.**
1722 SHERIDAN STREET NO. 225 | HOLLYWOOD, FLORIDA 33020 | OFFICE: 305.834.4150 | FAX: 305.832.0145

# Exhibit "1"



Oh and I also found a new candidate for Happy Tax CEO

iMessage Message received from Tricia Drago 6/15/2019 6:17:49 PM







# Composite Exhibit "2"

# BRENNAN LAW FIRM PLLC
## 1250 BROADWAY, 27TH FLOOR
## NEW YORK, NY 10001

Kerry A. Brennan
kerry.brennan@brennanlawpllc.com
212.729.1980

November 7, 2019

**Via E-mail   (mel_salyer@yahoo.com)**

Ms. Melissa Salyer
2405 Mathew Green Road
Virginia Beach, VA  23456

Re:    **Continuing Fiduciary Obligations As**
**Former Happy Tax Officer and Employee**

Dear Ms. Salyer:

This firm is counsel to Happy Tax Franchising LLC.

I am contacting you regarding (i) cooperating with Happy Tax's investigation of emails containing defamatory statements sent to a list of Happy Tax board members, employees, franchisee and perhaps others; and (ii) your continuing fiduciary obligations as a former officer – Executive Vice President of Business Development – and employee of Happy Tax.

First, subject to your availability, I would like to schedule a telephone call to discuss any information you may have about the dissemination of defamatory and/or disparaging emails about Happy Tax, certain of which originated from an email "Happy Tax Team" at happytax@protonmail.com and alltrue@tuta.io.  Please let me know a convenient time for you.  Specifically, I can be available today after 1:30 pm, or tomorrow, November 8 after 10:00 am or anytime on Monday.  If the weekend is preferable for you, I can arrange to speak with you at a convenient time.

Second, Happy Tax has become aware that, at the time you were departing Happy Tax, you forwarded confidential Happy Tax information to your personal email address.  Certain documents, specifically emails on which you were copied while you were an employee of Happy Tax, containing confidential Happy Tax information about prospective transactions, may have been shared with third parties outside of Happy Tax. Happy Tax also has recovered emails that you deleted.

As a former officer and employee, you have continuing duties of good faith, loyalty and fair dealing to Happy Tax.  As a reminder, you are not authorized to use any Happy Tax confidential or proprietary information to which you had access during the period of your employment for any purpose including any current business activities.  This includes, among other things, the Happy Tax lead list of franchise prospects that you sent to your personal email. To the extent you utilized your personal email for Happy Tax business, any business, documents and/or correspondence which was communicated via your personal email and Happy Tax documents and information that may have been saved to your personal computer and/or other electronic devices remain the property of Happy Tax, and such documents and information may not be used for any purpose or disclosed to any third party for any purpose.

In furtherance of your continuing duties of good faith, loyalty and fair dealing to Happy Tax, you cannot divulge any confidential, proprietary and financial information that came into your possession at Happy Tax, nor can you utilize any information from contracts or contemplated transactions in which you were involved.  Nor may you contact parties involved in such transactions. In addition, to the extent that you were aware of any information subject to the attorney-client privilege belonging to Happy Tax, you are not permitted to discuss such confidential and privileged information with any person.  I can discuss with you your obligations as a former officer and employee and the company's right to protect its confidential and/or attorney client privileged information.

Happy Tax requests that you preserve, and not divulge to any third party, any Happy Tax information that you may have taken with you at the time of your departure from Happy Tax or any Happy Tax information residing on any personal computers, telephones or any other electronic devices including all text messages, email and phone records.  Happy Tax reserves all rights and remedies against you for any harm resulting from the breach of your continuing duties of good faith, loyalty and fair dealing.

I look forward to hearing from you to schedule a time to speak.  Thank you.

