UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:19-cv-24539-FAM

HAPPY TAX FRANCHISING, LLC and MARIO
COSTANZ,

       Plaintiffs,

v.

JAMEY HILL, THE JL HILL GROUP, LLC,
TRICIA DRAGO, BANYAN ACCOUNTING,
LLC,

       Defendants.

_____

JAMEY HILL, THE JL HILL GROUP LLC,
TRICIA DRAGO and BANYAN ACCOUNTING,
LLC,

       Counterclaim and Third-Party Plaintiffs,

v.

MARIO COSTANZ, HAPPY TAX HOLDINGS
CORP., HAPPY TAX FRANCHISING, LLC, TED
MUFTIC, MICHAEL HADZIPANAJOTIS and
MONICA POIRIER,

       Counterclaim and Third-Party Defendants.

_____

**ANSWER AND DEFENSES TO THIRD AMENDED COMPLAINT,
COUNTERCLAIM AND THIRD-PARTY CLAIM**

      Defendants Jamey Hill, JL Hill Group LLC, Tricia Drago and Banyan Accounting, LLC,

by counsel, respond to counts I through V, VII and VIII of the plaintiffs' third amended

complaint [DE 81] as follows:

      1.      The defendants admit that JL Hill Group LLC and Banyan Accounting, LLC were

executed "area representative" agreements and "unit franchise" agreement with Happy Tax

Franchising, LLC, but deny the remaining allegations in third amended complaint paragraph 1.

2. – 3.   The defendants deny the allegations in third amended complaint paragraphs 2 through 3.

4.   The defendants admit that Happy Tax Franchising, LLC was formed as a Florida limited liability company, but deny the remaining allegations in third amended complaint paragraph 4.

5.   The defendants admit that Mario Costanz has identified himself from time to time as Happy Tax Franchising, LLC's "founder" and chief executive officer, but deny the remaining allegations in third amended complaint paragraph 5.

6.   The defendants admit that The JL Hill Group LLC is a Nevada limited liability company which Mario Costanz and Happy Tax Franchising, LLC induced to invest in two unit "franchises" and an area representative "franchise", but deny the remaining allegations in third amended complaint paragraph 6.

7.   The defendants admit that Jamey Hill is a Nevada resident and the sole member of The JL Hill Group, LLC, but deny the remaining allegations in third amended complaint paragraph 7.

8.   The defendants admit that Banyan Accounting, LLC is a Hawaii limited liability company which Mario Costanz and Happy Tax Franchising, LLC induced to invest in a unit "franchise" and an area representative "franchise", but deny the remaining allegations in third amended complaint paragraph 8.

9.   The defendants admit that Tricia Drago is a Hawaii resident and the sole member of Banyan Accounting, LLC, but deny the remaining allegations in third amended complaint paragraph 9.

10.     The Court dismissed the plaintiffs' purported claims as against defendant such that no response from the defendants to the allegations in third amended complaint paragraph 10 is required.

11.     The defendants admit that the plaintiffs and defendants are citizens of different states, but deny the remaining allegations in third amended complaint paragraph 11.

12.     The defendants admit that The JL Hill Group LLC and Banyan Accounting, LLC's area representative "franchise" agreements contain Florida jurisdiction and venue provisions, but deny the remaining allegations in third amended complaint paragraph 12.

13.     The defendants deny the allegations in third amended complaint paragraph 13.

14.     The defendants admit that Mario Costanz has claimed to have "founded" Happy Tax Franchising, LLC in 2014, and that he and Happy Tax Franchising, LLC have widely represented that certified public accounts would prepare (and have prepared) every income tax return for every "Happy Tax" customer.  The defendants deny the remaining allegations in paragraph 14 of the third amended complaint.

15.     The defendants admit that Mario Costanz and Happy Tax Franchising, LLC have widely represented that certified public accounts would prepare (and have prepared) every income tax return for every "Happy Tax" customer, but deny the remaining allegations in third amended complaint paragraph 15.

16.     The defendants deny the allegations in third amended complaint paragraph 16.

17.     The defendants admit that Mario Costanz and Happy Tax Franchising, LLC offered and induced The JL Hill Group LLC and to Banyan Accounting, LLC to enter into area representative "franchise" agreements and unit "franchise" agreements, but deny the remaining allegations in third amended complaint paragraph 17.

18. – 20.      The defendants admit that the respective area representative "franchise" agreements and unit "franchise" agreements contain certain provisions which are the best evidence of the meaning and content of those provisions, but deny the remaining allegations in third amended complaint paragraphs 18 through 20.

21.      The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced The JL Hill Group LLC to enter into a unit "franchise" agreement on or about September 28, 2015, but deny the remaining allegations in third amended complaint paragraph 21.

22. – 23.      The defendants admit that the unit "franchise" agreement contains certain provisions which are the best evidence of the meaning and content of those provision, but deny the remaining allegations in third amended complaint paragraphs 22 through 23.

24. – 27.      The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced The JL Hill Group LLC to enter into an area representative "franchise" agreement on or about July 13, 2017, but deny the remaining allegations in third amended complaint paragraphs 24 through 27.

28. – 30.      The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced The JL Hill Group LLC to enter into a unit "franchise" agreement on or about June 13, 2018, the terms of which are the best evidence of that agreement's meaning, content and legal effect, but deny the remaining allegations in third amended complaint paragraphs 28 through 30.

31. – 32.      The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced The JL Hill Group LLC to enter into an "amendment agreement", the terms of

which are the best evidence of that agreement's meaning, content and legal effect, but deny the remaining allegations in third amended complaint paragraphs 31 through 32.

33. – 34.    The defendants deny the allegations in third amended complaint paragraphs 33 through 34.

35. – 38.    The defendants admit that counsel for Happy Tax Franchising, LLC wrote to Mr. Hill on or about September 17, 2019, the terms of which are the best evidence of that writing's meaning, content and legal effect, but deny the remaining allegations in third amended complaint paragraphs 35 through 38.

39.    The defendants admit that Mr. Hill contacted Ms. Drago through LinkedIn, but deny the remaining allegations in third amended complaint paragraph 39.

40.    The defendants admit that Ms. Drago was introduced to Happy Tax Franchising employee and representative Melissa Salyer in 2017, but deny the remaining allegations in third amended complaint paragraph 40.

41.    The defendants admit that Ms. Drago communicated with Melissa Salyer in 2017, but deny the remaining allegations in third amended complaint paragraph 41.

42. – 44.    The defendants admit that Ms. Drago attended a "convention" in Texas in November 2017, but deny the remaining allegations in third amended complaint paragraphs 42 through 44.

45.    The defendants deny the allegations in third amended complaint paragraph 45.

46.    The defendants admit that, at Mario Costanz's invitation, Ms. Drago lunched with some Happy Tax Franchising, LLC employees and representatives, but deny the remaining allegations in third amended complaint paragraph 46.

47.    The defendants deny the allegations in third amended complaint paragraph 47.

48.     The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Banyan Accounting, LLC to expend significant amounts of money for an area representative franchise in Hawaii, California and Nevada and for "equity" in "Happy Tax", but deny the remaining allegations in third amended complaint paragraph 48.

49.     The defendants deny the allegations in third amended complaint paragraph 49.

50.     The defendants admit that Ms. Drago communicated with Mario Costanz in 2017, but deny the remaining allegations in third amended complaint paragraph 50.

51.     The defendants admit that Ms. Drago communicated with Mario Costanz and Melissa Salyer in 2017, but deny the remaining allegations in third amended complaint paragraph 51.

52.     The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Banyan Accounting, LLC to expend significant amounts of money for an area representative "franchise" in Hawaii and California and for "equity" in "Happy Tax", and to execute a unit "franchise" agreement on or about October 20, 2017.  The defendants deny the remaining allegations in third amended complaint paragraph 52.

53. – 54.     The defendants admit that the terms of the unit "franchise" agreement are the best evidence of its meaning, content and legal effect, but deny the remaining allegations in third amended complaint paragraphs 53 through 54.

55.     The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Banyan Accounting, LLC to execute an area representative "franchise" agreement on or about December 11, 2017, but deny the remaining allegations in third amended complaint paragraph 55.

56. – 58.    The defendants admit that the terms of the area representative "franchise" agreement are the best evidence of its meaning, content and legal effect, but deny the remaining allegations in third amended complaint paragraphs 56 through 58.

59. – 60.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Bayan Accounting, LLC to execute an "amendment agreement" on or about May 31, 2018, the terms of which are the best evidence of its meaning, content and legal effect, but deny the remining allegations in third amended complaint paragraphs 59 through 60.

61. – 62.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Bayan Accounting, LLC to execute an "amendment agreement" on or about January 9, 2019, the terms of which are the best evidence of its meaning, content and legal effect, but deny the remining allegations in third amended complaint paragraphs 61 through 62.

63. – 64.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Bayan Accounting, LLC to execute an "amendment agreement", the terms of which are the best evidence of its meaning, content and legal effect, on or about February 27, 2019, but deny the remining allegations in third amended complaint paragraphs 63 through 64.

65. – 66.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Bayan Accounting, LLC to execute an "amendment agreement" on or about April 2, 2019, the terms of which are the best evidence of its meaning, content and legal effect, but deny the remining allegations in third amended complaint paragraphs 65 through 66.

67. – 71.     The defendants deny the allegations in third amended complaint paragraphs 67 through 71.

72.     The defendants admit that Ms. Drago met with Mario Costanz and Happy Tax Franchising LLC's purported chief financial officer in Las Vegas on May 10, 2018, but deny the remaining allegations in third amended complaint paragraph 72.

73. – 74.     The defendants deny the allegations in third amended complaint paragraphs 73 through 74.

75.     The defendants admit that Mario Costanz sent an e-mail message to Ms. Drago on or about September 16, 2019, but deny the remining allegations in third amended complaint paragraph 75.

76. – 77.     The defendants deny the allegations in third amended complaint paragraphs 76 through 77.

78. – 91.     The Court dismissed all of the plaintiffs' claims against defendant Chad Green such that the defendants need not respond to third amended complaint paragraphs 77 through 91.

92. – 97.     The defendants deny the allegations in third amended complaint paragraphs 92 through 97.

98.     The defendants admit that Randall Pevin asked Ms. Drago to assist Happy Tax Franchising LLC personnel to prepare commission reconciliations, but deny the remaining allegations in paragraph 98.

99. – 102.     The defendants deny the allegations in third amended complaint paragraphs 99 through 102.

103.     The defendants admit that Ms. Drago sent a comedic photograph, in jest, to one

Happy Tax Franchising, LLC representative, but deny the remaining allegations in third amended complaint paragraph 103.

104. – 110.   The defendants deny the allegations in third amended complaint paragraphs 104 through 110.

111.   The defendants admit that Mario Costanz had urged the defendants, among other "Happy Tax Partners", to solicit more investments in Happy Tax Franchising, LLC, but refused to explain how most-recently invested funds were dissipated or provide any accurate information as to Happy Tax Franchising, LLC's financial condition, such that "Happy Tax Partners" wrote to Mario Costanz on or about September 6, 2019 to obtain that information.  The defendants deny the remaining allegations in third amended complaint paragraph 111.

112. – 117.   The defendants deny the allegations in third amended complaint paragraphs 112 through 117.

118.   The defendants admit that Mr. Hill, Ms. Drago and other area representatives and franchisees wrote to the Massachusetts Board of Accounting on or about September 27, 2019 to state their collective concern that Happy Tax Franchising, LLC's purportedly-audited financial statements had not been properly examined or audited, but deny the remaining allegations in third amended complaint paragraph 118 are denied.

119.   The defendants admit that the terms of the September 27, 2019 letter are the best evidence of its meaning, content and legal effect, but deny the remaining allegations in third amended complaint paragraph 119.

120. – 149.   The defendants deny the allegations in third amended complaint paragraphs 120 through 149.

150.   The defendants are without knowledge of any arrangements between the plaintiffs

and their counsel and deny the allegations in third amended complaint paragraph 150.

151.   The defendants deny the allegations in third amended complaint paragraph 151. Among other things, Mario Costanz and Happy Tax Franchising, LLC failed to deliver or otherwise provide any functional (proprietary or otherwise) "system" to competently and timely process customers' income tax returns, to produce actually audited financial statements free of misrepresentations and material omissions, or otherwise comply with any of their other obligations to the defendants.

152.   The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Mr. Hill and The JL Hill Group LLP to execute an area representative "franchise" agreement on or about July 13, 2017, but deny the remaining allegations in third amended complaint paragraph 152.

153. – 154.   The defendants admit that the terms of the area representative "franchise" agreement are the best evidence of its meaning, content and legal effect, but deny the remaining allegations in paragraphs 153 through 154.

155.   The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Mr. Hill and The JL Hill Group LLC to execute an "amendment agreement", but deny the remaining allegations in third amended complaint paragraph 155.

156. – 158.   The defendants deny the allegations in third amended complaint paragraphs 156 through 158.

159.   The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Mr. Hill and The JL Hill Group LLC to execute a unit "franchise" agreement on or about September 28, 2015.

160. – 161.   The defendants admit that the terms of the unit "franchise agreement" are

the best evidence of their meaning, content and legal effect, but deny the remaining allegations in paragraphs 160 through 161.

