UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-cv-24539-MORENO/Louis

HAPPY TAX FRANCHISING, LLC and MARIO
COSTANZ,

    Plaintiffs,

vs.

JAMEY HILL, THE J L HILL GROUP, LLC,
TRICIA DRAGO, BANYAN ACCOUNTING, LLC,

    Defendants.
_____/
JAMEY HILL, THE JL HILL GROUP, LLC,
TRICIA DRAGO, BANYAN ACCOUNTING, LLC,

    Counterclaim and Third-Party Plaintiffs,

v.

MARIO COSTANZ, HAPPY TAX HOLDINGS
CORP., HAPPY TAX FRANCHISING, LLC,
TED MUFTIC, MICHAEL HADZIPANAJOTIS,
and MONICA POIRIER,

    Counterclaim and Third-Party Defendants.
_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS MOTION TO STRIKE PLAINTIFFS' EXPERTS [D.E. No. 336]**

Plaintiffs, HAPPY TAX FRANCHISING, LLC and MARIO COSTANZ ("Plaintiffs"), by and through the undersigned counsel, hereby file their Response in Opposition to Defendants' Motion to Strike Plaintiffs' Experts [D.E. 336].[1] In support thereof, Plaintiffs state as follows:

---

[1] Defendants' Motion to Strike purports to attach Plaintiffs' 5 experts' reports as Composite Exhibit A, but multiple pages are missing. Plaintiffs' five expert reports Irene Orellana and Amanda Crosby as Exhibit 1, Joshua Acosta as Exhibit 2, Marcus B. Hodge as Exhibit 3, W. Michael Garner, Esq. as Exhibit 4, and Markley S. Roderick, Esq. as Exhibit 5.

# ARGUMENT

I.     LEGAL STANDARD

    A.     Rule 702 and *Daubert*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the Court engages in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert*, 509 U.S. at 589). The Court of Appeals for the Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Defendants do not challenge the qualifications of any of Plaintiffs' experts.

When determining whether an expert's testimony is *reliable*, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and...whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (citation omitted) (quotation marks omitted). To make this

determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Thus, these factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. *See id.* For nonscientific testimony, courts can determine reliability by comparing the expert's preparation and methodology to other experts in the field. See Kumho, 526 U.S. at 151 (noting that it is appropriate for a trial judge to ask if a given methodology is "generally accepted" in the expert's professional community and if the expert's "preparation is of a kind that others would recognize as acceptable"). Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1258 (citing *Kumho Tire Co.*, 526 U.S. at 152).

The final element, *helpfulness*, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical

leap must be made between the facts and the opinion." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.' " *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, as noted, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook ex rel. Estate of Tessier*, 402 F.3d at 1103 (quoting *Frazier*, 387 F.3d at 1258).

B. **Rules 26 and 37**

Federal Rule of Civil Procedure 26 requires a party to disclose to the other parties the identity of any witness it may use at trial to present expert testimony. *See* Fed. R. Civ. P. 26(a)(2). Rule 26(a)(2)(D) requires the disclosure of expert testimony at times and in the

sequence that the court orders. Fed. R. Civ. P. 26(a)(2)(D). Absent a court order saying otherwise, disclosure of expert testimony must occur at least 90 days before the date set for trial or for the case to be ready for trial. Fed. R. Civ. P. 26(a)(2)(D)(i). Thus, Rule 26(a)(2)(D)(i) sets a default deadline in the event that the trial court does not set its own schedule.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence…at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The non-disclosing party bears the burden of showing that the failure to comply with Rule 26 was substantially justified or harmless. *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009). In making this determination, the Court considers four factors: "(1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Torres v. First Transit, Inc.*, No. 17-CV-81162, 2018 WL 3729553, at *2 (S.D. Fla. Aug. 6, 2018) (citation omitted). "Prejudice generally occurs when late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question." *Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1260 (S.D. Fla. 2015) (citation omitted).

"Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact. The test is satisfied if there is [a] genuine dispute concerning compliance." *Home Design Services, Inc. v. Hibiscus Homes of Florida, Inc.*, No. 603CV1860ORL19KRS, 2005 WL 2465020, at *2 (M.D. Fla. Oct. 6, 2005) (quoting *Ellison v. Windt*, No. 6:99-cv-1268-Orl-KRS, 2001 WL 118617, at *2 (M.D. Fla. Jan. 24, 2001)) (citation omitted). "Failure to timely make

the required expert witness disclosures is harmless when the party entitled to the disclosure suffers no prejudice." *Id.*

Ultimately, the "determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Smith v. Jacobs Eng'g Grp., Inc.*, No. 4:06CV496-WS/WCS, 2008 WL 4264718, at *6 (N.D. Fla. Mar. 20, 2008), *report and recommendation adopted*, No. 4:06 CV 496 WS, 2008 WL 4280167 (N.D. Fla. Sept. 12, 2008) (citation omitted); *Warren v. Delvista Towers Condo. Ass'n, Inc.*, No. 13-23074-CIV, 2014 WL 3764126, at *1-2 (S.D. Fla. July 30, 2014) (noting that while the "failure to comply with the expert witness disclosure requirements may result in the striking of expert reports or the preclusion of expert testimony," a court has "great discretion in deciding whether to impose such a sanction").

II. DEFENDANTS' FAILURE TO MEET AND CONFER

Rule 37 requires a movant's counsel to "in good faith confer[] with the person or party failing to make disclosure... in an effort to obtain it without court action", and to certify to a court that she has done so. Fed.R.Civ.P. 37(a)(1). Similarly, Local Rule 7.1 compels counsel, prior to filing a motion in any civil action, to "confer with all parties or non-parties who may be affected by the relief sought in the motion in a good faith effort to resolve by agreement the issues to be raised in the motion."

On December 30, 2022, Defendants filed their Motion to Strike [D.E. 336] (the "Motion to Strike"). Two days before, on December 28, 2022, Mr. Simpson wrote the following email:

> To make their record, the defendants intend to move to strike the plaintiffs' experts, particularly those identified for the first time earlier this month. The defendants will most likely argue that the experts were not timely disclosed, each relies in data that was not disclosed nor produced in discovery and none meet the *Daubert/Kumho* admissibility standard. Please let me know your clients' respective positions as to the defendants' motion and the relief sought.

Undersigned counsel for Plaintiffs responded that same day requesting a call "to explore ways to work out a solution." Mr. Simpson responded late the following day, December 29, 2022 in a separate email thread proposing 10:30am on December 30, 2022. Undersigned did not receive the email before the proposed call the next morning and Defendant proceeded to file their Motion to Strike Experts later that day containing the following certification:

> Happy Tax Holdings Corp. asked to confer further will Defendants' counsel on December 30, 2022. Although Defendants' counsel confirmed his availability on that date, the plaintiffs' counsel and he did not connect.

Defendants made their "record," but it hardly qualifies as a "good faith effort to resolve by agreement made no meaningful attempt to resolve any of the issues raised in the motion. ECF 336, p. 16.

### III. PLAINTIFFS' EXPERT REPORTS WERE TIMELY DISCLOSED PURSUANT TO RULE 26(A)(2)(D)(I)

Plaintiffs served their two "linguistic expert" reports of Joshua Acosta and Irene Orellana and Amanda Crosby on September 22, 2022 in opposition to Defendants' motion for summary judgment. [ECF 336, p. 3]. In reliance on the 90-day default rule in Rule 26(a)(2)(D)(i), on December 13, 2022 (90 days prior to the March 13, 2023 trial date), Plaintiff served its two "linguistic expert" reports again as well as three additional expert reports of Michael Garner, Esq., Markley Roderick, Esq., and Marcus Hodge.

Defendants' contend that the 90-day default rule does not apply because this Court's November 18, 2019 Scheduling Order [ECF 10] provided for an expert disclosure deadline. [ECF 336, p. 3]. That Scheduling Order called for expert disclosures to be made 30 days before the discovery deadline and provided for a March 20, 2020 deadline "to complete all discovery (including expert testimony)")].

However, on April 9, 2020, this Court entered its first ORDER OF CONTINUANCE, requiring that "all non-expert discovery must be completed by August 12, 2020. [ECF 35, p.

