UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:19-cv-24539-FAM

HAPPY TAX FRANCHISING, LLC, *et al.*

    Plaintiffs,

v.

JAMEY HILL, *et al.*,

    Defendants.

**THIRD-PARTY PLAINTIFFS' OBJECTIONS TO**
**JANUARY 25, 2023 REPORT AND RECOMMENDATION**

    Jamey Hill, The JL Hill Group LLC, Tricia Drago and Banyan Accounting, LLC ("Third-Party Plaintiffs") respectfully object to Magistrate Judge Louis's January 25, 2023 Report and Recommendation [D.E. 345] ("R&R") as to third-party defendant Ted Muftic's ("Mr. Muftic") motion for summary judgment.

**I.  THIRD-PARTY PLAINTIFFS' SECURITIES FRAUD CLAIMS WERE FILED NO MORE THAN TWO YEARS AFTER THEY DISCOVERED OR A REASONABLY DILIGENT PLAINTIFF WOULD HAVE DISCOVERED "FACTS CONSTITUTING THE VIOLATION"**

    In the R&R, Magistrate Judge Louis concludes that "summary judgment is proper as to Counts II, III, and IV, on the ground that the statute of limitations bars those claims" and recommends that the Court grant Mr. Muftic's motion "to the extent it requests entry of summary judgment on…statute of limitations grounds." [D.E. 345 at 29, 31]. The net effect of that conclusion and recommendation is to deprive Third-Party Plaintiffs of a trial on the merits of their securities fraud claims, based on an errant ruling that Third-Party Plaintiffs filed their claims a mere 12 days late. Respectfully, the magistrate judge's ruling turns on inaccurate factual findings and improper inferences, and on misapplication of controlling law. Properly applied, controlling

1

law and the "combined body of evidence presented" would preclude directed verdict for Mr. Muftic at trial. *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 249-50 (1986).

### A.     Errant Factual Findings and Improper Inferences

Through four facts the magistrate judge thought "uncontroverted" and adverse inferences drawn from such facts, however, the magistrate rules that Third-Party Plaintiffs' securities fraud claims accrued on September 5, 2019 [D.E. 345 at 30-31]. Those facts and adverse inferences, and the evidentiary record that shows each to be disputed or unwarranted, are as follows:

   1.   The alleged "May of 2019" statement. In the R&R, the magistrate judge writes:

> Thereafter, in May of 2019, Drago told Monica Poirier that she "believed that Mario [Costanz] was a criminal and a fraud, and the business was fraudulent." [T]his fact is uncontroverted [D.E. 345 at 10].

Elsewhere in the R&R, the magistrate judge restates that fact:

> [I]n May of 2019 [] Drago believed Costanz was a criminal and a fraud, and that the business was fraudulent [D.E. at 345 at 25] (alteration supplied).

Still later in the R&R, the magistrate judge restates that fact and makes the following inference:

> Here, Muftic has adduced undisputed evidence that in May and June of 2019, Third-Party Plaintiffs suspected that the Happy Tax Franchise was fraudulent, as Third-Party Plaintiffs do not contest that Hill and Drago separately told Poirier that they believed the Happy Tax Franchise was fraudulent and that HT Franchising's financial statements or financial disclosure documents were fraudulent, respectively…These communications show that Hill and Drago were aware, *months* before September 17, 2019, of the potential (in)accuracy of HT Franchising's and HT Holdings's financial statements and franchise disclosure documents [D.E. 345 at 29] (emphasis in original).

As the evidentiary record makes clear, Tricia Drago never made any such statement to Monica Poirier or anyone else:

> I did not tell Monica Poirier (or anyone else) that Mario Costanz was a criminal or that Happy Tax Franchising, LLC's FDD or its financial statements were "fraudulent" [D.E. 316 at 37, ¶ 12].