Sincerely,

Kerry A. Brennan

Kerry A. Brennan

# BRENNAN LAW FIRM PLLC
## 1250 BROADWAY, 27ᵀᴴ FLOOR
## NEW YORK, NY 10001

Kerry A. Brennan
kerry.brennan@brennanlawpllc.com
212.729.1980

November 21, 2019

**Via E-mail   (randall@pevin.com)**

Mr. Randall Pevin
9 Rue Saine Bernadin
Valbonne
France  06560

Re:     **Continuing Fiduciary Obligations As
Former Happy Tax Officer**

Dear Mr. Pevin:

This firm is counsel to Happy Tax Franchising LLC.

I am contacting you regarding (i) cooperating with Happy Tax's investigation of emails containing false and defamatory statements sent to a list of Happy Tax board members, employees, franchisee and perhaps others; and (ii) your continuing fiduciary duties as a former officer –Vice President of Operations – of Happy Tax.  Happy Tax also has asked me to explore settlement negotiations with you.

First, subject to your availability, I would like to schedule a telephone call to discuss any information you may have about the dissemination of anonymous false and defamatory and/or disparaging emails about Happy Tax, certain of which originated from an email "Happy Tax Team" at happytax@protonmail.com and alltrue@tuta.io.  We have reason to believe that certain of these emails originated in France.  Please let me know a convenient time for you this week.  Specifically, I can be available today at any time.  I also can speak on Friday afternoon, or if the weekend is preferable for you, I can arrange to speak with you at a mutually convenient time.

Second, in addition to your Confidentiality Agreement dated December 4, 2018, as a former officer and employee, you have continuing duties of good faith, loyalty and fair dealing to Happy Tax.  As a reminder, you are not authorized to use any Happy Tax confidential or proprietary information to which you had access during the period of your employment for any purpose including any current business activities.  To the extent you

utilized your personal email for Happy Tax business, any business, documents and/or correspondence which was communicated via your personal email and Happy Tax documents and information that may have been saved to your personal computer and/or other electronic devices remain the property of Happy Tax, and such documents and information may not be used for any purpose or disclosed to any third party for any purpose.

In furtherance of your continuing duties of good faith, loyalty and fair dealing to Happy Tax, you cannot divulge any confidential, proprietary and financial information that came into your possession at Happy Tax, nor can you utilize any information from contracts or contemplated transactions in which you were involved.  Happy Tax requests that you preserve, and not divulge to any third party, any Happy Tax information that you may have taken with you at the time of your departure from Happy Tax or any Happy Tax information residing on any personal computers, telephones or any other electronic devices including all text messages, email and phone records.  Nor may you contact parties involved in such transactions. In addition, to the extent that you were aware of any information subject to the attorney-client privilege belonging to Happy Tax, you are not permitted to discuss such confidential and privileged information with any person.  I can discuss with you your obligations as a former officer and employee and the company's right to protect its confidential and/or attorney client privileged information.

Happy Tax reserves all rights and remedies against you for any harm resulting from the breach of your duties of good faith, loyalty and fair dealing as well as any other claims. Happy Tax hereby requests that you preserve any and all documents (including, but not limited to, emails, records of telephone conversations, telephone messages, texts and/or other electronic communications) relating to Happy Tax, its employees, franchisees and area representatives, during the period of your employment as well as all of your email and communications relating to Happy Tax with any person or entity after the termination of your employment with Happy Tax.

I look forward to hearing from you to schedule a time to speak.  Thank you.

Sincerely,

Kerry A. Brennan

Kerry A. Brennan

# Exhibit "3"

September 27, 2019

MA Board of Accountancy
1000 Washington Street, Suite 710
Boston, MA 02118
accountingboard@mass.gov
(617) 727-1806

Division of Professional Licensure
Office of Investigations
1000 Washington Street, Suite 710
Boston, MA 02118



AICPA
Professional Ethics Division
220 Leigh Farm Road
Durham, NC 27707
professionalethicssubmissions@aicpa.org

Federal Trade Commission
Washington, D.C. 20580

Re: Possible irregularities and misleading audited financial statements, financial statement reader concerns, qualification of CPA performing the audit, questionable reliance on audited financial statements, financial statements potentially not free from material misstatement, failure to provide the audited financial statements and FDD 120 days after fiscal year end to franchisees and investors and failure to provide a quarterly update on a lawsuit against Happy Tax in August 2018