162. – 164.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Mr. Hill and The JL Hill Group LLC to execute an area representative "franchise" agreement on or about July 13, 2017, but deny the remaining allegations in third amended complaint paragraphs 162 through 164.

165.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Mr. Hill and The JL Hill Group LLC to execute an "amendment agreement", the terms of which are the best evidence of its meaning content and legal effect, but deny the remaining allegations in third amended complaint paragraph 165.

166. – 168.    The defendants deny the allegations in third amended complaint paragraph 166 through 168.

169.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Banyan Accounting, LLC to execute a unit "franchise" agreement on or about October 20, 2017.

170.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Banyan Accounting, LLC to execute an area representative "franchise" agreement on or about December 11, 2017, but deny the remaining allegations in third amended complaint paragraph 170.

171. – 175.    The defendants deny the allegations in third amended complaint paragraphs 171 through 175.

176.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Banyan Accounting, LLC to execute a unit "franchise" agreement on or

11

about October 20, 2017.

177. – 178.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Banyan Accounting, LLC to execute an area representative "franchise" agreement on or about December 11, 2017, but deny the remaining allegations in third amended complaint paragraphs 177 through 178.

179. – 182.    The defendants deny the allegations in third amended complaint paragraphs 179 through 182.

183.    The defendants admit that Mario Costanz and Happy Tax Franchising, LLC induced Ms. Drago and Banyan Accounting, LLC to execute a unit "franchise" agreement on or about October 20, 2017.

184. – 189.    The defendants deny the allegations in third amended complaint paragraphs 184 through 189.

190. – 200.    The Court dismissed all claims and allegations as against Chad Greene such that the defendants need not respond to third amended complaint paragraphs 190 through 200.

201. – 214.    The defendants deny the allegations in third amended complaint paragraphs 201 through 214.

215. – 231.    The Court dismissed all claims and allegations in third amended complaint counts IX and X such that the defendants need not respond to third amended complaint paragraphs 215 through 231.

## <u>DEFENSES</u>

### <u>First Defense</u>

The plaintiffs fail to state a legal claim for breach of contract against any defendant.

Second Defense

Mario Costanz and Happy Tax Franchising, LLC fraudulently induced Mr. Hill and The JL Hill LLC to enter into and execute a September 28, 2015 unit "franchise" agreement and other documents; a July 13, 2017 area representative "franchise" agreement and other documents; a June 13, 2018 unit "franchise agreement" and other documents; and an August 8, 2018 "amendment agreement" and attendant documents, by making false statements of material fact to and omitting material facts from Mr. Hill and The JL Hill Group LLC, orally and in documents in 2015, 2017 and 2018.  Mario Costanz and Happy Tax Franchising, LLC knew those statements to be false when made or were misleading because they intentionally omitted to state material facts to Mr. Hill and The JL Hill Group LLC, intending that Mr. Hill and The JL Hill Group rely on those false and misleading statements.  Mr. Hill and The JL Hill Group LLC were damaged as a result of their reasonable reliance on Mario Costanz's and Happy Tax Franchising, LLC's false and misleading statements, such that all of the agreements and attendant documents that the plaintiffs induced Mr. Hill and The JL Hill Group LLC to enter into should be rescinded.

Third Defense

Mario Costanz and Happy Tax Franchising, LLC fraudulently induced Ms. Drago and Banyan Accounting, LLC to enter into and execute an October 20, 2017 unit "franchise" agreement and other documents; a December 11, 2017 area representative "franchise" agreement and other documents; and "amendment agreements" on May 31, 2018, January 9, 2019, February 2, 2019 and April 2, 2019, by making false statements of material fact to and omitting material facts from Ms. Drago and Banyan Accounting, LLC, orally and in documents in 2015, 2017 and 2018.  Mario Costanz and Happy Tax Franchising, LLC knew those statements to be false when

made or were misleading because they intentionally omitted to state material facts to Ms. Drago and Banyan Accounting, LLC, intending that Ms. Drago and Banyan Accounting, LLC rely on those false and misleading statements.  Ms. Drago and Banyan Accounting, LLC were damaged as a result of their reasonable reliance on Mario Costanz's and Happy Tax Franchising, LLC's false and misleading statements, such that all of agreements and attendant documents that the plaintiffs induced Ms. Drago and Banyan Accounting, LLC to enter into should be rescinded.

Fourth Defense

Mario Costanz and Happy Tax Franchising, LLC offered and sold to Mr. Hill and The JL Hill LLC two unit "franchises" and an area representative "franchise" in violation of the FTC Franchise Rule, 16 C.F.R. Part 436, such that the unit "franchise" agreements and the area representative "franchise" agreement, and all attendant documents, are void and unenforceable against Ms. Drago or The JL Hill Group LLC.

Fifth Defense

Mario Costanz and Happy Tax Franchising, LLC offered and sold to Ms. Drago and Banyan Accounting, LLC a unit "franchise" and an area representative "franchise" in violation of the FTC Franchise Rule, 16 C.F.R. Part 436, such that the unit "franchise" agreement and the area representative "franchise", and all attendant documents, are void and unenforceable against Ms. Drago or The JL Hill Group LLC.

Sixth Defense

Mario Costanz and Happy Tax Franchising, LLC offered and sold to Mr. Hill and The JL Hill Group LLC unregistered securities in violation of the Securities Act of 1933, 15 U.S.C. §§ 77a. *et seq*., and made false statements of material facts to and omitted material facts from Mr. Hill and The JL Hill Group LLC in violation of the Securities Exchange Act of 1934, 15 U.S.C.

14

§§ 78a *et seq*., such that all franchise agreements and attendant documents are void and unenforceable against Mr. Hill or the JL Hill Group.

Seventh Defense

Mario Costanz and Happy Tax Franchising, LLC offered and sold to Ms. Drago and Banyan Accounting, LLC unregistered securities in violation of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq*., and made false statements of material facts to and omitted material facts from Ms. Drago and Banyan Accounting, LLC in violation of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq*., such that all franchise agreements and attendant documents are void and unenforceable against Ms. Drago and Banyan Accounting, LLC.

Eight Defense

Mario Costanz and Happy Tax Franchising, LLC first materially breached their obligations to Mr. Hill and The JL Hill Group LLC owed under two unit "franchise" agreements, an area representative "franchise" agreement, and other attendant documents and discharged Mr. Hill and The JL Hill Group LLC from all obligations to perform any action otherwise due.

Ninth Defense

Mario Costanz and Happy Tax Franchising, LLC first materially breached their obligations to Ms. Drago and Banyan Accounting, LLC owed under a unit "franchise" agreement and an area representative "franchise" agreement, and other attendant documents and discharged Ms. Drago and Banyan Accounting, LLC from all obligations to perform any action otherwise due.

Tenth Defense

Any damages to which the plaintiffs may ultimately be due should be setoff against the significantly larger damages that the plaintiffs caused the defendants.

15

Eleventh Defense

The plaintiffs fail to state a legal claim for defamation against Mr. Hill or Ms. Drago.

Twelfth Defense

The statements that the plaintiffs purport to attribute to Mr. Hill or Ms. Drago are substantially true.

Thirteenth Defense

The statements that the plaintiffs purport to attribute to Mr. Hill or Ms. Drago are their respective pure opinions.

Fourteenth Defense

The statements that the plaintiff purport to attribute to Mr. Hill or Ms. Drago are not defamatory.

The defendants retained Shutts & Bowen LLP as their legal counsel and have agreed to pay counsel a reasonable fee for their services, for which the plaintiffs are responsible to pay.

WHEREFORE, the defendants demand judgment against Mario Costanz and Happy Tax Franchising, LLC as follows:

A.      Directing that Mario Costanz and Happy Tax Franchising, LLC shall take nothing on their third amended complaint against the defendants, and shall go forth without day;

B.      Awarding the defendants their costs and attorneys' fees as against Mario Costanz and Happy Tax Franchising, LLC, jointly and severally; and,

C.      Providing for such other and further relief that the Court deems appropriate.

**COUNTERCLAIM AND THIRD-PARTY COMPLAINT**

Counterclaim plaintiffs Jamey Hill ("Mr.  Hill"), The JL Hill Group LLC ("JLHG"), Tricia Drago ("Ms. Drago") and Banyan Accounting, LLC ("Banyan") sue the counterclaim

16

defendants Mario Costanz ("M. Costanz"), Happy Tax Franchising, LLC ("HT Franchising") and Happy Tax Holding Corp. ("HT Holding"); and third-party defendants Theodore "Ted" Muftic ("T. Muftic"),  Michael J. Hadzipanajotis ("M. Hadzipanajotis") and Monica Poirier ("M. Poirier") as follows:

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

2.      Mr. Hill is a Nevada citizen and the sole member of JLHG.

3.      JLHG is a Nevada limited liability company.

4.      Ms. Drago is a Hawaii citizen and the sole member of Banyan.

5.      Banyan is a Hawaii limited liability company.

6.      M. Costanz is a New York citizen.

7.      HT Franchising is a Florida limited liability company.  At all times material, M. Costanz was the sole member, manager, "president and chief executive officer" of HT Franchising, and otherwise owned, controlled and dominated HT Franchising.

8.      HT Holding is a Delaware corporation, with a Delaware principal place of business.  At all times material, M. Costanz was the overwhelmingly-majority shareholder of, chief executive officer of and board chairman for HT Holding, and otherwise owned, controlled and dominated HT Holding.

9.      T. Muftic is a Colorado citizen.  At all times material, T. Muftic held himself out as HT Franchising's chief financial officer.

10.      M. Hadzipanajotis is a Massachusetts citizen.  At all times material, M. Hadzipanajotis held himself out as HT Franchising's financial statement auditor and a certified public accountant licensed to perform audits of financial statements.

11.     M. Poirier is a Massachusetts citizen.  At all times material, M. Poirier held herself out as "CEO" and "CFO" of HT Franchising.

12.     The Court has personal jurisdiction over M. Costanz, M. HT Franchising, HT Holdings and M. Poirier as they previously sued Mr. Hill, JLHG, Ms. Drago and Banyan in this district in Case No. 1:19-cv-24552-JEM and M. Costanz and HT Franchising have asserted the same claims against Mr. Hill, JLHG, Ms. Drago and Banyan in this action.  The Court has personal jurisdiction over T. Muftic and M. Hadzipanajotis pursuant to sections 48.193(1)(a)(1) and (2), Florida Statutes.

13.     All conditions precedent to bringing this action and the claims asserted in it have occurred, have been waived or have otherwise been satisfied.

## THE JTH TAX, INC. LITIGATION

14.     On October 29, 2014, JTH Tax, Inc. d/b/a Liberty Tax Service sued M. Costanz and his company, Zee Calls, LLC, in the U.S. District Court for the Eastern District of Virginia, Case No. 2:14cv554.  In that action, JTH Tax, Inc. asserted fraud, business conspiracy, civil conspiracy to defraud claims against M. Costanz, and sought to avoid a fraudulent conveyance and pierce the corporate veil between M. Costanz and Zee Calls, LLC.

15.     On July 21, 2015, M. Costanz moved the Virginia federal district court to "permanently seal the complaint" in Case No. 2:14cv554.  According to M. Costanz:

> The allegations in the complaint, when viewed by the public, have already adversely affected and likely will continue to adversely affect Mr. Costanz's name, reputation, and ability to enter into future business opportunities. Mr. Costanz is a principal of a franchised business involved in tax preparation services. Franchised businesses require, among other things, audited financial statements. Recently, an accounting firm refused to offer its services to Mr. Costanz because it was concerned about the allegations in this case.

> Undoubtedly, in the current Internet age, potential franchisees and other entities considering business relations with Mr. Costanz's tax preparation franchise

system will research Mr. Costanz and his former business relationships by conducting Internet searches. Needless to say, if Mr. Costanz discovered this action through an Internet search of his name, others, such as the aforementioned accounting firm, will also see the allegations in the complaint unless the complaint is sealed.

The district court denied M. Costanz's motion to seal on August 31, 2015.

## M. HADZIPANAJOTIS'S FALSE AND MISLEADING AUDIT REPORTS

16.  The Massachusetts Board of Registration of Public Accountancy ("MA Board") issued M. Hadzipanajotis "Non Reporting License" No. 30343-CA on July 22, 2013.  The Massachusetts Code of Regulations ("CMR"), at Chapter 252, section 2.07(2)(b), authorized M. Hadzipanajotis, as a Non Reporting Licensee, to perform general accounting services, but prohibited him from auditing or issuing reports on financial statements.

17.  At all times material, M. Hadzipanajotis held himself out as a certified public accountant licensed and otherwise qualified to audit and issue reports on financial statements (a "Reporting CPA") and practiced public accountancy as "Michael J. Hadzipanajotis, CPA, CPA & Consulting Services", a firm not licensed by the MA Board.  During 2016, 2017, 2018 and 2019, M. Hadzipanajotis audited and issued reports on financial statements that were not in accordance with generally accepted accounting principles ("GAAP").

18.  M. Costanz retained M. Hadzipanajotis to audit and issue reports on HT Franchising financial statements for fiscal years ending April 30, 2016 and April 30, 2017; and, on HT Holding financial statements for fiscal years ending April 30, 2018 and April 30, 2019. M. Hadzipanajotis did not audit any HT Franchising or HT Holding financial statements, pursuant to generally accepted auditing standards ("GAAS") or otherwise.  However, M. Hadzipanajotis issued reports on HT Franchising financial statements for fiscal years 2016 and 2017 (dated September 15, 2016 and August 22, 2017) and reports on HT Holding financial

statements for fiscal years 2018 and 2019 (dated August 24, 2018 and August 26, 2019).