3] (emphasis supplied). The Order provides that it "supersedes only the inconsistent portions of the previous Scheduling Orders." There was no deadline established for expert disclosures, expert discovery, or "all" discovery.

On August 14, 2020, this Court entered its second ORDER OF CONTINUANCE, requiring that "all non-expert discovery must be completed by November 3, 2020. [ECF 72, p. 3] (emphasis supplied). There was no deadline established for expert discovery or disclosure. This Court entered three additional ORDERS OF CONTINUANCE on January 8, 2021, May 19, 2021, and October 14, 2021 [ECF 83, 100, 148], none of which modified any discovery deadlines or re-established an expert disclosure deadline. On February 1, 2022, this Court entered its sixth ORDER OF CONTINUANCE, which re-established a limited non-expert discovery deadline of May 12, 2022. [ECF 177]. On June 15, 2022, this Court entered a seventh ORDER OF CONTINUANCE, which re-opened all discovery to be completed by August 8, 2022. [ECF 207]. This is the first time that "all discovery" had been open since the first discovery period established by the original SCHEDULING ORDER that ended March 20, 2020. [ECF 10]. However, unlike the original SCHEDULING ORDER, the seventh ORDER OF CONTINUANCE did not establish an expert disclosure deadline. The Court entered its eighth and last ORDER OF CONTINUANCE on October 17, 2022, which did not address expert disclosure deadlines. [ECF 274].

Plaintiffs, through their former counsel, were of the reasonable belief that the 90-day default rule applied given that no separate deadlines for expert disclosure were established in the eight subsequent continuance Orders. *See generally* Plaintiffs' July 23, 2022 Joint Motion for Extension of Time to Complete Discovery [ECF 217] (requesting an extension of the discovery period, but no request made to modify the expert disclosure deadline, indicating a belief that the expert disclosure deadline had not lapsed). While Defendants argue that each continuance Order incorporates all consistent portions of the prior scheduling order, the

expert disclosure deadline established in the original Scheduling Order is not consistent because it stems 30-days from a deadline that is not provided for any of the following five Orders of Continuance. Specifically, a deadline "to complete all discovery (including expert testimony)" was not provided for in the subsequent Orders of Continuance that provide for either "non-expert discovery" or no discovery."

Even assuming Plaintiffs' expert reports are untimely, plaintiffs' disclosure of the reports after the discovery deadline was substantially justified and harmless. *See OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.3d 1344, 136065 (11th Cir. 2008) (reversing trial courts exclusion of expert witness where there was no evidence of willful or stonewalling delay with respect to the disclosure of the expert and its report); *Valdes v. Miami-Dade Cnty.*, 12-22426-CIV, 2015 WL 6829055, at *4, 5 (S.D. Fla. Nov. 6, 2015) ("defendants have shown substantial justification based on their reliance on the 90-day default rule" and, on that basis, distinguishing *Cruz v. United States*, 2013 WL 246763, at *4-6 (S.D. Fla. Jan. 22, 2013) (Moreno, J.) where the "party proffering the expert made no argument that the 90-day default rule applied").

Moreover, a party cannot claim prejudice where the party failed to depose an expert witness of which it had notice for an extended period of time. *Saewitz v. Lexington Insurance Company*, 2003 WL 25669319 at 3 (S.D.Fla. September 18, 2003). Similarly, a Southern District Court declined to strike a plaintiff's sole liability witness, notwithstanding late disclosure, where the defendant failed to timely object, had notice that an expert would testify, and failed to communicate with the plaintiff in an effort to avoid court intervention. *Poe v. Carnival Corporation*, 2007 WL 129007 at *1-4 (S.D.Fla. January 15, 2007). *See also, Catalina Rental Apartments, Inc. v. Pacific Insurance Company, Ltd.*, 2007 WL 1050634 (S.D.Fla. April 3, 2007) (holding that a lack of prejudice due to late expert disclosures did not

warrant the "harsh sanction" of striking expert witnesses, especially where there was not evidence of bad faith).