2

According to the R&R, the sole evidentiary source of the alleged May of 2019 statement is an entirely unresponsive 10-line excerpt from Monica Poirier's July 18, 2022 deposition transcript [D.E. 345 at 10, 25, 29]. To the following question, Ms. Poirier voluntarily blurted out her version of a purported conversation that supposedly took place more than three years in the past:

**Q.    So, Ms. Poirer, how is it that you came to, you agreed to look at this data and prepare a forecast?**

A.    Well, like I stated before, I bought a franchise in August of 2018. So I am a franchisee, and I had started getting clients in January of 2019. I had six clients. And then around April I noticed that the clients, the six clients that I had, it was taking a long time to complete returns and they all automatically got put on extension, and I thought it was a little strange. And then Tricia called me in May to tell me that the company ran out of money and they had to furlough out all the accounting folks, so I was a little shocked. I'm, like, what do you mean? What happened? And she basically told me that they ran out of money. And she was having meetings, she set up meetings with franchisees to tell them about this, and that she believed that Mario was a criminal and a fraud, and the business was fraudulent, is what she told me.

[D.E. 295-3 at 5-6]. According to Ms. Poirier, Ms. Drago supposedly said this within the context all significant area representatives and franchisee ("Partners") working together to "figure out a way to try and save the company" [*Id*.; D.E. 316 at 36, ¶¶ 8-9; D.E. 316 at 46-7, ¶¶ 7-8]. To that end, Ms. Poirier and Mario Costanz told Ms. Drago, Mr. Hill and other Partners to solicit new investments exceeding $1.0 million and sell more than 80 unit franchises before year-end 2019 [D.E. 316 at 37, ¶ 13; D.E. 316 at 47, ¶ 11]. In the summer of 2019, to accurately describe the company and investment opportunities to potential investors or franchisee, Ms. Drago and Mr. Hill requested updated franchise disclosure documents and updated audited financial statements [D.E. 345 at 11]. As the magistrate judge noted, this fact is undisputed [*Id.*].

As such, at the very least, Third-Party Plaintiff controverted the May of 2019 statement fact. Ms. Poirier's own deposition testimony shows that her accusation as to Ms. Drago is at least

suspect. Further, as Ms. Drago did not make the statements that Ms. Poirier purports to attribute to her, in light of Ms. Poirier's and Mr. Costanz's instructions to solicit more investments and sell 80 franchises, Third-Party Plaintiffs had no suspicion "that the Happy Tax Franchise was fraudulent" nor any awareness "months before September 17, 2019, of the potential (in)accuracy of ["Happy Tax"] financial statements and franchise disclosure documents", as the magistrate incorrectly inferred. *Anderson*, 477 U.S. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in in his favor.").

2. <u>The alleged "between May and July 2019" statement</u>. In the R&R, the magistrate judge states:

> Between May and July 2019, Hill told Poirier that HT Franchising's financial statements or franchise disclosure documents were fraudulent…[T]he fact is uncontroverted [D.E. 345 at 10].

Later, the magistrate judge restates this fact:

> "…evidence from around the same time that Hill told Poirier that HT Franchising's financial statements or franchise disclosure documents were fraudulent [D.E. 345 at 25].

As the evidentiary record shows, Jamey Hill never made any such statement to Ms. Poirier or anyone else:

> I did not tell Monica Poirier (or anyone else) that Mario Costanz was a criminal, that Happy Tax Franchising, LLC's FDD or its financial statements were "fraudulent" or that Happy Tax Franchising, LLC was "a fraud" [D.E. 316 at 47, ¶ 10].

> Jamey Hill did not tell Monica Poirier (or anyone else) that Happy Tax Franchising, LLC was "fraudulent" or that its FDD or its financial statements were "fraudulent" [D.E. 316 at 37, ¶ 12].