To the MA Board of Accountancy, Division of Professional Licensure, AICPA, and Federal Trade Commission,

My name is Jamey Hill and I am writing you today to file a formal complaint/inquiry into the audited financial statements for the periods ended April 30, 2019, April 30, 2018 and April 30, 2017 that were listed in a Franchise Disclosure Document dated September 13, 2019, August 28, 2018, August 23, 2017 (respectively) and used in multiple 2017 WeFunder SAFE Equity investment rounds for a company called Happy Tax Franchising LLC/Happy Tax Holding Corp.

Other investors and I are deeply concerned that these audited financial statements do not provide the minimum level of reasonable assurance that a reader should generally receive with an audited financial statement. We had our suspicions about the 2018 and 2017 audited financials being conducted improperly, and our suspicions grew when we reviewed the 2019 audited financials.

Some concerns are noted below:

- Is the CPA performing the audit qualified?
- Concerns that the financial statements are misleading

- Numerous material restatements without disclosures
- Material adjustments that weren't previously reported in prior audited financial statements
- Balance sheet off balance (2017)
- Potential missing liabilities
- Potential grossly overstated revenues
- Retained earnings/equity totals not carrying forward properly
- Concern that the audited financial statements are not free from material misstatement
- Lack of financial statement disclosures to give the reader accuracy and an understanding over the financial statements
- Concern that the audit does not provide a reasonable level of assurance as required by auditing standards
- Concerns over the internal control environment and testing
- Concern over the lack of board of director and management inquiries
- Questionable presentation of SAFE equity and discontinued operations
- Discrepancies between footnotes and financial statement values
- Inaccurate FMV and allowance for doubtful accounts notes presentation
- Concerns over inconsistent/irrelevant notes to the financial statements
- Concerns that the financial statements are not substantiated
- And many other concerns not listed here

As you all know, a financial statement audit is intended to provide creditors, investors, and other outside parties with a high level of comfort on the accuracy of the financial statements. A material misstatement is one where the severity or nature of the difference (i.e., misstatement) would cause a user to form an incorrect conclusion about a financial statement. It is because of these two very important reasons that we would like to call your attention to these audited financial statements.

The audited financial statements that I have attached to this letter contain inconsistencies and irregularities that concern us and appear, on the surface, to not be audited as accepted by the AICPA generally accepted auditing standards. As listed above, these financial statements show numerous irregularities, balance sheets off balance, material restatements in audited numbers being reported for the same period, missing footnotes, unexplained restatements, and the footnotes do not give the reader of the financial statements a clear picture of the entity being audited.

Of high concern is these financial statements were used by over 400 investors to make decisions to invest in a Wefunder & SAFE Equity Investor Campaign in 2017, purchase additional territories and franchises through SAFE offerings, as well as to potential prospects to buy franchise and area rep territories for the company in excess of $3m. The Happy Tax Wefunder campaign alone solicited over $800k from 360 investors. These securities were solicited using the financials presented in the 2017 audited financial statements. These financials were completely restated with no explanation in the 2019 audited financial statements.

We respectfully request that all 4 agencies investigate this company and the nature of this audit engagement to ensure these financials were audited in accordance with generally accepted auditing standards, including confirmation that proper inquiries with the entity's board of directors and management were completed (to include the CFO Ted Muftic), that adequate testing was completed and documented, that legal attorneys were interviewed for potential lawsuits that should have been accrued on the balance sheet, that proper

approval was obtained and confirmed and which principal approved and who was fiduciary of the audited financial statements presented to investors.

We would like to see supported evidence that the financial statements were presented to all listed board of directors, and that such board members provided subsequent approval of the audited financial statements, confirmation that the internal control environment was reviewed and tested, and that the management representation letter was signed by the CEO and CFO.