19.     In his 2016 and 2017 reports, M. Hadzipanajotis represented, in pertinent part, as follows:

> We have audited the accompanying financial statements of Happy Tax Franchising, LLC which comprise the balance sheets as of [April 30, 2016; April 30, 2017] and the related statements of income, and consolidated cash flows for the year then ended, and the related notes to the financial statements.
>
> ***
>
> Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.
>
> ***
>
> We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.
>
> **Opinion**
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Happy Tax Franchising, LLC as of [April 30, 2016; April 30, 2017] and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

20.     In his 2018 report, M. Hadzipanajotis stated:

> We have audited the accompanying financial statements of Happy Tax Holding Corp. which comprise the balance sheets as of April 30, 2016, April 30, 2017 and April 30, 2018 and the related statements of operations and cash flows for the year then ended, and the related notes to the financial statements.
>
> ***
>
> Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.
>
> ***
>
> We believe that the audit evidence we have obtained is sufficient and appropriate

to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Happy Tax Holding Corp. and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

21.      In his 2019 report, M. Hadzipanajotis stated:

We have audited the accompanying financial statements of Happy Tax Holding Corp. which comprise the balance sheets as of April 30, 2017, April 30, 2018 and April 30, 2019 and the related statements of income, and consolidated cash flows for the year then ended, and the related notes to the financial statements.

\*\*\*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

\*\*\*

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Happy Tax Holding Corp. and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

22.      M. Hadzipanajotis expressly consented, in writing, to M. Costanz and HT Franchising incorporating M. Hadzipanajotis's reports on HT Franchising financial statements into HT Franchising's unit and area representative franchise disclosure documents ("FDDs") issued September 15, 2016; August 23, 2017; August 28, 2018; and September 13, 2019.  M. Costanz and HT Franchising appended M. Hadzipanajotis's September 15, 2016 report on HT

Franchising financial statements to and incorporated it into forms M. Costanz and T. Muftic caused to be filed with the U.S. Securities and Exchange Commission on April 5, May 5 and May 12, 2017.  M. Costanz and HT Franchising appended M. Hadzipanajotis's August 23, 2017 report on HT Franchising financial statements to and incorporated it into forms M. Costanz and T. Muftic caused to be filed with the U.S. Securities and Exchange Commission on October 16, October 24, November 3, November 29 and December 21, 2017.

23.     The statements that M. Hadzipanajotis made in his respective reports, as alleged in paragraphs 16 through 22, above, were false and misleading when made because:

a.      M. Hadzipanajotis was never licensed or otherwise qualified to audit and report on HT Franchising's or HT Holding's financial statements;

b.      "Michael J. Hadzipanajotis, CPA, CPA & Consulting Services" was never licensed nor otherwise qualified to audit and report on HT Franchising's or HT Holding's financial statements;

c.      M. Hadzipanajotis did not audit HT Franchising's or HT Holding's financial statements, in accordance with GAAS or otherwise.

d.      M. Hadzipanajotis had no reason or factual basis to opine that any HT Franchising or HT Holding financial statement "present[ed] fairly, in all material respects, the financial position of [HT Franchising or HT Holding] and the results of [their] operations and [their] cash flows for [any] year then ended in accordance with accounting principles generally accepted in the United States of America";

e.      HT Franchising's and HT Holding's financial statements for fiscal years 2016, 2017, 2018 and 2019, were not prepared, maintained or "restated" in accordance with GAAP; and,

    f.  M. Hadzipanajotis knowingly and intentionally violated 252 CMR sections 3.02(1), 3.05(2)(a)(1); Chapter 112, Massachusetts General Laws, sections 61(3), 87C1/2(a)(5) and 87C1/2 (a)(9).

### M. COSTANZ FORMS AND PROMOTES HT FRANCHISING

   24. M. Costanz caused HT Franchising to be formed on December 19, 2014.  From that time forward, M. Costanz touted HT Franchising in the press, on the Internet, in telephone calls, in investor presentations and investment disclosure documents, as a revolutionary business model in the income tax return preparation services industry.  M. Costanz claimed that HT Franchising's "proprietary technology", unique business "system" and the use of exceptionally-qualified and experienced certified public accountants ("CPAs") to prepare every income tax return set HT Franchising apart from its competitors.

   25. From at least 2014 forward, M. Costanz regularly stated that HT Franchising had more than 100 CPAs in its "back office" ready to quickly and accurately prepare each customer's income tax return.  Each of those CPAs, according to M. Costanz, had over five years of experience in taxation and had personally prepared at least 1000 income tax returns.  M. Costanz declared that HT Franchising's CPAs were far-from "cowboy tax professionals who are costing hard-working Americans millions of dollars each year in IRS penalties and interest".

   26. From at least 2014 forward, M. Costanz widely promoted himself in the press, on the Internet, in telephone calls, in published brochures, in investor presentations and investment disclosure documents as the "founder" and "CEO" of HT Franchising.  To induce investors to invest in HT Franchising, M. Costanz claimed to have vast experience in income tax preparation services and in franchising income tax preparation services businesses.  For example, in and after August 2015, M. Costanz often declared on television and Internet-posted videos that he had

owned and sold 99 Liberty Tax® franchises and had owned the "area development rights" for all Liberty Tax® franchises for Manhattan, Westchester, Putnam and Dutchess Counties, New York.

27.     Further, M. Costanz touted his HT Franchising corporate governance and management "team" to persuade potential investors to believe HT Franchising was well-run, with sufficient internal controls to assure investors that HT Franchising was financially sound and a wise investment opportunity.  For example, in the press, on the Internet and in HT Franchising investment disclosure documents, M. Costanz reported that Keith Alessi, former chief executive officer for Jackson Hewitt®, a national income tax preparation company, served as "director" on HT Franchising's "board".  Later, in similar media, M. Costanz reported that T. Muftic, a Harvard MBA with substantial experience as chief financial officer for several business entities, was HT Franchising's chief financial officer ("CFO").

28.     From 2014 through at least 2019, M. Costanz dictated and otherwise controlled the statements made in and content of HT Franchising unit and area representative FDDs, unit franchise agreements, area representative agreements, applications to various state regulatory agencies to register HT Franchising as a franchisor, along with unit franchise agreements and area representative agreements.  M. Costanz similarly dictated and otherwise controlled the statements made in and content of HT Franchising's Internet website, marketing and promotional materials and investor solicitations and presentations, among other publications.

### M.  COSTANZ AND HT FRANCHISING SELL A UNIT FRANCHISE TO JTHG

29.     Mr. Hill learned about HT Franchising in the summer of 2015.  Mr. Hill conducted preliminary due diligence on HT Franchising and read M. Costanz's statements about HT Franchising's "proprietary" technology, unique operating "system", use of CPAs to prepare

every income tax return, M. Costanz's substantial experience in income tax preparation services and franchising those businesses, M. Costanz's claimed purchase, operation and sale of 99 Liberty Tax® franchises, and HT Franchising's executive staff's experience.

30.     In early August 2015, Mr. Hill contacted HT Franchising to inquire about investing in a HT Franchise unit in Nevada.  Happy Tax e-mailed an HT Franchising unit FDD dated July 10, 2015 as amended on July 23, 2015, to Mr. Hill, which Mr. Hill received on September 12, 2015.  In that FDD, M. Costanz and HT Franchising represented:

a.     They offer franchises "for the right to establish and operate a Happy Tax income tax preparation business using the Principal Trademarks and System initially from the franchisee's home";

b.     They have a "System" that "includes our proprietary technology, tools, support and resources";

c.     They "have a back office staffed with dedicated certified public accountants (CPAs) or other qualified tax professional[sic] who will prepare each income tax return processed by [me]";

d.     "No litigation is required to be disclosed";

e.     A franchisee must pay a "Preparation Fee" of fifteen percent of the amount collected from each customer, which is "paid to us to have our team of CPAs or other tax professionals prepare each income tax return process by [me]";

f.     A franchisee must pay a "Royalty" of twenty percent of the amount collected from each customer for use of the "System", or a required $4000 minimum royalty each year;

g.     A franchisee does not prepare or participate in preparing any income tax

return.  Rather, a franchisee only solicits customers to use HF Franchising's "System" and gives each customer's information to HF Franchising so that its CPAs can prepare each customer's return;

> h.    They set the prices customers must pay for income tax preparation services;

> i.    A franchisee must use HT Franchising's "System" exclusively, as they prohibit a franchisee from using any other source or resource for income tax preparation services; and,

> j.    M. Costanz and other identified officers have substantial experience in operating and managing income tax return service business and in franchising such businesses.

31.    M. Costanz certified and swore under penalty of law that he "read and know[s] the contents of…[the FDD]…and that all material facts stated in [it] are accurate and [it] does not contain any material omissions."

32.    Based on the statements M. Costanz made in the press, on the Internet and in the FDD, Mr. Hill decided to invest in a HT Franchising unit franchise through JLHG.  M. Costanz agreed to sell JLHG a unit franchise for $8500, and sent Mr. Hill a three-year unit franchise agreement for signature.  Mr. Hill signed the unit franchise agreement on JLHG's behalf on September 25, 2015.

## THE BRONX TAX LAWSUIT AND JUDGMENTS

33.    On February 3, 2017, Bronx Tax, LLC sued HubTax, LLC, HT Franchising and M. Costanz in the New York Supreme Court, Case No. 650617/2017.  Bronx Tax, LLC sued to enforce a non-competition and non-solicitation agreement that M. Costanz had executed in conjunction with his sale of an income tax preparation business, as M. Costanz had evicted

Bronx Tax, LLC from an office rented from HubTax, LLC and opened a competing "phantom income tax preparation franchise" in that office.

34.    On August 13, 2018, HT Franchising and M. Costanz agreed to pay Bronx Tax, LLC $235,000, in installments over several months, to settle the lawsuit.  On August 13, 2018, M. Costanz executed the settlement agreement for HT Franchising and for himself, along with an "Affidavit of Happy Tax Franchising LLC d/b/a Happy Tax Service of Confession of Judgment"; and an "Affidavit of Mario Costanz of Confession of Judgment".  In these sworn statements, M. Costanz authorized Bronx Tax, LLC to obtain final consent judgments against HT Franchising and himself for all unpaid amounts due under the settlement agreement upon any payment default.

35.    M. Costanz and HT Franchising failed to pay Bronx Tax, LLC all amounts due, such that a $181,423.36 final judgment was entered against M. Costanz on November 11, 2018, leaving HT Franchising exposed to a $50,000 consent judgment that may be entered at any time.

## M. COSTANZ, HT FRANCHISING AND HT HOLDINGS
## ISSUE, OFFER AND SELL SECURITIES

36.    During conversations and telephone calls in 2017, M. Costanz told Mr. Hill and Ms. Drago on more than one occasion that he had invested over $1.2 million in HT Franchising in September 2016.

37.    On or about November 23, 2016, M. Costanz and HT Franchising began to offer $2.0 million in unregistered securities ("debt", "option, warrant or other right to acquire another security") to investors through general media advertising and direct investor presentations. According to Form D which M. Costanz signed and caused to be filed with the U.S. Securities and Exchange Commission, M. Costanz intended to use $100,000 of investment proceeds to pay "executive officers or directors").

38.     M. Costanz caused HT Holding to be formed on February 23, 2017.

39.     M. Costanz, T. Muftic and HT Holding issued and offered at least $100,000 in unregistered securities (simple agreement for future equity "SAFE" units) to investors through several advertising media including Internet advertisements, Internet website posting, direct e-mail solicitations, direct investor presentations and dissemination of "investor presentation" PowerPoint "decks".  According to the Form C that M. Costanz and T. Muftic authored and filed with the U.S. Securities and Exchange Commission on April 5, 2017, M. Costanz, T. Muftic and HT Holding required the unregistered securities to be fully subscribed by August 28, 2017.

40.     M. Costanz, T. Muftic and HT Holding made similar unregistered securities offerings (SAFE units) to investors, through the same or similar advertising media and filed additional Forms C with the U.S. Securities and Exchange Commission on May 5, May 12, November 3 and November 29, 2017.  According to each of those Forms C, M. Costanz, as HT Holding "CEO", and T. Muftic, as HT Holding "CFO", executed each of them, certifying that "[p]ursuant to the requirements of Sections 4(a)(6) and 4A of the Securities Act of 1933 and Regulation Crowdfunding (§§ 227.100-503) [they and HT Holding] reasonable grounds to believe that [they and HT Holding] meet all of the requirements for filing on Form C and [have] duly caused this Form to be signed…".