In *Landivar v. Celebrity Cruises, Inc.*, the Southern District recognized that "the parties must work to resolve it before seeking the "severe sanction" of excluding an expert's testimony." 340 F.R.D. 192, 196 (S.D. Fla. 2022) (Altonaga, C.) (citations omitted). Similar to here, in *Landivar* the "Defendant does not describe any efforts it made to remedy perceived defects in Dr. Bradberry's report — whether by conferring with Plaintiff's counsel, requesting an extension of the expert disclosure deadlines, requesting to further depose Dr. Bradberry, or seeking a hearing before the Magistrate Judge." *Id.* At the parties' belated meet and confer conference on January 12, 2023, Plaintiffs inquired as to how to remedy Defendants' perceived issues and proposed that Defendants take discovery from Plaintiffs' experts. On January 19, 2023, Mr. Simpson responded, stating that "I have not reached consensus with my clients as to your proposal, nor do I expect to do so within an additional week." Ex. 6.

Defendants' lack of interest in obtaining any remedy short of striking Plaintiffs' experts demonstrates that they are only interested in playing discovery "gotcha." Plaintiffs' experts should not be stricken considering that there is at least a genuine dispute concerning the timeliness of Plaintiffs' expert disclosures, the importance of Plaintiffs expert witnesses (described below), Defendants' failure to meet and confer in good faith before filing its motion, Defendants refusal to entertain any attempt to cure the deficiencies, and lack of prejudice to Defendants,

IV.  DAUBERT

    A.  **Plaintiffs' Forensic Linguistic Experts**

Defendants contend that Plaintiffs' forensic linguist experts must be stricken because their methods have "not been and cannot be tested, has no known rate of error, has not been

generally accepted by the scientific community and has not been subjected to peer review of publication." ECF 336, pp. 14 (as to Acosta), 15 (as to Orellana and Crosby).

Plaintiffs' experts, Joshua Acosta, Irene Orellana, and Amanda Crosby are highly educated and experienced in forensic linguistics. The American Academy of Sciences classifies linguistics as the scientific and systematic study of language. Ex. 1, p. 3. Mr. Acosta specializes in computational linguistics and conducted six stylometric tests analyzing the writing samples of persons suspected to have written the anonymous emails to provide a "significant observation of authorship." *See generally,* Ex. 2. Mr. Acosta explains that he analyzed the statistical significance of the results and found that the stylistic signatures are prevalent to support his conclusion that "it is highly likely … that Randall and Tricia worked together to compose the anonymous emails." Ex. 2., p. 3, 14-15.

Ms. Orellana and Ms. Crosby a forensic stylistic analysis by comparing the language styles in a set of known emails ("K Documents") to the anonymous emails ("Q Documents"). The analysis involves comparing the consistency the distinctiveness of nine notable linguistic features in the K Documents and Q Documents and testing them against a set of competing authorship hypotheses to determine which best explains the non-random distribution of the language data. Ex. 1, p. 4-6. The conclusion reached "[f]rom the frequency, the level of distinctiveness, and the consistency of the above features, the results of our analysis align with Hypothesis 4, which indicates a likely common author of K Tricia and the Q Documents." *Id.*, p. 26.

Both reports contain a lengthy and detailed explanation of the methodology employed in forming the opinions presented. Defendants challenge the reliability of Plaintiffs' linguistic experts and point the Court to an opinion from the Illinois Court of Appeals because, according to them, it was one of the few cases in the country they could find addressing linguistic expert testimony. ECF 336, p. 15. Defendants must not have read that case because

the appellate court recognized that "***courts have been considering this type of evidence for more than a century***." *People v. Coleman,* 24 N.E.3d 373, 401 (Ill. App. Ct. 2014) (*citing Throckmorton v. Holt*, 180 U.S. 552, 568 (US 1901). *People v. Coleman* actually stands for the opposite proposition because it affirmed the admission of an expert linguist's testimony. *Id*. At 402 ("we find no error in the trial court allowing the State to present the testimony of an expert linguist").