Further, like the alleged May of 2019 statement, the magistrate judge's sole evidentiary source for the between May and July 2019 is an excerpt from Ms. Poirier's deposition transcript [D.E. 345 at 10, 25, 29]. In this excerpt, however, Ms. Poirier says she "would have to go back

4

and look" for any false or defamatory statement to impute to Mr. Hill, but later spontaneously volunteers that Mr. Hill maybe said "the financials were fraudulent and the FDD was fraudulent" perhaps in an e-mail message, a text message or in a telephone call, sometime during a four-month period [D.E. 295-3 at 70-1].

Clearly, Third-Party Plaintiff controverted the alleged between May and July 2019 statement fact. Here again, Ms. Poirier's own deposition testimony shows that her accusation as to Mr. Hill is at least suspect. Further, as Mr. Hill did not make the statements that Ms. Poirier purports to attribute to him, and Ms. Poirier and Mr. Costanz directed him solicit more investments and sell 80 franchises, Third-Party Plaintiffs had no suspicion "that the Happy Tax Franchise was fraudulent" nor any awareness "months before September 17, 2019, of the potential (in)accuracy of ["Happy Tax"] financial statements and franchise disclosure documents", as the magistrate incorrectly inferred. *Anderson*, 477 U.S. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in in his favor.").

        3.     The "June 2019 text message". In the R&R, the magistrate quotes from a text message that Monica Poirier does not recall receiving or reading [D.E. 295-3 at 51]:

> Would you have invested if you knew HT didn't have a real tax department? I was told we had over 100 tax pro[*sic*] nationwide[.] That's why I invested so much[.] How comfortable would you be pitching investors when you know there is a high chance of a class action coming against HT – Mario/Ted for misrepresentation, fraud among other things [D.E. 345 at 10-11].

The text message does not bear a date [D.E. 295-4] and Ms. Poirier did not testify during her deposition that the text message was sent or received in June 2019 [D.E. 295-3 at 51]. The magistrate judge omitted the following fact advanced in the text message:

> I'm must really torn at this point. I want Mario to raise the money but I don't think…[D.E. 295-4].

The magistrate judge concludes, however, "The facts advanced in the text messages are thus

uncontroverted" [D.E. 345 at 11].

Later in the R&R, the magistrate judge reinterprets the text message to say:

…a June 2019 text message from Drago to Poirier wherein Drago asserts that a class action would be filed against Muftic and Costanz for misrepresentation and fraud [*Id.*]

As the evidentiary record reflects, Ms. Drago did not assert that a class action would be filed against Messrs. Muftic and Costanz:

Tricia Drago did not threaten or advocate for a "class action lawsuit" against Mario Costanz or Ted Muftic for fraud or misrepresentation or anything else during the conference calls [D.E. 316 at 47, ¶ 8].

Many area representatives and franchisees expressed their frustrations with Happy Tax Franchising, LLC operations and executives, and questioned why Happy Tax Franchising, LLC had run out of money after having collecting significant sums in area representative and franchise fees. Some vented about a "class action lawsuit" and occasionally used the words "fraud" and "misrepresentation" – Monica Poirier was among those area representatives and franchisees. I did not threaten or otherwise advocate for a "class action lawsuit" against Mario Costanz, Ted Muftic or anyone else, as I wanted Happy Tax Franchising, LLC to succeed [D.E. 316 at 36, ¶ 9].

In this context, I wrote in a text message to Monica Poirier, using rhetorical questions like "would you have invested…?" and "how comfortable would you be pitching to investors…?" to illustrate my position. I did not threaten to file any class action against Mario Costanz or Ted Muftic for misrepresentation or fraud [D.E. 316 at 37, ¶ 11].

For her part, Ms. Poirier confirms that the statements made in the text message were rhetorical, but also volunteers:

A. Yes. She's saying that she didn't feel comfortable because she believed there was fraud.

Q. **Actually, she is saying there's a high chance of a class action coming. Did you ever ask Mrs. Drago why she believes there is a high chance of a class action coming?**

A. I think, you know, I don't really recall exactly but that's when she was having these meetings with other franchisees and telling them about this situation and asking them to join, I don't know, some type of class action.