I personally have worked in the auditing industry for quite some time and there appears to be enough irregularities within these financial statements to make them appear questionable and not conducted in accordance with generally accepted auditing standards as claimed in the CPA cover letter. We believe based on our concerns above, that these audited financials warrant a deeper view into ensuring audit procedures were performed to gain a level of assurance that these financials are free from material misstatement, as they were relied upon by investors, franchisees, and area representatives which caused millions of dollars to be invested under false and potentially misleading representations, which may include the intentional concealing of material financial facts by management.

The Certified Public Accountant signing off on these financials for the past 3 years is listed below:

MIKE J HADZIPANAJOTIS
56 White Street Belmont, MA 02478
(508) 648 9502
CPA License #30343

Happy Tax Franchising LLC is a franchisor located in Miami Beach, FL and specializes in selling franchises and territories in the tax preparation industry. They are required by franchise law to submit their annual franchise disclosure document ("FDD") each year and it is within the FDD where we are able to see the audited financial statements of Happy Tax Franchising LLC/Happy Tax Holding Corp. With the exception of the WeFunder campaign, this is our only opportunity to see the health of this company so they are relied upon heavily. As you know, a full financial statement audit increases the assurance level that readers place on the information within the financial statements. However, after review of the past 3 years audited financial statements of this company, it appears that they contain enough errors and questions that raise substantial concerns over the reliability of the financial statements and the qualifications of the CPA conducting the audit.

## Company Overview

Happy Tax Holdings Corp
919 North Market Street, Suite 950
Wilmington, DE 19801

Happy Tax Franchising LLC
350 Lincoln Road
Miami Beach, FL 33139

## List of Officers
Monica Poirier, CEO

Mario Costanz, Chairman and Founder (Former CEO)
Ted Muftic, Chief Financial Officer (Has since resigned)
Melissa Salyer, Vice President (Has since resigned)
Marcus Slater, VP of Marketing/Secretary (Has since resigned)

**Board of Directors Per SEC Published Form C & WeFunder Offering**
Keith Alessi
Marcus Slater
Ted Muftic
Mario Costanz
Melissa Salyer

Per AICPA standards, the audit is the highest level of assurance service that a CPA performs and is intended to provide a user comfort on the accuracy of financial statements. The CPA performs procedures in order to obtain "reasonable assurance" (defined as a high but not absolute level of assurance) about whether the financial statements are free from material misstatement.

In an audit, a CPA is required to obtain an understanding of a business's internal control and assess fraud risk. The CPA is also required to corroborate the amounts and disclosures included in the financial statements by obtaining audit evidence through inquiry, physical inspection, observation, third-party confirmations, examination, analytical procedures, and other procedures.

When performing an audit engagement, the CPA is required to determine whether his or her independence has been impaired. If the CPA's independence has been impaired, the CPA cannot perform the audit engagement.

The CPA will issue a formal report that expresses an opinion on whether the financial statements are presented fairly, in all material aspects, in accordance with the applicable financial reporting framework. In addition, the CPA is required to report any significant or material weaknesses in the organization's system of internal control that are identified during the audit. By becoming aware of internal control weaknesses and discussing these with the CPA, an organization might be able to improve the way it does business.

As the highest level of assurance, an audit typically is appropriate – and often required – when a client is seeking complex or high levels of financing and credit. An audit also is appropriate if the client is seeking outside investors or preparing to sell or merge with another business.

Key Aspects of an Audit

- Intended to provide creditors, investors, and other outside parties with a high level of comfort on the accuracy of financial statements
- CPA issues a formal report that expresses an opinion on whether the financial statements are presented fairly, in all material aspects, in accordance with the applicable financial reporting framework
- Typically appropriate and often required when seeking high levels of financing or outside investors, or when selling a business