41.     In the April 5, May 5 and May 12, 2017 Forms C, M. Costanz, T. Muftic and HT Holding represented:

        a.     HT Holding had ten employees;

        b.     HT Holding had zero assets, zero cash and equivalents, zero accounts receivable, zero short- or long-term debt and zero revenue;

c.       Keith Alessi is an HT Holding director and purportedly joined the HT Holding board in 2017;

d.       T. Muftic is an HT Holding "CFO" and director and purportedly joined the HT Holding board in 2017;

e.       M. Costanz is HT Holding "CEO" and "President" having become such in 2017;

f.       M. Costanz holds 6,910,000 shares of HT Holding "Class A Shares" and controls 96.22 percent of "Voting Power Prior to Offering";

g.       "We guarantee our filings prepared by our CPAs so that if our CPAs commit an error, any refunds could impair our cash flows";

h.       "Class A Common stock has ten times the voting rights of the Common Stock…";

i.       HT Holding had "an operating history";

j.       HT Holding's "revenue from tax preparation operations represented 100% of our total revenue during the fiscal year ended April 30, 2016";

k.       HT Holding "filed patent applications on our technology and methodologies";

l.       HT Holding had "cash and cash equivalents and loans currently receivable as of March 2017" totaling $1,180,567; and

m.       "Happy Tax Changed from LLC to Delaware C Corporation in Feb[sic] 2017. We have disclose[sic] our previous entity's operations in the financial statements attached".

42.       In Exhibit "A" to each of the April 5, May 5 and 12, 2017 Forms C, M. Costanz,

T. Muftic and HT Holding made the following statements:

      a.      "Invest in Happy Tax…A technology company offering a convenient on-demand CPA prepared tax preparation";

      b.      "Happy Tax Franchise – Build a team and source tax returns that our CPA's[sic] will prepare.  You keep approx[sic] 65-75% of the revenue";

      c.      "Franchisees and IC's[sic] deal with clients, our app collects the information and then our CPAs prepare the actual tax returns"; and,

      d.      "We not only let people submit their return in under 15 minutes (faster than our competitors), but all returns are also prepared by our CPA's[sic] who have been vetted by Happy Tax to give a great filing experience with a 100% accuracy guarantee";

43.      In the November 3 and 29, 2017 Forms C, M. Costanz, T. Muftic and HT Holding represented the following:

      a.      HT Holding had ten employees;

      b.      HT Holding had $984,487 in total assets at "most recent fiscal year-end" and $217,485 in total assets at "prior year-end"; $233,492 in cash and equivalents at "most recent fiscal year-end" and $60,204 in cash and equivalents at "prior year-end"; zero accounts receivable at "most recent fiscal year-end" and at "prior year-end"; $310,468 in short term debt at "most recent fiscal year-end" and $366,305 in short term debt at "prior year-end"; zero long term debt at "most recent fiscal year-end" and "prior year-end"; revenue of $1,657,547 at "most recent fiscal year-end" and $861,141 in revenue at "prior year-end"; and net income of $594,005 at "most recent fiscal year-end" and *negative* $281,290 in net loss at "prior year-end".

      c.      Keith Alessi is an HT Holding director and purportedly joined the HT Holding board in 2017;

      d.     T. Muftic is an HT Holding director and purportedly joined the HT Holding board in 2017;

      e.     M. Costanz is HT Holding "CEO" and "President" having become such in 2017;

      f.     M. Costanz holds 6,910,000 shares of HT Holding "Class A Shares";

      g.     "We guarantee our filings prepared by our CPAs so that if our CPAs commit an error, any refunds could impair our cash flows";

      h.     "Class A Common stock has ten times the voting rights of the Common Stock…";

      i.     HT Holding had "an operating history";

      j.     HT Holding's "revenue from tax preparation operations represented 100% of our total revenue during the fiscal year ended April 30, 2017";

      k.     HT Holding "filed patent applications on our technology and methodologies"; and,

      l.     "Happy Tax Changed from LLC to Delaware C Corporation in Feb[sic] 2017. We have disclose[sic] our previous entity's operations in the financial statements attached".

      44.     In Exhibit "A" to those Forms C, M. Costanz, T. Muftic and HT Holding stated as follows:

      a.     "Invest in Happy Tax…A technology company offering a convenient on-demand CPA prepared tax preparation";

      b.     "Happy Tax Franchise – Build a team and source tax returns that our CPA's[sic] will prepare. You keep approx[sic] 65-75% of the revenue";

c.      "Franchisees and IC's[sic] deal with clients, our app collects the information and then our CPAs prepare the actual tax returns"; and

d.      "We not only let people submit their return in under 15 minutes (faster than our competitors), but all returns are also prepared by our CPA's[sic] who have been vetted by Happy Tax to give a great filing experience with a 100% accuracy guarantee".

45.     Appended to and incorporated into each of the Forms C are HT Franchising's financial statements which, according to M. Hadzipanajotis, were "audited in accordance with auditing standards generally accepted in the United States" so as to "obtain reasonable assurance about whether the financial statements are free from material misstatement".

## M. COSTANZ SELLS JLHG AN AREA REPRESENTATIVE ARRANGEMENT

46.     In mid-2017, M. Costanz and HF Franchising offered to sell Mr. Hill and JLHG an area representative "franchise" for a small portion of Nevada.  At that time, according to M. Costanz's and HT Franchising's statements in the press, on the Internet and in investor presentations, HT Franchising had sold a number of area representative franchises across the United States, so Mr. Hill agreed to look into that investment opportunity.

47.     An HT Franchising area representative is permitted to "recruit franchisees" with a proscribed geographic "territory" in exchange for fifty percent of each recruited franchisee's "net initial franchise fee and royalties paid to" HT Franchising.  An area representative may also recruit franchisees outside of her, his or its proscribed territory, in exchange for fifty percent of each recruited franchisee's "net initial franchise fee", but not royalties, paid to HT Franchising. Additionally, area representatives are permitted to sell other geographic territories in exchange for a ten percent referral fee for referring a prospect that buys an area, as the money is received as defined by an HT Franchising "Area Representative Revenue Flow" document.

48.    M. Costanz and HT Franchising priced geographic territories according to a per capita charge, usually $.25, for the entire population located within a specific geographic territory.  As such, the initial fee for an area representative is significantly higher than for a unit franchise.

49.    Typically, M. Costanz and HT Franchising sold only ten-year area representative arrangements, and required the area representative to "sell" a fixed number of unit franchises within her, his or its geographic territory (usually ten per year) over the ten-year term.  M. Costanz and HT Franchising reserved the right to reduce the size of an area representative's territory if she, he or it failed to reach certain minimum "sales volume requirements".

50.    M. Costanz and HT Franchising e-mailed Mr. Hill an HT Franchising area representative FDD issued September 15, 2016.  In that FDD, M. Costanz and HT Franchising represented:

      a.    "You will assist in recruiting and coaching Happy Tax Unit franchisees";

      b.    "No litigation is required to be disclosed"; and,

      c.    M. Costanz and other identified officers have substantial experience in operating and managing income tax return service business and in franchising such businesses.

51.    M. Costanz certified and swore under penalty of law that he "read and know[s] the contents of…[the FDD]…and that all material facts stated in [it] are accurate and [it] does not contain any material omissions."

52.    That FDD also included financial statements which M. Hadzipanajotis reportedly "audited in accordance with auditing standards generally accepted in the United States" so as to "obtain reasonable assurance about whether the financial statements are free from material

misstatement".  M. Hadzipanajotis expressly consented to the use of the financial statements in and as an integral part of that FDD.

53.     Mr. Hill's review of the financial statements showed an $861,000 year-over-year increase in revenue for HT Franchising, with $278,000 in marketing and advertising costs and $250,000 in salaries.  The statements also showed $366,000 in debt and $158,000 in loans receivable.  To Mr. Hill, the financial statements showed that HT Franchising was growing in its first full year in operation with experienced, highly-skilled management.  After watching the many video presentations from M. Costanz and testimonials on the HT Franchising Internet website and YouTube, reading the statements M. Costanz made in press releases and articles as to why HT Franchising would "revolutionize the tax return preparation industry" and relying heavily on the truthfulness and accuracy of the HT Franchising financial statements, Mr. Hill believed that an area representative arrangement would be a profitable investment.  In reliance on encouraging audited financial statements and statements from HT Franchising executives about current company operations, Mr. Hill agreed with M. Costanz and HT Franchising that JLHG would invest in an HT Franchising area representative arrangement in July 2017.

54.     Mr. Hill caused JLHG to execute an HT Franchising area representative agreement for a relatively-small territory surrounding Henderson, Nevada on July 7, 2017, and committed JLHG to pay HT Franchising $40,000 for that arrangement in a promissory note over a specific period of time.

### M. COSTANZ AND HT FRANCHISING SELL MS. DRAGO AND BANYAN A UNIT FRANCHISE AND AN EXPANSIVE AREA REPRESENTATIVE ARRANGEMENT

55.     In September 2017, Mr. Hill contacted Ms. Drago via LinkedIn to ask whether she may have interest in HT Franchising.

56.     On October 5, 2017, M. Costanz directed an HT Franchising executive to provide

34

Ms. Drago a unit HT Franchising FDD and an area representative arrangement FDD, both issued August 23, 2017.  In the unit FDD, M. Costanz and HT Franchising represented:

      a.      They offer franchises "for the right to establish and operate a Happy Tax income tax preparation business using the Principal Trademarks and System initially from the franchisee's home";

      b.      They have a "System" that "includes our proprietary technology, tools, support and resources";

      c.      They "have a back office staffed with dedicated certified public accountants (CPAs) or other qualified tax professional[sic] who will prepare each income tax return processed by [me]";

      d.      "No litigation is required to be disclosed";

      e.      A franchisee must pay a "Preparation Fee" of fifteen percent of the amount collected from each customer, which is "paid to us to have our team of CPAs or other tax professionals prepare each income tax return process by [me]"

      f.      A franchisee must pay a "Royalty" of twenty percent of the amount collected from each customer for use of the "System", or a required $4000 minimum royalty each year;

      g.      A franchisee does not prepare or participate in preparing any income tax return.  Rather, a franchisee only solicits customers to use HF Franchising's "System" and gives each customer's information to HF Franchising so that its CPAs can prepare each customer's return;

      h.      They set the prices customers must pay for income tax preparation services;

        i.     A franchisee must use HT Franchising's "System" exclusively, as they prohibit a franchisee from using any other source or resource for income tax preparation services; and,

        j.     M. Costanz and other identified officers have substantial experience in operating and managing income tax return service business and in franchising such businesses.

57.     In the area representative FDD, M. Costanz and HT Franchising represented:

        a.     "The franchise offered is for a Happy Tax Area Representative arrangement pursuant to which you assist in recruiting and coaching Happy Tax unit franchise owners and in exchange receive a portion of the initial franchise fees and royalties paid by such unit franchisees";

        b.     "No litigation is required to be disclosed"; and,

        c.     M. Costanz and other identified officers have substantial experience in operating and managing income tax return service business and in franchising such businesses.

58.     Both the unit FDD and the area representative FDD contained the same HT Franchising financial statements for fiscal year-end April 30, 2017.  M. Hadzipanajotis represented that he had audited those financial statements "in accordance with auditing standards generally accepted in the United States" so as to "to obtain reasonable assurance about whether the financial statements are free from material misstatement".  M. Hadzipanajotis expressly consented to the use of the audited financial statements in and as an integral part of both FDDs.

59.     From Ms. Drago's review of those financial statements, she saw nearly 100% year-over-year operating revenue growth, a healthy 35% profit margin, an almost quadruple increase in available cash reserves over the prior year and significant amount of liquid capital to cover HT Franchising's stated liabilities.  The financial statements also noted HT Franchising's

acquisition and successful sale of an "acquired entity", HubTax, LLC, during the previous fiscal year for $425,000, and the "fair value" of notes due to HT Franchising were stated at an additional $877,000, with no significant subsequent effects as of August 22, 2017.

60.     Based on the truthfulness and accuracy of the audited financial statements, after watching dozens of M. Costanz's YouTube video testimonials, reviewing his online Internet website statements and looking into the backgrounds of the disclosed principals, Ms. Drago thought that a HT Franchising unit franchise may be a sound investment for she and Banyan.

61.     On October 5, 2017, M. Costanz and HT Franchising provided Ms. Drago and Excel spreadsheet that HT Franchising's CFO T. Muftic developed to calculate potential "ROI" on a HT Franchising area representative arrangement.  Ms. Drago carefully reviewed T. Muftic's spreadsheet, and input conservative values to see that T. Muftic's "ROI" figures for an area representative arrangement were favorably high.

62.     On October 8, 2017, M. Costanz asked Ms. Drago to complete an HT Franchising application, including a detailed personal financial statement that showed her personal assets and debt obligations, and invited Ms. Drago to attend a November 2017 HT Franchising convention to be held in Dallas, Texas.  At this point, M. Costanz told Ms. Drago that she could own substantial "equity" in HT Franchising by purchasing the entire state of Hawaii as a territory.

63.     Mr. Costanz completed his interview of Ms. Drago during an October 11, 2017 telephone call.  In the week that followed, Ms. Drago looked further into HT Franchising's business and reputation, as well as the reputations of HT Franchising's executive staff, and exchanged several e-mail messages with Mr. Costanz seeking more information about HT Franchising's "equity" offering.  Ms. Drago also requested the right to rescind any investment in HT Franchising if, after meeting personally with M. Costanz and HT Franchising's executive

staff at the November convention and attending the presentations to be given at the convention, an investment no longer made economic sense for Banyan.

64.     At M. Costanz's direction, Ms. Drago wired HT Franchising $71,000 toward the purchase of a territory encompassing all of Hawaii on October 13, 2017, and executed a unit franchise agreement on October 20, 2017.  Shortly afterward, Ms. Drago wired HT Franchising an additional $10,000 for HT Franchising's required "marketing" payment on October 26, 2017.