In a recent decision, this Court found that linguistic expert testimony is appropriate in determining authorship of emails where the Defendant has denied authoring them. *Kleiman v. Wright,* 18-CV-80176, 2020 WL 6729362, at *32–34 (S.D. Fla. Nov. 16, 2020). In Kleiman, the expert conducted a forensic linguistic authorship analysis of certain documents associated with Defendant. *Id*. at *32. The "forensic stylistic" analysis performed by the expert in *Kleiman* is based on the same methodology used by Orellana and Crosby - comparing "Q Documents" to "K Documents," analyzing language patterns, and posing competing authorship hypotheses to determine which best explains the non-random distribution of the language data. *Compare* Ex. 1, p. 4—6 and *Kleiman, at \*32.* The Court in *Kleiman* concluded that

> Dr. Leonard's testimony is plainly relevant to key issues in this case, particularly as Defendant has denied authoring certain emails relating to whether he partnered with Mr. Kleiman. Defendant fails to show how the sample size and quality of the documents that Dr. Leonard considered are insufficient to perform his analysis, and he fails to convince the Court that Dr. Leonard's methodology is unreliable under Daubert. Other federal courts have rejected efforts to exclude expert testimony on the basis that the forensic stylistics approach is unreliable. See, e.g., Dutcher v. Bold Films LP, No. 2:15-CV-110-DB, 2019 WL 181353, at *1 (D. Utah Jan. 11, 2019). And the mere fact that Dr. Eggington adheres to a different school of thought regarding forensic analysis does not compel the conclusion that Dr. Leonard's analysis is unreliable or fundamentally flawed. Moreover, whether any of the identified "linking features" reflected in Dr. Leonard's report is commonplace in writing or a truly unique and distinctive feature can be pursued on cross-examination. The same is true regarding his alleged "confirmation bias." Accordingly, Defendant's Motion is denied as to Dr. Leonard.

*Id.*, at *34.

Defendants also contend that Acosta, Orellana and Crosby relied on "cherry-picked, plaintiffs-curated '@happytax.com' e-mail messages." ECF 336, at p.15. Like in *Kleiman*, the Defendants fail to show how the sample size and documents that the experts considered are insufficient to perform their analysis. *See also Coquina Investments v. Rothstein*, 10-60786-CIV, 2011 WL 4949191, at *6 (S.D. Fla. Oct. 18, 2011) ("That Mr. Rubin reviewed only a sample of data goes to the weight of his testimony, rather than its admissibility. The fact that there may be other e-mails in the data set, which Mr. Rubin did not review, does not alter the reliability of his conclusion that he identified ten e-mails that were purportedly forged."). This may be grist for cross-examination at trial, but it is not a good reason to exclude the linguistic experts altogether from the case. A reasonable fact-finder could credit the expert testimony of Plaintiffs' linguistic experts to support a finding that Defendants authored the anonymous emails.

### B. Plaintiffs' Forensic Accountant Expert

Defendants contend that Mr. Hodge should be excluded because he "offers only errant legal conclusions (reached using his wholly *un*scientific "method") as opinions" ECF 336, p. 10. Defendants do not challenge Mr. Hodge's qualifications.

Mr. Marcus Hodge is a certified public accountant, a certified fraud examiner, certified in financial forensics, and accredited in business valuation. Ex. 3, p. 63 (resume). Mr. Hodge has experience performing economic damages calculations, accounting reconstruction, and embezzlement mechanics analysis. *Id*. His report includes a three-page, single-spaced list of cases for which he has provided litigation support and/or expert testimony (approximately 150 cases). Ex. 3, p. 64-66.

Mr. Hodge provides testimony based on his investigation of Happy Tax's books and records for financial misconduct. Mr. Hodge analyzed various factual accusations made by

Defendants as to financial and corporate misconduct asserted against Happy Tax and Mr. Costanz.

Regarding the statements that Mr. Costanz has been falsely accused of "embezzling" and "stealing" from Happy Tax, Mr. Hodge found from his review of Happy Tax's financial records that Mr. Costanz did not receive a single distribution from Happy Tax. Ex. 3, p. 19. Mr. Hodge also investigated the statements made by Defendants that Happy Tax's "books are not clean." Mr. Hodge reviewed the financial books and records and found that the companies had "normal" uses of cash and that Happy Tax had a large overhead for payroll. Ex. 3, p. 20-22. Mr. Hodge did not find any financial activity that would indicate the existence of waste or misuse of the companies' assets. Ex. 3, p. 18.