6

[*Id.*]. Ms. Poirier also confirmed that Ms. Drago did not threaten or assert that a class action lawsuit would be filed against Messrs. Costanz and Muftic. Rather, an unidentified Kentucky franchisee (or franchisees) talked about a class action lawsuit [*Id.*]

The evidentiary record makes clear that the inferences that the magistrate judge made as to the June 2019 text messages are errant and unwarranted. Specifically, the text message was neither authenticated nor dated; the content of the test message is entirely rhetorical; and Ms. Drago never threatened or asserted (in this text message or otherwise) that a class action would be filed against Muftic and Costanz for misrepresentation and fraud. *Anderson*, 477 U.S. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in in his favor.").

    4.  The "September 5, 2019 list of questions." For the first time in Mr. Muftic's Reply, he argues that because Ms. Drago and Mr. Hill, among other Partners, wrote to Ms. Poirier and Mr. Costanz and others on September 5, 2019, Third-Party Plaintiffs "knew of the facts underlying their claims" as of that date [D.E. 332 at 7]. Mr. Muftic offers no evidentiary or legal support for his quantum leap to his conclusion.

According to the R&R, the magistrate judge adopted Mr. Muftic's argument, but made a different inference:

> Thus, not only were Third-Party Plaintiffs aware of the potential (in)accuracy of HT Franchising's and HT Holdings's financial statements and franchise disclosure documents, as noted above, they also sought an audience with Third Party Defendants regarding the very issues that underlie their current claims [D.E. 345 at 31].

The evidentiary record shows, however, that Third-Party Plaintiffs' were not "aware of [any] potential inaccuracy of [Happy Tax's] financial statements and franchise disclosure documents" as of September 5, 2019, merely because they sought internal financial and operating information and asked questions to alleviate their concerns:

7

> Mario Costanz announced that he had appointed Monica Poirier as Happy Tax Franchising, LLC's newly-appointed CEO" and "CFO" in July 2019. Ms. Poirier continued to ask me and other area representatives and franchisees to solicit at least $1.0 in investments from new investors and to sell more than 80 unit franchises before December 31, 2019.
>
> Ms. Poirier announced in July 2019 that Happy Tax Franchising, LLC had received a $1.0 investment from a new investor. According to Ms. Poirier, she had hired CPAs to prepare income tax returns and that all "back-logged" returns has been completed, and franchisees would be paid their long overdue "commissions" in the near future.
>
> As summer progressed, I asked Ms. Poirier when Happy Tax Franchising, LLC's updated FDD and its updated audited financial statements would be distributed to area representatives and franchisees and filed with state regulatory agencies. Ms. Poirier replied that that she would make the updated FDD and audited financial statements available to me and others when they were completed.
>
> I asked Ms. Poirier for the updated FDD and audited financial statements, among other operating financial information, during "partner" conference calls, through early September 2019. She declined to answer my questions or provide the information I asked for.
>
> On or about September 5, 2019, I and other area representatives and franchisees, wrote to Mario Costanz and Monica Poirier, among other Happy Tax Franchising, LLC management and "board" members, to express our collective concern with Happy Tax Franchising, LLC's operational and financial instability, leadership's unwillingness to provide Happy Tax Franchising, LLC internal financial information, the accuracy of statements made in Happy Tax Franchising, LLC's FDDs, and the accuracy and validity of Happy Tax Franchising, LLC's purported audited financial statements.

[D.E. 316 at 37-8, ¶¶ 13-17; D.E. 316 at 47-8, ¶¶ 11-15]. The magistrate judge offers no evidentiary basis for her adverse and unwarranted inference. *Anderson*, 477 U.S. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in in his favor.").