- Seeks to obtain reasonable (defined as high, but not absolute) assurance about whether the financial statements as a whole are free of material misstatement
    - A material misstatement is one where the severity or nature of the difference (i.e., misstatement) would cause a user to form an incorrect conclusion about a financial statement
    - Misstatements can arise from either fraud or error
        - The risk of not detecting a material misstatement resulting from fraud is higher than the risk of not detecting one resulting from error, as fraud may involve sophisticated and carefully organized schemes designed to conceal it (e.g. forgery, deliberate failure to record transactions, collusion, intentional misrepresentations being made to the auditor)
        - An audit is not an official investigation into alleged wrongdoing, and an auditor is not given specific legal powers (such as the power of search) that may be necessary for such an investigation
        - The primary responsibility for the prevention and detection of fraud rests with those charged with governance of the entity and management
- When engaged to perform an audit, a CPA is required to:
    - be independent
    - obtain an understanding of the entity's internal control and assess fraud risk
    - perform inquiry and analytical procedures
    - perform verification and substantiation procedures

*Statutes and Regulations*

**252 CMR: Board of Registration in Public Accountancy**
Section 2.10: Code of Ethics and Rules of Professional Conduct
Section 2.13: Non-prohibited and Prohibited Services
Section 2.15: (2) Quality Review Certification and Compliance of Requirements

**AICPA Code of Conduct**
Section 0.300.030 The Public Interest
Section 0.300.070 Scope and Nature of Services

**Generally Accepted Auditing Standards**
AU-150: Generally Accepted Auditing Standards
AU-C 200: Overall Objectives of the Independent Auditor
AU-C 240: Considerations of Fraud in a Financial Statement Audit

**Federal Trade Commission**
Franchise Rule 16 C.F.R. Part 436 – Compliance Guide

The reliance on these "audited financial statements" is being questioned because of the multiple discrepancies discovered. We do not feel that these audited financial statements are a fair and material representation of the entities in question. We do not feel that the audited financials have ever portrayed a fair representation of the entity and are materially misstated.

Thank you for taking the time to look into these financial statement audits. We feel a duty to protect the public interest and feel there is substantial concern over the audited financial statements being presented to make informed investment decisions.

Should you have any questions, you can reach out to me at 702-286-7900 or at jameylhill@yahoo.com.

Respectfully,

Jamey Hill, MSA
And on behalf of Tricia Drago, MSA, Sean McDonald, CPA, Chad Greene, CPA, Johnnie Jemel Mainer-Smith and those similarly situated
Concerned citizen for protecting the public interest
Happy Tax Investors

*Enclosures:*
Recent Timeline of Events Leading Up To Filing This Complaint
A Summary of 2017/2018 Financial Statement Questions (Please refer to Happy Tax Analysis Schedule)
Division of Professional Licensure Application for Complaint
MA Board of Accountancy License Verification – Michael J. Hadzipanajotis
Michael J. Hadzipanajotis LinkedIn Profile
Happy Tax WeFunder List of Board of Directors & Officers
04-30-2017 Happy Tax Audited Financial Statements & Consent
04-30-2018 Happy Tax Audited Financial Statements & Consent
04-30-2019 Happy Tax Audited Financial Statements (Consent not available)
Happy Tax WeFunder Offering Narrative (https://wefunder.com/happy.tax/about)
Happy Tax WeFunder Past Equity Raises
Happy Tax Financial Statement Analysis
September 5, 2019 Partner/Investor List of Questions Sent To The Board of Directors/Management
September 13, 2019 Email From Keith Alessi
September 13, 2019 Email From Tricia Drago/Jamey Hill to Monica Poirier Requesting Audited Financials and FDD
Exhibit L (Receipt) From FDD Listing Where To Send a Complaint for False/Misleading Statements or a Material Omission
Franchise Rule 16 C.F.R. Compliance Guide – "Instructions For Updating Disclosures"
Happy Tax WeFunder Investor Presentation
Happy Tax 2017 Investor Letter (https://gethappytax.com/happy-tax-investor-letter-2017/)
Happy Tax WeFunder SAFE Equity Investment
FDD Paragraph Indicating Happy Tax Acquired Opportunity Tax on April 30, 2017
Screenshot of Investor Deck Showing Happy Tax Owns Majority Stake In TaxMatic