65.     In mid-October 2017, M. Costanz renewed his offer to sell "equity in the company" to Ms. Drago and made a similar "equity" offer to Mr. Hill, through an investment in his securities offering.  In early November, 2017, M. Costanz again encouraged Ms. Drago and Mr. Hill to invest in his securities offering.   M. Costanz sent Ms. Drago and Mr. Hill a November 7, 2017 "letter to investors" that directed Ms. Drago and Mr. Hill to the Forms C and attachments that he and T. Muftic has executed and filed with the U.S. Securities and Exchange Commission on November 3, 2017.

66.     Ms. Drago attended the HT Franchising convention in Dallas, Texas, from November 10 through 12, 2017.  She attended presentations given by M. Costanz, T. Muftic and other executive staff members.  During T. Muftic's presentation as HT Franchising CFO, he projected the same "ROI" spreadsheet onto a large screen, and described in detail how a $225,000 investment in an HT Franchising area representative arrangement will generate $1.175 million in "free cash flow" during  year  ten , and appreciate in value such that it would sell for multiples of that annual free cash flow, such that the cumulative cash flow over ten years would equate to 44 times the original investment

67.     On the last day of the convention, Ms. Costanz invited Ms. Drago to attend a HT Franchising executive lunch before her flight to return home.   During lunch, M. Costanz

complimented Ms. Drago and stated "I know everyone in this industry and a lot of smart people, but I have never met someone before I met you this weekend, who could be the CEO of Happy Tax, besides myself."  M. Costanz then asked to speak privately offer Ms. Drago an even larger "equity" investment in HT Franchising for a much larger payment than the $71,000 she had recently paid for a unit franchise.  Less than two hours later, M. Costanz wrote to Ms. Drago in a text message: "I meant what I said about you being the only other person I've met that could be CEO of our company (and I know everyone in the industry)."

68.     After her return home, Ms. Drago further examined T. Muftic's "ROI spreadsheet", recounted the statements T. Muftic, M. Costanz and other HT Franchising executives made at the convention, Ms. Drago considered M. Costanz's statements and increased equity offer and opted for a larger area representative agreement territory (all of Hawaii, several counties in central California and Clark County, Nevada).  Ms. Drago reviewed the audited HT Franchising financial statements, the area representative arrangement FDD, M. Costanz's statements made in YouTube and website videos and written publications and T. Muftic's "ROI" financial performance representations, and decided that Banyan would make a significantly larger investment in HT Franchising for a substantially-expanded area representative arrangement territory and "equity in the company".

69.     Later in November 2017, M. Costanz renewed his offer to sell "equity in the company" to Ms. Drago and Mr. Hill and emphasized that they should make their investment in M. Costanz's securities offering immediately.  Ms. Drago and Mr. Hill considered M. Costanz's statements, carefully reviewed the statements M. Costanz, T. Muftic and HT Holding made in the as-filed Forms C and attachments, including the financial statements which M. Hadzipanajotis reportedly had audited "in accordance with auditing standards generally accepted

in the United States" so as to "to obtain reasonable assurance about whether the financial statements are free from material misstatement".

70.     In early December, 2017, M. Costanz directed HT Franchising executives to prepare and forward a revised HT Franchising area representative arrangement agreement to Ms. Drago to execute to confirm her $1,984,600 investment in a substantially-expanded area representative arrangement, which encompassed the entire state of Hawaii, several northern-California counties and Clark County, Nevada, and included "equity in the company".   Ms. Drago made clear to M. Costanz that she would use a bank line of credit, secured by a mortgage on her home, to fund the $325,920 additional "down payment" that M. Costanz and HT Franchising required from Ms. Drago and Banyan, and executed a ten-year promissory note for the remaining $1,587,608 for the balance

71.     To encourage Ms. Drago to cause Banyan to pay to and commit to pay to M. Costanz and HT Franchising an additional $325,920, M. Costanz told Ms. Drago directly and wrote to her in e-mail messages that several other investors were "coming in at or near" Banyan's total investment, and promised that he would spend Banyan's invested funds to considerably improve HT Franchising "proprietary technology and infrastructure" and direct the "entire corporate team" to help Ms. Drago and Banyan promote and attract customers to HT Franchising's services.

72.     In reliance on M. Costanz's statements and promises, the Forms C and attachments, the audited financial statements, and M. Costanz's promise of "equity in the company" if she and Banyan invested in M. Costanz's securities offering, Ms. Drago caused Banyan to invested $100,000 in HT Holding-issued SAFE units in two tranches, $50,000 on November 17, 2017 and $50,000 on December 11, 2017.  In total, Banyan invested $396,920 in

HT Holding-issued SAFE units, and total payments, including an additional $15,000 in "marketing fees" to $411,920. Similarly, in reliance on the Forms C and attachments, the audited financial statements and M. Costanz's representations as to "equity in the company", Mr. Hill caused JLHG to invest $5000 in HT Holding-issued SAFE units on December 7, 2017.

## **HT FRANCHISING'S POOR 2018 TAX SEASON PERFORMANCE**

73.     From December 2017 through March 2018, with M. Costanz's full approval, Ms. Drago caused Banyan to purchase advertisements in several media, including three television stations, local radio stations and Facebook, among others, to promote the "Happy Tax brand" and HT Franchising's services throughout all of Hawaii before the 2018 "tax season" began in earnest. Ms. Drago also retained a spokesperson and "wrapped" her motor vehicle to display the "Happy Tax brand". During those four months alone, Banyan expended more than $40,000 to promote the "Happy Tax brand" and HT Franchising's services to consumers throughout Hawaii. Ms. Drago and Banyan also paid HT Franchising over $20,000 for additional marketing "kits" to on-board independent sales contractors through the HT Franchising "System".

74.     In mid- January, 2018, M. Costanz declared that going-forward, all customers must pay income tax preparation fees directly to HT Franchising, from which HT Franchising will deduct the 15% "CPA fee" and the 20% "royalty", and pay the balance to the generating-franchisee, and would produce a report showing all amounts collected and computations of the amounts withheld.

75.     From that time forward, Mr. Hill and Ms. Drago, among all other HT unit franchisees and area representatives, struggled to serve their respective customers because HT Franchising's internal processes and income tax preparation functions were inconsistent and unreliable. Customers' income tax returns were delayed for long periods of time within HT

Franchising's "System", and a large portion of processed income tax returns (when HT Franchising eventually produced them) was riddled with errors.

76.     Although M. Costanz and HT Franchising widely claimed that a HT Franchising unit franchisee "does not prepare or participate in preparing any income tax return", Mr. Hill, Ms. Drago and scores of HT Franchising unit franchisees' and area representatives' roles were significantly more involved and resource-consuming than the "franchisees merely solicit customers" to use HT Franchising's unique and proprietary CPA-only "System" promise that M. Costanz and HT Franchising had made to all of them.   The overall poor quality of service and error-ridden income tax returns that HT Franchising eventually turned out, made pursuing new customers to use HT Franchising's "System" virtually impossible.

77.     Before Ms. Drago signed Banyan's unit franchise agreement and area development arrangement agreement, M. Costanz assured Ms. Drago's lack of experience in taxation and income tax return preparation would not hinder her and Banyan's success in any way.   With HT Franchising's robust "System", its phalanx of CPAs (each with more than five years' experience in income taxation and having prepared at least 1000 federal income tax returns) preparing each customer's income tax return and HT Franchising's "100% accuracy guarantee", M. Costanz assured Ms. Drago that she could focus all of her energy on developing customer relationships.   Taking M. Costanz at his word, Ms. Drago did not initially personally review HT Franchising CPA-prepared returns before delivering them to her customers.

78.     One of the first five Banyan customers to receive HT Franchising CPA-prepared income tax returns identified many errors throughout that return, including typographical errors and use of an incorrect Social Security Number.   Horrified, Ms. Drago began to review each HT

Franchising CPA-prepared income tax return, line by line, data-point by data point, to identify typographical errors, incorrect amounts and a host of other defects in each such return.

79.     Despite hours of arduous work and attention to detail and expending staggering amounts of money and other resources to promote HT Franchising state-wide, Ms. Drago and Banyan struggled to serve their customers and to preserve their relationships with those customers.  Although M. Costanz had committed the full HT Franchising "corporate team" to support Ms. Drago and Banyan's efforts, Ms. Drago's requests for assistance and leadership fell on deaf ears.

80.     Worse yet, HT Franchising intercepted and collected each dollar every customer paid for income tax return preparation services, depriving unit franchisees from the "65% to 75% of all revenue collected from customers" that M. Costanz and HT Franchising had promised to lure unit franchisees, including Mr. Hill and Ms. Drago, to invest in HT Franchising.  For a short time, M. Costanz and HT Franchising provided unit franchisees, including JLHG and Banyan, a monthly "reconciliation report" to purportedly account for the total amount of customer revenue collected within area representative geographic territories, and to show the amount due to the unit franchisees and area representatives., and a similar weekly report for franchisee-sourced returns completed

81.     The reports were manually-created and populated by an HT Franchising corporate employee; no data base, accounting system or other automated process was used to collect, compile or parse customer collections data, or to allocate customer collections among specific area representative arrangement territories.  In that way, HT Franchising prevented each unit franchisee and area representative from monitoring or validating her, his or its actual production or the amounts owed to them for that production.

82.     "Commissions" payments, as M. Costanz termed them, were sporadic through 2018 and even more rare in 2019.  M. Costanz and HT Franchising stopped providing any report to Banyan entirely – and stopped paying any "commissions" due to Banyan – after November 2018.

83.     In early 2018, M. Costanz conceived a "crypto tax division" for HT Franchising, and used all HT Franchising resources available – which he had promised to use to support area representative and franchisee operations – to promote that "division" directly to potential consumers.  M. Costanz directed HT Franchising Partners, including Mr. Hill and Ms. Drago, to solicit crypto-currency customers by any means, and demanded that each crypto-currency customer pay substantial income tax return preparation fees "up front" directly to HT Franchising.   Over time, M. Costanz secretly amassed almost $400,000 in crypto-currency customers' pre-payments, but claimed HT Franchising had "run out of money" by April 30, 2018, leaving these customers' income tax returns unprepared well past the filing deadline. Notably, M. Costanz did not report this unearned revenue (or associated liability for it) on HT Franchising's financial statements.

84.     On February 14, 2018 -- less than one month into the 2018 tax season, Ms. Drago wrote to Mr. Costanz to report the poor quality of HT Franchising's services and error-riddled income tax returns, and to express her concerns about the substantial investment Banyan had made in HT Franchising based on M. Costanz's statements, promises and assurances.   In particular, Ms. Drago reported that the "onboarding, technology and tax processing" disappointed her completely, and the "corporate team's" accusing Ms. Drago and Banyan as the source of those "System" failures resolved nothing.  Although Mr. Costanz wrote "I will reply to this soon" to Ms. Drago, a reply never came.

85.     In late April 2018, M. Costanz asked Ms. Drago and Mr. Hill to meet with he and CFO T. Muftic at a Las Vegas, Nevada, conference and to appear at a "meet and greet" to solicit prospective investors.  At breakfast one morning, M. Costanz and T. Muftic asked Ms. Drago to candidly describe her HT Franchising experience during the 2018 tax season.  When Ms. Drago replied that neither she nor Banyan received the operational support that M. Costanz had promised, M. Costanz flew into a rage and shouted at Ms. Drago, demanding that she "STOP SAYING THAT"!  As Ms. Drago realized that despite all of her efforts and expenditure of enormous resources Banyan could not possibly service the expansive territory or sell the large number of unit franchises that M. Costanz and HT Franchising demanded that Banyan sell, she asked to reduce Banyan's geographic territory and the total amount that M. Costanz and HT Franchising had required Banyan to pay for it.   Weeks later, on May 15, 2018, M. Costanz and T. Muftic grudgingly agreed to "amend" Banyan's area representative arrangement agreement to decrease the expansive territory.

## M. COSTANZ AND HT FRANCHSING OFFER AND SELL
## MR. HILL AND JLHG A SECOND UNIT FRANCHISE

86.     In late spring, 2018, M. Costanz and HT Franchising asked Mr. Hill whether JLHG intended to execute a new unit franchise agreement as its original, three-year unit franchise agreement would expire later that year.  M. Costanz and HT Franchising provided Mr. Hill a unit franchise FDD issued August 23, 2017.   In it, M. Costanz and HT Franchising represented:

a.     They offer franchises "for the right to establish and operate a Happy Tax income tax preparation business using the Principal Trademarks and System initially from the franchisee's home";

b.      They have a "System" that "includes our proprietary technology, tools, support and resources";

c.      They "have a back office staffed with dedicated certified public accountants (CPAs) or other qualified tax professional[sic] who will prepare each income tax return processed by [me]";

d.      "No litigation is required to be disclosed";

e.      A franchisee must pay a "Preparation Fee" of fifteen percent of the amount collected from each customer, which is "paid to us to have our team of CPAs or other tax professionals prepare each income tax return process by [me]";

f.      A franchisee must pay a "Royalty" of twenty percent of the amount collected from each customer for use of the "System", or a required $4000 minimum royalty each year;

g.      A franchisee does not prepare or participate in preparing any income tax return.  Rather, a franchisee only solicits customers to use HF Franchising's "System" and gives each customer's information to HF Franchising so that its CPAs can prepare each customer's return;

h.      They set the prices customers must pay for income tax preparation services;

i.      A franchisee must use HT Franchising's "System" exclusively, as they prohibit a franchisee from using any other source or resource for income tax preparation services; and,

j.      M. Costanz and other identified officers have substantial experience in operating and managing income tax return service business and in franchising such businesses.