Mr. Hodge offers testimony regarding Defendants' assertions and suggestions that Happy Tax has engaged in financial misconduct because it was required to prepare financial "restatements" (amended financial statements). Mr. Hodge will testify that the simple fact of preparing a restated financial statement does not imply any financial wrongdoing. Ex. 3, p. 24. Mr. Hodge will provide testimony that will assist the jury in understanding what is a financial restatement, why they are prepared and in what circumstances, whether this is a normal accounting practice, why Happy Tax restated its financials, when revenue is "recognized" for accounting purposes, and that it is common for businesses to restate financials based on inaccurate revenue projections. pp. 24-38.

On a related topic, Mr. Hodge also provides expert testimony concerning Happy Tax's audited financials. Ex. 3, p. 39-47. Happy Tax was required to include audited financial statements in its Franchise Disclosure Document. It hired Mr. Hadzipanajotis, a certified public accountant, to perform the audit. It turned out that Mr. Hadzipanajotis did not have a special "Reporting License" from the Massachusetts Board of Registration of Public Accountancy and was therefore not licensed to perform audits. Defendants use that fact as

the basis to contend that "Happy Tax's financial statements from 2016-2019 were not prepared, maintained or "restated" in accordance with GAAP." Counterclaim, ¶ 23 (c-e). Mr. Hodge provides testimony regarding audited financials (what are they), who prepares audited financials, how they are prepared, skills needed to prepare them, Mr. Hadzipanajotis' qualifications to prepare audited financials, different licensing requirements to prepare audited financials and what is required, comparing the qualifications of a CPA to those required in Massachusetts to obtain a "reporting" license, what significance or effect that has on Happy Tax's audited financials, and whether Happy Tax's financial statements were otherwise prepared in accordance with GAAP. Ex. 3, p. 39-47.

Mr. Hodge also provides testimony based on his review of the relevant financial records that Mr. Costanz made contributions totaling $1,000,000.00 in cash and property with citations to the financial records and explanations, which both support Plaintiffs' damages claim and refute false statements made by Defendants. Ex. 3, p. 47. The remainder of Mr. Hodge's report (pp. 51-61) addresses Mr. Hodge's analysis of Counter-Plaintiffs' damages calculations where he found various flaws in their calculations, e.g., damages do not account for income received by Mr. Hill that would offset losses.

Defendants seek a wholesale exclusion as to the entirety of Mr. Hodge's expert testimony. Defendants contend that Mr. Hodge provides improper legal conclusion with very little analysis consisting of a string of short quotes taken out of context from Mr. Hodge's report. For example, Defendants' contend that Mr. Hodge is providing a legal conclusion as to the effect of a non-disparagement agreement. However, Mr. Hodge's testimony is an economic observation about the financial consequences resulting from Defendant Tricia Drago's failure to sign the contract and applying that to Ms. Drago's damages calculations. Moreover, Defendants' legal citations do not support their broad propositions. *See United States ex rel. Armfield v. Gills*, 8:07-CV-2374-T-27TBM, 2012 WL 12918276, at *1 (M.D. Fla.

July 24, 2012) (permitting expert to testify but precluding expert opinion "that Defendants' conduct constituted Medicare billing fraud or was "illegal" as these are ultimate legal conclusions.").

Defendants also the reliability of Mr. Hodge's "direct method" and claim that it is "his own, unique methodology." ECF 336, p. 12. Mr. Hodge states that he applied the American Institute of Certified Public Accountant's Statement on Standards for Forensic Services No. 1 (SSFS 1) in performing his analysis. Ex. 3, p. 3. Mr. Hodge applied the "direct method" to arrive at his conclusions. *Id*. at p. 4. This simply means that he relied directly on the evidence without any gaps or assumptions in his conclusions. This methodology provides the tightest "fit" that can exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