### B. Misapplication of Controlling Law

A Section 10(b) securities fraud "cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting

the violation'". *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010); 28 U.S.C. § 1658(b). "Facts constituting the violation" include "the fact of scienter, 'a mental state embracing the intend to deceive, manipulate, or defraud'" *Id*.; and at 559 U.S. at 649 ("We consequently hold that facts showing scienter are among the facts that 'constitut[e] the violation"); a material false statement or misrepresentation or omission; a connection with the purchase or sale of a security; reliance on the material false statement or misrepresentation or omissions; economic loss; and a causal connection between the material false statement or misrepresentation or omission and the loss (*i.e.* "loss causation*")*. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1295 (11th Cir. 2011).

Further, "Congress had enacted special heightened pleading requirements" for the scienter element of a Section 10(b) claim. *Merck & Co*., 559 U.S. at 649 citing 15 U.S.C. §§ 78u-4(b)(2) (requiring plaintiffs to "state with particularity *facts* giving rise to a strong inference that the defendant acted with the required state of mind") (emphasis in original).

In the R&R, the magistrate judge found Third-Party Plaintiffs' evidence of uncontested facts of no moment. This is true despite that, as of September 17, 2019, neither Ms. Drago nor Mr. Hill knew the falsity or misleading nature of the following statements, representations and omissions:

    a.    Happy Tax Franchising, LLC never had a "revolutionary business model", never had a unique business "System" nor any "proprietary" technology, as it used licensed, commercially available to transmit information and to prepare income tax return forms;

    b.    Happy Tax Franchising, LLC never had a "back office" staffed with many CPAs, each with more than 5 years' experience in taxation and having completed more than 1000 returns;

    c.    Every customer's income tax return had not been prepared by a CPA;

    d.    The 15% "CPA fee" or "Preparation Fee" that Happy Tax Franchising, LLC collected from each customer's payment was never collected for

or paid to any CPA to prepare every customer's income tax return.

   e. Mario Costanz never owned or sold 99 Liberty Tax® franchises or the development rights for Liberty Tax® franchises for several New York counties;

   f. Mario Costanz's poor management of Valerie-ann Kelly's Liberty Tax® franchise locations such that JTH Tax, Inc. sued for breach of and to terminate her Liberty Tax® franchise agreements on October 31, 2014 (only two days after JTH, Inc. sued Mario Costanz and Zee Calls, LLC on October 29, 2014);

   g. Mario Costanz never invested $1.2 million in Happy Tax Franchising, LLC;

   h. Mario Costanz had never owned or operated a franchisor company.

   i. Happy Tax Franchising, LLC had no board of directors or any other corporate governance to control for and prevent Mario Costanz's misuse, domination and manipulation of Happy Tax Franchising, LLC's financial accounts, assets and purported internal accounting records;

   j. Keith Alessi was never a Happy Tax Franchising, LLC or Happy Tax Holdings Corp. "board of director"; and, T. Muftic was chief financial officer for Happy Tax Franchising, LLC and Happy Tax Holdings Corp. in name only -- a façade Mario Costanz and T. Muftic used to mislead potential investors to think Happy Tax Franchising, LLC and Happy Tax Holdings Corp. were legitimate, properly managed companies.

   k. Happy Tax Franchising, LLC's purportedly "audited" fiscal year 2017 and 2018 "financial statements" contained material misstatements and were not free of material omissions, and Happy Tax Holdings Corp. had no "operations", revenue, earnings, assets or income in fiscal years 2017 or 2018 or otherwise;

   l. Fraud, unfair business practices and similar claims were asserted against Mario Costanz in *JTH Tax, Inc. d/b/a Liberty Tax Service v. Mario Costanz and Zee Calls, LLC*, Case No. 2:14cv554 (E.D. Va. Oct. 28, 2014);

   m. Mario Costanz failed to disclose the *JTH Tax, Inc*. lawsuit or his attempt to have the complaint in that action "sealed" to prevent potential Happy Tax Franchising, LLC franchisees and area representatives from discovering the fraud and similar claims that had been asserted against him;

   n. Mario Costanz caused Happy Tax Franchising, LLC to be sued in *Bronx Tax, LLC v. HubTax, LLC, Happy Tax Franchising, LLC, and Mario*