## M. COSTANZ AND HT FRANCHISING SELL JLHG AN EXPANDED AREA REPRESENTATIVE TERRITORY

87.     Within the territory that M. Costanz and T. Muftic allowed Ms. Drago to release from Banyan's area representative arrangement was Clark County, Nevada.  M. Costanz, T. Muftic and HT Franchising offered Clark County, Nevada to Mr. Hill and JLHG to expand JLHG's area representative arrangement territory for $245,627 price, payable primarily through an "amended promissory note".  At this time, M. Costanz and HT Franchising owed Mr. Hill and JLHG $29,769 for a "sales commission" because he introduced Ms. Drago to M. Costanz and HT Franchising in mid-2017.  Although M. Costanz and HT Franchising paid JLHG a small portion of that sale commission, they did not pay the bulk of that commission to JHLG, despite JLHG's repeated requests.  Months later, M. Costanz directed an HT Franchising executive to suggest a $20,000 principal reduction in the proposed amended promissory note.

88.     According to M. Costanz's glowing statements as to HT Franchising's solid business performance and continued growth, HT Franchising audited financial statements, and HT Franchising's July 7, 2017 area representative arrangement agreement, Mr. Hill considered and evaluated M. Costanz's expanded territory offer at the $20,000 discounted price.

89.     Later that summer, M. Costanz and HT Franchising provided Mr. Hill with an area representative FDD, issued August 28, 2018, on August 30, 2018.  In it, M. Costanz and HT Franchising represented:

a.     "The franchise offered is for a Happy Tax Area Representative arrangement pursuant to which you assist in recruiting and coaching Happy Tax unit franchise owners and in exchange receive a portion of the initial franchise fees and royalties paid by such unit franchisees";

b.     "No litigation is required to be disclosed"; and,

c.    M. Costanz and other identified officers have substantial experience in operating and managing income tax return service business and in franchising such businesses.

90.    That area representative FDD also included "updated" financial statements which were purportedly audited in accordance with auditing standards generally accepted in the United States, which require an auditor "to obtain reasonable assurance about whether the financial statements are free from material misstatement".    As to those financial statements, M. Hadzipanajotis stated:

> In our opinion the financial statements referred to above present fairly in all material respects the financial position of Happy Tax Franchising, LLC as of April 30, 2018 and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

M. Hadzipanajotis expressly consented to the use of the audited financial statements in and as an integral part of the FDD.

91.    In those financial statements, Mr. Hill noted nearly 123% (or $1.4 million) year-over-year  revenue growth; a 66% (or $670,000)  year-over-year increase in franchise fees income; a 53% (or $538,000) year-over-year increase in income tax return preparation fees income; a 40% (or $100,000) increase in earnings before interest, taxes and amortization ("EBITDA") before accounting for discontinued operations over the previous fiscal year; a 66% (or $642,000) increase in assets over the previous fiscal year; an 81% (or $527,000) year-over-year increase in  net notes receivable, when combined with collected revenue, was more than sufficient to cover operating expenses.

92.    Notably, the auditor's report for those financial statements did not qualify the auditor's opinion with any "going concern" language or any adverse developments as of August 24, 2018, which told Mr. Hill that HT Franchising was well on its way to another financially-

strong fiscal year. Based on M. Costanz's reports of HT Franchising's strong business operations, increased earnings, and the statements made in HT Franchising's August 28, 2018 area representative arrangement FDD, Mr. Hill caused JHLG to execute an amendment to JLGH's area representative arrangement agreement with HT Franchising to expand its geographical territory to encompass Clark County, Nevada, on September 5, 2018.

### M. COSTANZ'S DEMANDS ON MR. HILL AND MS. DRAGO TO INVEST MORE MONEY INTO HT FRANCHISING AND TO SOLICIT MORE INVESTORS

93.     In early January 2019 and at M. Costanz's direction, an HT Franchising executive contacted Ms. Drago to report that HT Franchising was "a little short on cash", and asked Ms. Drago and Banyan to invest $50,000 more in HT Franchising. To induce Ms. Drago and Banyan to make that investment, M. Costanz proposed to further "reduce" the previously-amended $920,080 promissory note balance. Specifically, M. Costanz proposed to "waive" the first year's accrued interest (approximately $52,000) and discount the remaining principle balance by $102,231 in exchange for a $50,000 cash payment to be made by January 7, 2019. Taking M. Costanz at his word, Ms. Drago agreed that Banyan would invest the additional $50,000. True to her word, Ms. Drago caused Banyan to wire $50,000 to HT Franchising on January 7, 2019, and continued to focus her full-time efforts on developing customer relationships and persuading those customers to use HT Franchising's income tax return services. Later, M. Costanz and HT Franchising further amended Banyan's promissory note to reduce the principal balance to $817,848.49.

94.     In mid-February, 2019, again at M. Costanz's direction, a second HT Franchising executive contacted Ms. Drago to report that HT Franchising did not have sufficient cash to "make payroll" for HT Franchising's CPAs and "tax department". Without an additional cash investment from Banyan, the executive stated, HT Franchising could not continue to operate to

"process" HT Franchising customers' income tax returns.  The executive reported that M. Costanz had instructed him to require an additional $250,000 to $300,000 from Ms. Drago and Banyan.  Ms. Drago declined, as Banyan did not have sufficient liquid capital to make such a large, unexpected investment in HT Franchising, particularly during the 2019 tax season.

95.     Shortly afterward, the executive contacted Ms. Drago again.  The executive reported that M. Costanz had directed him to tell Ms. Drago that M. Costanz intended to bankrupt HT Franchising if Banyan did not make the staggering investment that M. Costanz demanded.  Then, according to M. Costanz, Ms. Drago and Banyan would "lose their half-million-dollar investment" in HT Franchising when the company goes out of business.  In M. Costanz's words, Ms. Drago "had millions", so she should simply give M. Costanz and HT Franchising the money he demanded.

96.     As a large number of Banyan customers, and customers of many other unit franchisees and area representatives, had already provided their tax-related information and had paid HT Franchising significant fees to have their income tax returns prepared, Ms. Drago believed she had no choice but to invest more money in HT Franchising to preserve operations as she reasonably believed and relied on M. Costanz's rash promise to destroy HT Franchising – and all of the customers who had trusted HT Franchising with their financial information – merely to deprive Ms. Drago and Banyan of the $500,000 Banyan had previously invested in HT Franchising.

97.     Under intense pressure from M. Costanz's promise to bankrupt HT Franchising, Ms. Drago agreed that Banyan would invest an additional $150,000 in HT Franchising divided into two several payments to be made over a forty-five-day period.  M. Costanz instructed HT Franchising executives to report to Ms. Drago that M. Costanz would terminate Banyan's unit

franchise agreement and area representative agreement, immediately sue Ms. Drago and Banyan and sell Banyan's $817,848.49 amended promissory note to a third-party (for collection) for "pennies on the dollar", if Banyan did not invest the full additional $150,000.

98.     Ms. Drago proceeded to wire HT Franchising $50,000 on February 28, 2019; $20,000 on March 1, 2019; $5,000 on March 5, 2019; and $35,000 on March 29,2019, in reliance on M. Costanz's statements and promises to destroy Banyan's collective investment in HT Franchising.  As Ms. Drago and Banyan had expended extraordinary effort to persuade customers to use HT Franchising's income tax return preparation services and those customers had already paid HT Franchising a significant amount of money in advance for those services, Banyan was due more than $40,000 for its portion of those customers' fees.  M. Costanz and HT Franchising had already intercepted 100% of the amounts Banyan's customers paid for tax return preparation services, and had refused to pay Banyan any portion of the amounts due it, M. Costanz and HT Franchising simply "kept" the $40,000 due to Banyan as another forced "investment".

99.     From late March 2019 through early May 2019, M. Costanz, directly and through HT Franchising executives, repeatedly offered to "sell" HT Franchising, or a non-performing fragment of HT Franchising's business, to Ms. Drago.  M. Costanz told Ms. Drago, for the first time, that HT Franchising had around $1.0 million in debt and had no money to continue to operate in any capacity.  M. Costanz refused to provide any bank account statements or internal accounting records to reasonably evaluate M. Costanz's offers.  Later M. Costanz told Ms. Drago that HT Franchising had no internal accounting records and she would have to pay him $250,000 to "recreate" them.  For those reasons, among others, Ms. Drago declined M. Costanz's offers.

100.    Alarmed that HT Franchising could no longer perform its core function – prepare income tax returns – Ms. Drago asked M. Costanz to tell her what would be necessary for HT Franchising to begin to prepare income tax returns.  In response, M. Costanz and M. Poirier pressured Ms. Drago, Mr. Hill and other Partners, area representatives and unit franchisees to solicit at least $1.0 million in investments from new investors or to solicit prospective franchisees to purchase over 80 unit franchises before December 31, 2019.  Leary of M. Costanz's continued demands for more money while refusing to account for the funds that Partners, area representatives and franchisees had invested in HT Franchising, those Partners, area representatives and franchisees declined to invest more money, solicit investments from others or solicit prospective franchisees without a clear picture of HT Franchising's financial condition through an independent forensic audit of HT Franchising's internal accounting records, financial accounts and financial statements.

101.    On May 8, 2019, an HT Franchising executive announced a system-wide suspension on franchise and area representative arrangement sales that would remain in effect until HT Franchising's FDDs were properly updated.

102.    From early summer 2019 through August 2019, M. Costanz, and newly appointed "CEO" and "CFO", M. Poirier repeatedly refused to provide Partners, area representatives or franchisees any HT Franchising financial information or any insight into HT Franchising' true financial condition.  During that time, however, M. Costanz, HT Franchising and M. Poirier continued to intercept and keep payments from franchisee-sourced customers but refused to account to the Partners, area representatives or franchisees for those payments, provide any commission "reports" to them or to pay any money that HT Franchising owed them.  As to Ms. Drago and Banyan, M. Poirier refused to report to them or to pay any money to them because

Ms. Drago refused to sign a "non-disparagement agreement" in M. Costanz's and HT Franchising's favor and agree to release M. Costanz and HT Franchising from any legal claims that Ms. Drago or Banyan may otherwise have against them.

### M. COSTANZ AND M. POIRIER MATERIALLY AND ADVERSELY RESTATE HT FRANCHISING'S "AUDITED" 2017 AND 2018 FINANCIAL STATEMENTS

103.    M. Costanz, M. Poirier continued to conceal and refuse to disclose HT Franchising financial information -- including updated FDDs for 2019 -- to the Partners, area representatives or franchisees through early September 2019.  On or about September 5, 2019, Mr. Hill and Ms. Drago, among other Partners, area representatives and franchisees, wrote to M. Costanz and M. Poirier, among other HT Franchising management and "board" members, to express their collective concern with HT Franchising's operational and financial instability, M. Costanz's and M. Poirier's unwillingness to provide HT Franchising internal financial information, the accuracy of statements made in HT Franchising's FDDs, the accuracy and validity of HT Franchising's purported audited financial statements.

104.    Rather than provide the requested information and the leadership required, M. Costanz devolved into berating the Partners, area representatives and franchisees, and demanded that Ms. Drago "cease and desist" communicating with all other Partners, area representatives and franchisees.

105.    In mid-September 2019, Mr. Hill, Ms. Drago and other Partners, area representatives and franchisees obtained access to HT Franchising's September 13, 2019 unit and area representative arrangement FDDs from state franchise regulatory agencies.  Included in those FDDs were HT Franchising's and HT Holding's "consolidated" financial statements for the fiscal year-ends April 30, 2019; April 30, 2018 and April 30, 2017.  As in all years prior, M. Hadzipanajotis reported that he had audited those statements "in accordance with generally

accepted auditing standards" and determined they were "free of material misstatement". Without legitimate explanation (in financial statement footnotes or elsewhere), M. Costanz and M. Poirier, with M. Hadzipanajotis's rubber-stamp of approval, adversely "restated" virtually every significant metric for HT Franchising's 2017 and 2018 fiscal years.

106.    To illustrate, according to M. Costanz's and M. Poirier's restatement of HT Franchising's fiscal year 2018 financial condition, collected franchise fees were actually $334,000 less (or 20%) than originally reported.  Similarly, collected income tax preparation fees were really $385,000 less (or 60%) than first reported in 2018.  Further, when reported originally in 2018, HT Franchising's total revenue was actually overstated by $719,000 (or 28%), while net income was overstated by $659,000 (or 208%).  HT Franchising's liabilities for fiscal year ending 2018 were understated by $592,000 (or 165%). Additionally, as a result of these restatements, the fiscal year end April 30, 2018, which originally reported net income of $317,000, was actually a net loss of $342,000.

107.    As further examples, according to M. Costanz's and M. Poirier's restatement of HT Franchising's fiscal year 2017 financial condition, total claimed other operating expenses increased $382,000 (or 2877%) than first reported in 2017, HT Franchising's liabilities were understated by $286,000 (or 92%) than first reported in 2017, and equity decreased $186,000 (or 30%).  As a result of these restatements, the fiscal year ending April 30, 2017, which originally reported net income of $251,000, was actually a net loss of 111,232 (or 326%).