In developing his opinions, Mr. Hodge reviewed Happy Tax's books and records, audited financial statements, bank records, court filings, and voluminous documents that have been filed or obtained by the parties for use in this case. Ex. 3, p. 67. Mr. Hodge's preparation and methodology compares to that of other nontechnical experts who have reviewed accounts to identify the underlying factual bases for a legal conclusion. *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (allowing the testimony of expert economic and forensic accounting witnesses); *Regions Bank v. Kaplan*, 2017 WL 1278716, at *2 (M.D. Fla. Mar. 31, 2017) (finding that a certified fraud examiner and forensic accountant used proper methodology when he reviewed business accounts to identify the underlying factual elements of a fraudulent scheme). They also are of a kind "generally accepted" in his field, that "others would recognize as acceptable." *Kumho Tire Co.*, 526 U.S. at 151.

C. **Plaintiffs' Franchise and Securities Experts**

Defendants move to exclude W. Michael Garner, Esq.'s expert testimony regarding franchise disclosure regulations and practice and Markley S. Roderick, Esq.'s expected

testimony regarding securities disclosure regulations and practice. Defendants challenge their testimony on the grounds that they consist of legal conclusions or are purely argumentative and not helpful to the jury. ECF 336, pp. 9-11.

Mr. Garner has been practicing franchise law for 42 years. Ex. 4, p. 2. He published a three-volume treatise, *Franchise and Distribution Law and Practice.* Mr. Garner serves as the editor of the American Bar Association (ABA) Franchise Desk Book, served as editor-in-chief of the ABA's *Franchise Law Journal*, and served on the Governing Committee of the ABA Forum on Franchising. *Id.*, pp. 2-3. Mr. Garner has significant experience with franchise disclosure documents throughout his career and has been personally involved in analyzing disclosure decisions with respect to ITEM 3 of the FDD with his clients. Mr. Garner's broad experience in the area of franchise law and complying with franchise disclosure rules and regulations qualify him to testify as an expert in this case. Similarly, Mr. Roderick is Mr. Garner's counterpart in the area of securities law. Ex. 5, pp. 1-2. Mr. Roderick has extensive experience in securities law and the registration/disclosure obligations mandated by The Securities Act of 1933.

Without much analysis, Defendants contend that the attorney expert witnesses will not be helpful to the jury. One issue the jury will have to decide is whether 2 prior lawsuits ("The Liberty Tax Action" and "The Bronx Tax Action") were required to be disclosed by Happy Tax in ITEM 3 of its Franchise Disclosure Document. The jury will also have to decide whether an "unregistered security" was sold to the Defendants in violation of the Securities Act. Mr. Garner's testimony will be helpful to the jury in understanding how to decide whether the 2 prior lawsuits needed to be disclosed. The jury will be required to understand the nature of the 2 prior lawsuits, interpret the federal regulation that requires disclosure of only a limited category of prior actions, and decide whether Happy Tax was required to disclose the Liberty Tax Action and The Bronx Tax Action. Specifically, the regulation

provides, in pertinent part, that the following prior actions in ITEM 3 of the Franchise Disclosure Document:

> (ii) Was a party to any material civil action involving the franchise relationship in the last fiscal year. For purposes of this section, "franchise relationship" means contractual obligations between the franchisor and franchisee directly relating to the operation of the franchised business (such as royalty payment and training obligations). It does not include actions involving suppliers or other third parties, or indemnification for tort liability.
>
> (iii) Has in the 10–year period immediately before the disclosure document's issuance date:
>
>> (A) Been convicted of or pleaded nolo con- tendere to a felony charge.
>>
>> (B) Been held liable in a civil action involving an alleged violation of a franchise, antitrust, or securities law, or involving allegations of fraud, unfair or deceptive practices, or compar- able allegations. "Held liable" means that, as a result of claims or counterclaims, the person must pay money or other consideration, must reduce an indebtedness by the amount of an award, cannot enforce its rights, or must take action adverse to its interests.