10

*Costanz*, Case No. 650617/2017 (Sup. Ct. New York Feb. 3, 2017), caused Happy Tax Franchising, LLC to agree to entry of a $50,000 consent judgment and defaulted in his and Happy Tax Franchising, LLC's payment obligations under a settlement agreement, such that a $181,423.36 consent judgment was entered against Mario Costanz on November 11, 2018;

   o. Happy Tax Holdings Corp. had no employees, no "operating history" and never earned any "revenue from tax preparation operations";

   p. Happy Tax Holdings Corp. had no "cash and cash equivalents and loan currently receivable" as of March 2017 or afterward;

   q. Happy Tax Franchising, LLC had not "changed from LLC to Delaware C Corporation in Feb[sic] 2017";

   r. Michael Hadzipanajotis did not audit any Happy Tax Franchising, LLC or Happy Tax Holdings Corp. financial statements, pursuant to generally accepted auditing standards ("GAAS") or otherwise.

   s. Michael Hadzipanajotis was never licensed or otherwise qualified to audit and report on Happy Tax Franchising, LLC's or Happy Tax Holdings Corp.'s financial statements;

   t. "Michael J. Hadzipanajotis, CPA, CPA & Consulting Services" was never licensed nor otherwise qualified to audit and report on Happy Tax Franchising, LLC's or Happy Tax Holdings Corp.'s financial statements;

   u. Michael Hadzipanajotis had no reason or factual basis to opine that any Happy Tax Franchising, LLC or Happy Tax Holdings Corp. financial statement "present[ed] fairly, in all material respects, the financial position of [Happy Tax Franchising, LLC or Happy Tax Holdings Corp.] and the results of [their] operations and [their] cash flows for [any] year then ended in accordance with accounting principles generally accepted in the United States of America";

   v. Happy Tax Franchising, LLC's and Happy Tax Holdings Corp.'s financial statements for fiscal years 2016, 2017, 2018 and 2019, were not prepared, maintained or "restated" in accordance with GAAP;

   w. Michael Hadzipanajotis knowingly and intentionally violated 252 CMR sections 3.02(1), 3.05(2)(a)(1); Chapter 112, Massachusetts General Laws, sections 61(3), 87C1/2(a)(5) and 87C1/2 (a)(9).

   x. Happy Tax Franchising, LLC never had more than 100 CPAs in its "back office" ready to quickly and accurately prepare each customer's income tax return;

    y. Each of Happy Tax Franchising, LLC's purported CPAs did not have over five years of experience in taxation or had personally prepared at least 1000 income tax returns;

    z. Happy Tax Franchising, LLC did not have a competent, experienced corporate governance and management "team", and no internal financial, accounting or other controls were in place; and,

    aa. Mario Costanz restricted Ted Muftic's access to Happy Tax Franchising, LLC's and Happy Tax Holdings Corp.'s accounting and internal financial data, such that Ted Muftic's role as "CFO" was limited primarily to soliciting investments in Happy Tax Franchising, LLC and Happy Tax Holdings Corp.

[D.E. 316 at 43, ¶ 6; D.E. 316 at 32, ¶ 6]. Each of these foregoing facts is uncontroverted. *Anderson*, 477 U.S. at 255 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in in his favor.").

The magistrate judge similarly discounted Third-Party Plaintiffs' evidence that shows each of the following uncontested material facts:

> On or about September 20, 2019, [Mr. Hill and Ms. Drago] obtained access to Happy Tax Franchising, LLC's September 13, 2019 unit and area representative arrangement FDDs. Included in those FDDs were Happy Tax Franchising, LLC's and Happy Tax Holdings Corp.'s "consolidated" financial statements for the fiscal year-ends April 30, 2019; April 30, 2018 and April 30, 2017. As in all years prior, Michael Hadzipanajotis reported that he had audited those statements "in accordance with generally accepted auditing standards" and determined they were "free of material misstatement".
>
> [Mr. Hill and Ms. Drago] saw that Ms. Poirier and Michael Hadzipanajotis had "restated" virtually every metric in Happy Tax Franchising, LLC's audited financial statements for fiscal year-ends April 30, 2018 and April 30, 2017. But, they gave no explanation for the restated figures, in the statement notes or elsewhere. According to the "restated" financial statements for fiscal year 2018, collected franchise fees were actually $334,000 less (or 20% less) than originally reported. Similarly, collected income tax preparation fees were really $385,000 less (or 60% less) than first reported in 2018. When reported originally in 2018, Happy Tax Franchising, LLC's total revenue was actually overstated by $719,000 (or 28%), while net income was overstated by $659,000 (or 208%). Happy Tax Franchising, LLC's liabilities for fiscal year ending 2018 were understated by $592,000 (or 165%). Also, as a result of these restatements, the fiscal year end April 30, 2018, which originally reported net income of $317,000, was actually a

    net loss of $342,000 (or 208%).

    Also, for fiscal year 2017, total claimed "other operating expenses: increased $375,000 (or 2877%) than first reported in 2017, liabilities were understated by $286,000 (or 92%) than first reported in 2017, and equity decreased $186,000 (or 30%). As a result of these restatements, the fiscal year ending April 30, 2017, which originally reported net income of $594,000, was actually a net loss of $111,232 (or 119%).

    As neither Monica Poirier, Mario Costanz nor any other Happy Tax Franchising, LLC officer provided any explanation for the restated 2018 and 2017 financial statements, I, along with other area representatives and franchisees, made a September 27, 2019 formal inquiry with the Massachusetts Board of Accountancy, to express our concerns as to Happy Tax Franchising, LLC's irregular and misleading "audited" financial statements. In November 2020, the Massachusetts Board responded and reported that Michael Hadzipanajotis had violated Massachusetts law and regulations, was subject to discipline and had surrendered his CPA license to avoid discipline.

[D.E. 316 at 48-9, ¶¶ 16-19; D.E. 316 at 38-9, ¶¶ 18-21]. As such, the magistrate implicitly ruled that Ms. Drago's and Mr. Hill's uncontroverted evidence that they did not discover the facts that "constitut[e] the violation" at any time prior to September 17, 2019, is of no moment.

But, the magistrate judge also does not apply the "when a reasonably diligent plaintiff would have discovered the 'facts constituting the violation'" provision of Section 1658(b) to the actual evidence. The R&R does not identify a single evidentiary fact that a hypothetical reasonably diligent plaintiff would have discovered at any time prior to September 17, 2019 so as to "adequately plead an effective complaint". *100079 Canada, Inc. v. Stiefel Labs., Inc*. 596 Fed. App'x. 744, 748 (11 th Cir. 2014). Rather, the magistrate judge offers only errant inferences [D.E. 345 at 29]. More to the point, a suspicion or a purported awareness of "the potential inaccuracy of [Happy Tax's] financial statements and franchise disclosure documents" are not elements of a Section 10(b) or Rule 10b-5 claim.

## IV.   CONCLUSION

    Based on the foregoing, Third-Party Plaintiffs respectfully request that the Court sustain

13

their objections, reject the magistrate judge's recommendation as to the statute of limitations and deny Mr. Muftic summary judgment.

*/s/ Lonnie L. Simpson*
Lonnie L. Simpson, Esq., FBN 821871
lsimpson@shutts.com
**SHUTTS & BOWEN LLP**
4301 W. Boy Scout Blvd., Suite 300
Tampa, Florida 33607
Telephone: (813) 229-8900
*Counsel for Third-Party Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 8, 2023, the foregoing Third-Party Plaintiffs' Objection to January 25, 2023 Report and Recommendation was electronically filed *via* EC/CMF, which will send electronic notice to counsel of record.

*/s/ Lonnie L. Simpson*
ATTORNEY