108.    Left with no explanation from M. Costanz or M. Poirier for their significant restatement of HT Franchising's 2017 and 2018 financial statements, Mr. Hill, JLHG, Ms. Drago and Banyan, along with other Partners, area representatives and franchisees, made a September 27, 2019 formal inquiry with the MA Board expressing their concerns as to HT Franchising's

irregular and misleading "audited" financial statements.  Later, the MA Board responded to that inquiry, reporting that M. Hadzipanajotis had violated Massachusetts law and regulations, was subject to discipline and surrendered his CPA license to avoid that discipline.

### M. COSTANZ'S AND T. MUFTIC'S STATEMENTS ARE FALSE AND MISLEADING

109.   The statements that M. Costanz made to Mr. Hill and Ms. Drago to induce them to invest in HT Franchising and HT Holding, as alleged in paragraphs 24, 25, 29, 30.c., 30.e., 30.g., 41.g., 42.a.-d., 43.g., 44.a.-d., 56.c., 56.e., 56.g., 74, 76, 86.c., 86.e., 86.g. and 94 were false when made because HT Franchising never had a "back office"  staffed with many CPAs, each with more than 5 years' experience in taxation and having completed more than 1000 returns; every customer's income tax return had not been prepared by a CPA; the 15% "CPA fee" or "Preparation Fee" that HT Franchising collected from each customer's payment was never collected for or paid to any CPA to prepare every customer's income tax return.

110.   The statements that M. Costanz made to Mr. Hill and Ms. Drago to induce them to invest in HT Franchising and HT Holding, as alleged in paragraphs 24, 29, 30.a., 30.b., 30.f., 30.g., 30.i., 41.k., 42.a., 43.k., 56.a., 56.b., 56.f., 56.g., 56.i., 71, 73, 75 through 77, 84.a., 86.b., 86.f. through i. were false when made because HT Franchising never had a "revolutionary business model", never had a unique business "System" nor any "proprietary" technology, as it used licensed, commercially available to transmit information and to prepare income tax return forms never had a "back office"  staffed with many CPAs, each with more than 5 years' experience in taxation and having completed more than 1000 returns; every customer's income tax return had not been prepared by a CPA; the 15% "CPA fee" or "Preparation Fee" that HT Franchising collected from each customer's payment was never collected for or paid to any CPA to prepare every customer's income tax return.

111.    The statements that M. Costanz made to Mr. Hill and Ms. Drago to induce them to invest in HT Franchising and HT Holding, as alleged in paragraphs 26, 27, 30.j., 36, 50.c. and 56.j. were false when made because M. Costanz never owned or sold 99 Liberty Tax® franchises or the development rights for Liberty Tax® franchises for several New York counties; M. Costanz's poor management of Valerie-ann Kelly's Liberty Tax® franchise locations such that JTH Tax, Inc. sued for breach of and to terminate her Liberty Tax® franchise agreements on October 31, 2014 (only two days after JTH, Inc. sued M. Costanz and Zee Calls, LLC on October 29, 2014); M. Costanz never invested $1.2 million in HT Franchising; M. Costanz had never owned or operated a franchisor company.

112.    The statements that M. Costanz made to Mr. Hill and Ms. Drago to induce them to invest in HT Franchising and HT Holding, as alleged in paragraphs 27, 40, 41.c., 41.d., 43.c., 43.d., 56.j., 57.c., 86.j., and 89.c. were false when made because HT Franchising had no board of directors or any other corporate governance to control for and prevent M. Costanz's misuse, domination and manipulation of HT Franchising's financial accounts, assets and purported internal accounting records; Keith Alessi was never a HT Franchising or HT Holding "board of director"; and, T. Muftic was chief financial officer for HT Franchising and HT Holding in name only -- a façade M. Costanz and T. Muftic used to mislead potential investors to think HT Franchising and HT Holding were legitimate, properly managed companies.

113.    The statements that M. Costanz made to Mr. Hill and Ms. Drago to induce them to invest in HT Franchising and HT Holding, as alleged in paragraphs 40, 41.j., 41.l., 43.b., 51, 53, 59 and 91 were false when made because HT Franchising's purportedly "audited" fiscal year 2017 and 2018 "financial statements" contained material misstatements and were not free of material omissions, and HT Holding had no "operations", revenue, earnings, assets or income in

fiscal years 2017 or 2018 or otherwise.

114.    The statements that M. Costanz made to Mr. Hill and Ms. Drago to induce them to invest in HT Franchising and HT Holding, as alleged in paragraphs 30.d., 50.b., 56.d., 57.b., 86.d., and 89.b. were false when made because fraud, unfair business practices and similar claims were asserted against M. Costanz in *JTH Tax, Inc. d/b/a Liberty Tax Service v. M. Costanz and Zee Calls, LLC*, Case No. 2:14cv554 (E.D. Va. Oct. 28, 2014);  M. Costanz failed to disclose his attempts to have the complaint in that action "sealed" to prevent potential HT Franchising franchisees and area representatives from discovering the fraud and similar claims that had been asserted against him; M. Costanz caused HT Franchising to be sued in *Bronx Tax, LLC v. HubTax, LLC, HT Franchising, and M. Costanz*, Case No. 650617/2017 (Sup. Ct. New York Feb. 3, 2017), caused HT Franchising to agree to entry of a $50,000 consent judgment and defaulted in his and HT Franchising's payment obligations under a settlement agreement, such that a $181,423.36 consent judgment was entered against M. Costanz on November 11, 2018.

115.    The statements that M. Costanz made to Mr. Hill and Ms. Drago to induce them to invest in HT Franchising and HT Holding, as alleged in paragraphs 10, 41.a., 41.i., 41.k., 41.l, 41.m., 43.a., 43.b., 43.i., 43.j., 43.k., 43.l., and 43.m. were false when made because HT Holding had no employees; HT Holding had no "operating history" in 2017, 2018 or otherwise; HT Holding never earned any "revenue from tax preparation operations"; HT Holding had no "cash and cash equivalents and loan currently receivable" as of March 2017 or afterward; HT Holding had not applied for any patents; HT Franchising had not "changed from LLC to Delaware C Corporation in Feb[sic] 2017", as M. Costanz filed annual reports with the Florida Secretary of State from 2015 through at least 2020, showing HT Franchising's continued existence as a distinct legal entity; HT Holding earned no "revenue from tax preparation operations" or "total

revenue" during fiscal year ended April 30, 2017, as HT Holding had no operations (much less "tax preparation operations") and no "total revenue" at any time.

116.     The following facts, among others, give rise to a strong inference that M. Costanz acted with scienter in making and disseminating each of the false statements of material fact or omissions of material fact:  M. Costanz contrived and widely promoted an entirely fictitious "system" using non-existent "proprietary technology" to purportedly prepare income tax returns "on demand"; M. Costanz knew that his "system" did not employ scores of CPAs, particularly those with over 5 years' experience in taxation and having prepared more than 1000 income tax returns, to prepare every income tax return;  M. Costanz contrived false "financial statements" for the sole purpose of misleading potential franchisees and investors to pay him substantial amounts of money to use a "system" that did not exist;   and, M. Costanz knew that HT Franchising no board of directors, but intentionally (and falsely) stated that Keith Alessi was "Board of director".

117.     The following facts, among others, give rise to a strong inference that T. Muftic acted with scienter in making and disseminating each of the false statements of material fact or omissions of material fact:  T. Muftic never acted as a chief financial officer for HT Franchising or HT Holdings, as he never participated in any financial planning decisions, accounting functions, performance metrics measurement, financial reporting, or any other financial or operational aspect of HT Franchising's purported business;  T. Muftic held himself out as HT Franchising's "CFO" and consented to M. Costanz's use of him as supposed "CFO" to sell HT Franchising unit franchise, area representative arrangements and unregistered securities; and T. Muftic created and promoted false financial performance representations for the sole purposes of

misleading potential franchisees to purchase costly HT Franchising area representative arrangements.

118.    The following facts give rise to a strong inference that M. Hadzipanajotis acted with scienter in making or disseminating the false statements of material fact or omissions of material fact: M. Hadzipanajotis knew he was not licensed, qualified or otherwise authorized to audit or issue a report on HT Franchising or HT Holding financial statements, but deliberately issued knowingly-false reports four separate times over four years; M. Hadzipanajotis knew that an auditor's primary responsibility is to conduct a legitimate and thorough audit of financial statements in accordance with generally accepted auditing standards, by planning and performing an audit to obtain reasonably assurance about whether financial statements are free from material misstatement, but did absolutely nothing to discharge that responsibility; M. Hadzipanajotis did not audit HT Franchising or HT Holding financial statements in accordance with GAAS, GAAP or any other generally accepted principles, but said the exact opposite in his reports; M. Hadzipanajotis did nothing to determine that neither HT Franchising nor HT Holding had directors, no actual chief financial officer or any other internal controls over M. Costanz's manipulation of HT Franchising's or HT Holding's internal accounting records and financial reports, or dissipation of HT Franchising assets or investor funds; M. Hadzipanajotis knew that his "unqualified opinion" that HT Franchising and HT Holding financial statements were free from material misstatement had absolutely no basis in fact  and would mislead any potential franchisee, area representative or other investor who relied on the truthfulness of that opinion; and, M. Hadzipanajotis knew and intended that M. Costanz and HT Franchising had distributed and would distribute his reports and the un-audited financial statements to potential franchisees, area representatives and other investors in attempts to mislead those investors to give M. Costanz

and HT Franchising substantial amounts of money.

119.    Mr. Hill, JLHG, Ms. Drago and Banyan retained Shutts & Bowen LLP and have agreed to pay their attorneys a reasonable fee for their services for which M. Costanz, T. Muftic, M. Hadzipanajotis HT Franchising, HT Holding and M. Poirier are responsible.

### COUNT I

120.    This is a claim brought pursuant to sections 4(a)(2) and 4A(c) of the Securities Act of 1933, 15 U.S.C. §§ 77d(a)(2) and 77d-1(c), and Regulation CF, 17 C.F.R. §§ 227.100 *et. seq.*, directed against M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding.

121.    Mr. Hill, JLHG, Ms. Drago and Banyan incorporate the allegations made in paragraphs 1 through 119 of this counterclaim and third-party complaint as if restated fully here.

122.    M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding are an "issuer" as that term is defined in 15 U.S.C. § 77d-1(c)(3).

123.    Mr. Hill, JLHG, Ms. Drago and Banyan are each a "person who purchased a security" as that phrase is used in 15 U.S.C. § 77d-1(c)(1)(A).

124.    M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding made, by means of written or oral communication, untrue statements of material fact and omitted to state material facts required to be stated or necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, offered and sold securities to Mr. Hill, JLHG, Ms. Drago and Banyan in transactions purportedly exempted by the provisions of 15 U.S.C. §§ 77d(a)(2), using means or instruments of transportation or communication in interstate commerce or of the mails.

125.    Mr. Hill, JLHG, Ms. Drago and Banyan did not know of the untruth of the

statements M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding made to them or the material facts that M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding omitted from disclosure to Mr. Hill, JLHG, Ms. Drago and Banyan.

126.     Mr. Hill, JLHG, Ms. Drago and Banyan justifiably relied on the statements and omissions M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding made.

127.     Mr. Hill's, JLHG's, Ms. Drago's and Banyan's justifiable reliance on the statements and omissions M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding made to them caused their respective economic losses.

## COUNT II

128.     This is a claim brought pursuant to Section 10(b) of the Securities and Exchange Act of 1934 ("'34 Act"), 15 U.S.C. §§ 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), directed against M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding.

129.     Mr. Hill, JLHG, Ms. Drago and Banyan incorporate paragraphs 1 through 119 of this counterclaim and third-party complaint as if restated fully here.

130.     Each of M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding is a "person" as that term is defined in Section 3(a)(9) of the '34 Act, 15 U.S.C. § 77c(9).

131.     Each of the franchise agreements, area representative arrangement agreements, as amended, promissory notes, as amended, and SAFE units is a "security" as that term is defined in Section 3(a)(10) of the '34 Act, 15 U.S.C. § 77c(10).

132.     M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding, each with scienter, made the untrue statements of material fact and failed to state material facts necessary in order to make the statements made, in the light of the circumstances under which

they are made, not misleading, all in connection with the purchase and sale of securities.

133.    M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding made use of the mails, wires, and telephones in interstate commerce when making the statements and to failing to state the material facts in connection with the purchase and sale of securities.

134.    Mr. Hill, JLHG, Ms. Drago and Banyan justifiably relied on the false statements of material facts made by M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding and their failures to state material facts.

135.    Mr. Hill's, JLHG's, Ms. Drago's and Banyan's justifiable reliance on the statements and omissions M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding caused their respective economic losses.

## COUNT III

136.    This is a claim brought pursuant to Section 10(b) of the Securities and Exchange Act of 1934 ("'34 Act"), 15 U.S.C. §§ 78j(b) and Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c), directed against M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding.

137.    Mr. Hill, JLHG, Ms. Drago and Banyan incorporate paragraphs 1 through 119 of this counterclaim and third-party complaint as if restated fully here.