16 CFR § 436.5(c).

Mr. Garner's testimony will not simply recite the regulatory scheme. Mr. Garner's testimony regarding franchise disclosure requirements and compliance with franchise regulations will provide context to the jury as to what is a Franchise Disclosure Document, the purpose of the FTC Franchise Rule, the purpose of ITEM 3 disclosures, the practice of preparing an ITEM 3 disclosure, the role of the franchise lawyer in preparing Franchise Disclosure Documents, whether there is a duty to disclosure beyond what is required by the FTC Franchise Rule, explaining the nature of the 2 prior actions in the context of the disclosure requirements, and explaining the use of releases in franchise relationships.

Similarly, Mr. Roderick's testimony can assist a jury in understanding what is a security, what are "registered" and "unregistered" securities, the prevalence of offering "unregistered" securities, in what circumstances may an issuer offer an unregistered

securities, the difference between a franchise and a security, and assistance interpreting the regulatory scheme.

Neither Mr. Garner or Mr. Roderick will define governing law or suggest he is instructing the jury on the law. Rather, he will confine his testimony to explaining his procedures, standards, customs, usage and practice among franchise lawyers, the trademark bar, and explain how these procedures, customs, and the like bear upon the resolution of factual issues at bar. Plaintiff's franchise law expert should be permitted to testify on custom and practice in preparing Franchise Disclosure Documents. The jury will need to understand the regulatory regime with which Happy Tax was required to comply and the industry customs and practices in complying with those regulations. The jury will also need to understand the factual nature of the 2 prior actions and of the "unregistered securities" as applied in the context of the franchise and securities regulations. Mr. Garner and Mr. Roderick will serve a useful purpose in that regard without usurping the role of the jury or the judge.

An expert "cannot testify to the legal implications of conduct [because] the court must be the jury's only source of law." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537 (11th Cir.1990). However, there is no per se rule against an expert witness offering testimony to explain a regulatory framework. For example, in *United States ex rel. Armfield v. Gills*, 8:07-CV-2374-T-27TBM, 2012 WL 12918276, at *1 (M.D. Fla. July 24, 2012), the Court found that the expert was not permitted to opine that Defendants' conduct constituted Medicare billing fraud or was 'illegal' because those opinions are legal conclusions, but permitted the expert to testify regarding Medicare billing requirements and compliance with Medicare rules and regulations. Experts have been permitted to provide factual conclusions based on their review and analysis of the evidence and relevant regulatory guidance. *See Coquina Investments v. Rothstein*, 10-60786-CIV, 2011 WL 4949191, at *5 (S.D. Fla. Oct. 18, 2011) (allowing opinions

that "provide factual conclusions based on Ms. Ghiglieri's review and analysis of the evidence and relevant regulatory guidance," but excluding opinions that summarize the evidence and "provide a general conclusion that the evidence indicates TD Bank participated in fraud."); *Georgian v. Zodiac Grp., Inc.*, No. 10–60037, 2011 WL 2530967, at *3 (S.D.Fla. Jun.23, 2011); *Kearney v. Auto–Owners Ins. Co.*, No. 06–595, 2009 WL 3712343, at *5 (M.D.Fla. Nov.5, 2009) ("While [the expert's] opinion overlaps the language of the statute, [he] is providing a factual conclusion-that [defendant] acted fairly and honestly, and that it acted after giving due regard to [the plaintiff's] interests-not a legal conclusion.").

Accordingly, Mr. Garner and Mr. Roderick should not be excluded.

V. CONCLUSION

**WHEREFORE**, and for the foregoing reasons, Plaintiffs, HAPPY TAX FRANCHISING, LLC and MARIO COSTANZ, respectfully request that this Honorable Court enter an Order: (i) denying Defendants' Motion to Strike; and (ii) such other and further relief as this Honorable Court deems just and proper.

Dated: January 27, 2023         Respectfully submitted,

**HIRZEL DREYFUSS & DEMPSEY, PLLC**
*Counsel For Plaintiffs*
121 Alhambra Plz, Suite 1500
Coral Gables, Florida 33134
Telephone: (305) 615-1617

By: /s/_Leon Hirzel_
    **LEON F. HIRZEL**
    Florida Bar No. 085966
    hirzel@hddlawfirm.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that the foregoing document was filed on January 27, 2023 via CM-ECF, which will generate Notices of Electronic Filing to all counsel of record.

By: /s/_Leon Hirzel_
**LEON HIRZEL**