138.    Each of M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding is a "person" as that term is defined in Section 3(a)(9) of the '34 Act, 15 U.S.C. § 77c(9).

139.    Each of the franchise agreements, area representative arrangement agreements, as amended, promissory notes, as amended, and SAFE units is a "security" as that term is defined in Section 3(a)(10) of the '34 Act, 15 U.S.C. § 77c(10).

140.     M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding, each with scienter, employed the devices, schemes and artifices to defraud Mr. Hill, JLHG, Ms. Drago and Banyan, and engaged in the acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

141.     M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding made use of the mails, wires, and telephones in interstate commerce to employ the devices, schemes and artifices to defraud Mr. Hill, JLHG, Ms. Drago and Banyan and to engage in the acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

142.     Mr. Hill, JLHG, Ms. Drago and Banyan justifiably relied on the devices, schemes and artifices to defraud that M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding employed, as well as the acts, practices, or courses of business in which M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding engaged.

143.     M. Costanz's, T. Muftic's, M. Hadzipanajotis's, HT Franchising's and HT Holding's devices, schemes and artifices to defraud, and their respective acts, practices or courses of business and Mr. Hill's, JLHG's, Ms. Drago's and Banyan's justifiable reliance on each of them caused Mr. Hill's, JLHG's, Ms. Drago's and Banyan's respective economic losses.

## COUNT IV

144.     This is claim brought pursuant to Section 20 of the '34 Act, 15 U.S.C. § 78t(a), directed against M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising and HT Holding.

145.     Mr. Hill, JLHG, Ms. Drago and Banyan incorporate paragraphs 1 through 119, 128 through 136 and 138 through 143 of this counterclaim and third-party complaint as if restated fully here.

146.    M. Costanz and T. Muftic owned, controlled and dominated HT Franchising and HT Holding in all respects.   Among other things, M. Costanz and T. Muftic dictated HT Franchising's and HT Holding's formations, business practices, business operations, accounting and financial reporting practices; and manipulated their accounting and financial records; expended and dissipated their assets, including funds received from franchisees, area representatives and investors; filed sworn and certified statements with the U.S. Securities and Exchange Commission  and state regulatory agencies for each of them to conduct regulated businesses; and certified their compliance with federal and state law and regulations.

147.    M. Costanz and T. Muftic personally participated in and facilitated HT Franchising's and HT Holding's violations of the federal securities laws, and personally benefitted from their respective actions.

### **COUNT V**

148.    This is a claim brought pursuant to section 29(b) of the '34 Act, 15 U.S. Code § 78cc(b), directed against HT Franchising and HT Holding.

149.    Mr. Hill, JLHG, Ms. Drago and Banyan incorporate paragraphs 1 through 119, 128 through 136 and 138 through 143, above, as if restated fully here.

150.    Mr. Hill, JLHG, Ms. Drago and Bayan were each a party to franchise agreements, area representative arrangement agreements, as amended, promissory notes, as amended, and SAFE agreements, which were made in connection with M. Costanz's, HT Franchising's and HT Holding's offering and sale of securities in violation of section 10(b) and Rule 10b-5.

151.    HT Franchising and HT Holding were each a party to franchise agreements, area representative arrangement agreements, as amended, promissory notes, as amended, and SAFE agreements through which M. Costanz, HT Franchising and HT Holding offered and sold

securities in violation of section 10(b) and Rule 10b-5.

152.    As defrauded investors, Mr. Hill, JLHG, Ms. Drago and Banyan belong to the class of persons that the securities laws were designed to protect.

## COUNT VI

153.    This is a claim brought pursuant to The Federal Trade Commission Franchise Rule, as amended, 16 CFR Part 436 ("Franchise Rule"), and The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), section 501.201 *et seq*., Florida Statutes, directed against M. Costanz, T. Muftic and HT Franchising.

154.    Mr. Hill, JLHG, Ms. Drago and Banyan incorporate the allegations in paragraphs 1 through 119, above, as if restated fully here.

155.    HT Franchising is subject to regulation by the U.S. Federal Trade Commission pursuant to the Franchise Rule.  That rule required HT Franchising to deliver a complete and accurate FDD to a potential franchisee at least 14 full calendar days before the date on which that franchisee signs a binding agreement or pays HT Franchising any money.

156.    The Rule also required HT Franchising to clearly and completely disclose 23 specific items of information in each of its unit and area representative arrangement FDDs. Failing to accurately disclose those 23 specific items of information (or making any statements that conflict with the information the Franchise Rule required HT Franchising to disclose in an FDD), is a unfair or deceptive practice or act in violation of section 5 of the Federal Trade Commission Act.  Further, a violation of the Federal Trade Commission Act or the Franchise Rule is a *per se* violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. ("FDUTPA").

157.    M. Costanz, T. Muftic and HT Franchising personally participated in each of the

65

actions and in making each of the statements as alleged, and failed to disclosure material information as required by Franchise Rule, and made statements that contradict the information the Franchise Rule requires to be included in and disclosed by FDDs.

158.    In FDD Item 2 ("Business Experience") 16 C.F.R. § 436.5(b), a franchisor must (i) disclose by name and position its officers and all other individuals who will have managerial authority relating to the sale or operation of the offered franchise; and (ii) state, each such person's principal employers and employment positions during the immediately preceding five (5)-year period.

159.    In each of the unit and area representative arrangement FDDs that M. Costanz and HT Franchising delivered or caused to be delivered to Mr. Hill, JLHG, Ms. Drago and Banyan, M. Costanz and HT Franchising failed to disclose the following in violation of Franchise Rule section 436.5(b):  M. Costanz never owned 99 Liberty Tax® franchises, or the exclusive area development rights for New York; and, M. Costanz's poor management and operations of Liberty Tax® Franchise units owned by Valerie-ann Kelly, caused JTH, Inc. to sue her for breach of contract and to terminate all of Valerie-ann Kelly's Liberty Tax® franchise agreements.

160.    In FDD Item 3 ("Litigation"), 16 C.F.R. § 436.5(c), the franchisor must disclose all prior civil actions against all officers and all other individuals who will have managerial authority relating to the sale or operation of the offered franchise actions in which allegations of fraud, unfair or deceptive practices, or comparable allegations are asserted within 10 years before the issuance date of an FDD.

161.    In each of the unit and area representative arrangement FDDs that M. Costanz and HT Franchising delivered or caused to be delivered to Mr. Hill, JLHG, Ms. Drago and Banyan,

M. Costanz and HT Franchising failed to disclose or misrepresented the following in violation of Franchise Rule section 436.5(c):  The *JTH Tax, Inc. dba Liberty Tax Service v. M. Costanz and Zee Calls, LLC*, litigation, particularly the fraud, civil conspiracy to defraud, business conspiracy and fraudulent conveyance claims and allegations of deceptive and unfair business acts directed at M. Costanz, including the "settlement agreement" reached among the parties to privately resolve the dispute; M. Costanz's exhaustive attempts to conceal that JTH Tax, Inc. sued him personally for fraud, civil conspiracy to defraud, business conspiracy and fraudulent conveyance and alleged his deceptive and unfair business acts, including moving to "seal the complaint" to protect his reputation as a franchisor;  the *Bronx Tax, LLC v. Mario Costanz et al*., Case No. 2017-650617, NY Superior Court, particularly the allegations that HT Franchising and M. Costanz were attempting to operate and maintain a "phantom franchise operation"; that M. Costanz had agreed that he and HT Franchising would pay the plaintiff over $200,000 to settle the dispute; or that M. Costanz defaulted on his payment obligations such that a $185,000 judgment was entered against him and HT Franchising was left exposed to a potential $50,000 "confessed judgment" that may be entered against it without notice at any time.

162.    In FDD Item 4 ("Bankruptcy"), 16 C.F.R. § 436.5(d), the franchisor must disclose any and all petitions for relief under the U.S. Bankruptcy Code and orders of discharge issued to any debtor for all officers, directors or any person that exercises managerial control over operations or franchise management for the 10-year period ending with an FDD's issue date.

163.    In each of the HT Franchising unit and area representative arrangement FDDs that M. Costanz and HT Franchising delivered or caused to be delivered to Mr. Hill, JLHG, Ms. Drago and Banyan from 2017 forward, M. Costanz and HT Franchising failed to disclose the following in violation of Franchise Rule section 435.5(d):  The petition for relief under Chapter

13 of the U.S. Bankruptcy Code that L. Knox Wimberly, HT Franchising's "Director of Tax" filed In each such FDD, however, M. Costanz and HT Franchising failed to disclose that L. Knox Wimberly filed a petition for relief under the U.S. Bankruptcy Code on June 24, 2009 and received a discharge in 2015.

164. Mr. Hill, JLHG, Ms. Drago and Banyan relied on the FDDs in making their investment decisions as to HT Franchising and suffered actual injury and harm from M. Costanz's, T. Muftic's and HT Franchising's failures to comply with the Franchise Rule.

<u>**COUNT VII**</u>

165. This is a claim for fraudulent inducement directed against M. Costanz, HT Franchising and HT Holding.

166. Mr. Hill, JLHG, Ms. Drago and Banyan incorporate the allegations made in paragraphs 1 through 119 of this counterclaim and third-party complaint as if restated fully here.

167. M. Costanz, HT Franchising and HT Holding made the false statements as to past or existing material facts to Mr. Hill, JLHG, Ms. Drago and Banyan.

168. M. Costanz, HT Franchising and HT Holding had superior knowledge of the subject matter of their false statements which Mr. Hill, JLHG, Ms. Drago and Banyan could not have discovered through reasonable diligence.

169. M. Costanz, HT Franchising and HT Holding made future promises to perform with no present intention of doing so.

170. M. Costanz, HT Franchising and HT Holding knew that each such statement was false when made.

171. M. Costanz, HT Franchising and HT Holding made each such statement with the intent that Mr. Hill, JLHG, Ms. Drago and Banyan rely and act on each such statement.

172.    Mr. Hill, JLHG, Ms. Drago and Banyan were damaged as a result of their reasonable reliance on M. Costanz's, HT Franchising's and HT Holding's the false statements.

## COUNT VIII

173.    This is a claim for breach of contract directed against HT Franchising and HT Holding.

174.    Mr. Hill, JLHG, Ms. Drago and Banyan incorporate the allegations made in paragraphs 1through 119 of this counterclaim and third-party complaint as if restated fully here.

175.    HT Franchising and HT Holding materially breached their respective contracts with Mr. Hill, JLHG, Ms. Drago and Banyan as follows:

176.    Mr. Hill, JLHG, Ms. Drago and Banyan suffered actual damages from HT Franchising's and HT Holding's material breaches of their respective contracts.

## COUNT IX

177.    This is a claim for breach of fiduciary duty directed against M. Costanz, HT Franchising and M. Poirier.

178.    Mr. Hill, JLHG, Ms. Drago and Banyan incorporate paragraphs 1 through 119, above, as if fully restated here.

179.    As partners to Mr. Hill, JLHG, Ms. Drago and Banyan, and as the persons responsible for intercepting, collecting and accounting for all amounts paid by JLHG and Banyan customers for income tax return preparation services, for accurately calculating and withholding royalties and for timely and accurately reporting and paying all amounts due to JLHG and Banyan, M. Costanz, HT Franchising and M. Poirier owed Mr. Hill, JLHG, Ms. Drago and Banyan fiduciary duties.

180.    M. Costanz, HT Franchising and M. Poirier breached their fiduciary duties to Mr.

Hill, JLHG, Ms. Drago and Banyan by intercepting and collecting, but failing entirely to account for, all amounts paid by JLHG and Banyan customers for income tax return preparation services, by failing entirely to accurately calculate and withhold only royalties actually due, by refusing to timely or accurately report to JLHG and Banyan and by refusing to pay JLGH and Banyan all amounts due to them.

181.   Mr. Hill, JLHG, Ms. Drago and Banyan suffered actual damages as a direct result of M. Costanz's, HT Franchising's and M. Poirier's respective breaches of their fiduciary duties.

182.

## DEMAND FOR RELIEF

WHEREFORE, Mr. Hill, JLHG, Ms. Drago and Banyan respectfully request that the Court enter final judgment against M. Costanz, T. Muftic, M. Hadzipanajotis, HT Franchising, HT Holding and M. Poirier, jointly and severally, rescinding all contracts as between any of them and Mr. Hill, JLHG, Ms. Drago and Banyan, and awarding compensatory damages, prejudgment interest, punitive damages, attorneys' fees and costs, and all other relief to which Mr. Hill, JLHG, Ms. Drago and Banyan may be entitled.

**SHUTTS & BOWEN LLP**

*/s/ Lonnie L. Simpson*
Lonnie L. Simpson, Esq., FBN 821871
lsimpson@shutts.com
4301 W. Boy Scout Blvd., Suite 300
Tampa, Florida 33607
Telephone: (813) 229-8900
Facsimile: (813) 229-8901
*Counsel for Defendants/Counterplaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 17, 2021, I electronically filed Defendants' Answer, Defenses,

Counterclaim and Third-Party Claim with the Clerk of the Court via CM/ECF which will send an

electronic notice to counsel of record and to *pro se* plaintiff Mario Costanz.

<u>/s/ *Lonnie L. Simpson*</u>
ATTORNEY

TPADOCS 23823934 1